1  JASON D. GUINASSO, ESQ. (SBN# 8478)
   HUTCHISON & STEFFEN, PLLC
2  500 Damonte Ranch Parkway, Suite 980
   Reno, NV 89521
3  Telephone: (775) 853-8746
   Facsimile: (775) 201-9611
4  jguinasso@hutchlegal.com
   *Attorney for Rebekah Charleston*

5

6              **UNITED STATES DISTRICT COURT**

7                  **DISTRICT OF NEVADA**

8

| | |
|---|---|
| REBEKAH CHARLESTON; ANGELA DELGADO-WILLIAMS; and LEAH ALBRIGHT-BYRD; | Case No.: 3:19-cv-00107-MMD-WGC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| STATE OF NEVADA; STEVE SISOLAK, in his capacity as Governor of the State of Nevada, and the LEGISLATURE OF THE STATE OF NEVADA; | |
| Defendants. | |

17      **COMES NOW**, Plaintiffs Rebekah Charleston, Angela Delgado-Williams, and Leah

18  Ablright-Byrd (collectively "Plaintiffs"), by and through their undersigned counsel of record,

19  and hereby requests an order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8),

20  and the ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties,

21  licensing brothels unconstitutional, null and void as preempted by federal law; and, a

22  preliminary and permanent injunction be issued prohibiting the State of Nevada and all of its

23  political subdivisions from continuing to implement, enforce, or put into force and effect Nev.

24  Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8).

25  / / /

# I.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Title 28 U.S.C. § 1331(2018) and Title 28 U.S.C. § 1343(3) (2018) in that the controversy arises under the United States Constitution and under 42 U.S.C. § 1983 (2018) and 28 U.S.C. § 2201 (2018) and 28 U.S.C. § 2202 (2018). This Court has authority to award attorneys' fees pursuant to 42 U.S.C. § 1988 (2018).

2.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) (2018); as Plaintiffs have operated in, the subject offenses took place in, and a substantial amount of the decisions that are the subject of this civil action were made in this judicial district.

3.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and this Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

# II.

## PARTIES

4.      Plaintiff, Rebekah Charleston is a resident of the State of Texas.  Plaintiff Rebekah Charleston has been directly impacted and harmed by the deprivation and violation of her federal rights under the United States Constitution by the actions of the State of Nevada and its officials under the color of state law by enacting Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), codifying the language authorizing legalized prostitution in licensed brothels in counties with populations less than seven hundred thousand (700,000) within the State of Nevada.

5.      Plaintiff, Angela Delgado-Williams is a resident of the State of Texas.  Plaintiff has been directly impacted and harmed by the deprivation and violation of her federal rights under the United States Constitution by the actions of the State of Nevada and its officials

under the color of state law by enacting Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), codifying the language authorizing legalized prostitution in licensed brothels in counties with populations less than seven hundred thousand (700,000) within the State of Nevada.

6.     Plaintiff, Leah Albright-Byrd is a resident of the State of Texas.  Plaintiff has been directly impacted and harmed by the deprivation and violation of her federal rights under the United States Constitution by the actions of the State of Nevada and its officials under the color of state law by enacting Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), codifying the language authorizing legalized prostitution in licensed brothels in counties with populations less than seven hundred thousand (700,000) within the State of Nevada.

7.     Defendant, State of Nevada (the "State"), organized and existing under, and by virtue of, the laws of the United States of America, has violated and continues to violate the United States Constitution by enacting Nev. Rev. Stat.  201.354(1) and Nev. Rev. Stat. 244.345(8), and by codifying the language authorizing legalized prostitution in licensed brothels in counties with populations less than seven hundred thousand (700,000) within the State of Nevada.

8.     Defendant, Legislature of the State of Nevada, is the legislative authority of this State and has violated and continues to violate the United States Constitution by enacting Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) without regard to the harm inflicted on Plaintiffs and others like Plaintiffs who have been illegally trafficked to Nevada to engage in prostitution, and by codifying the language authorizing legalized prostitution in licensed brothels in counties with populations less than seven hundred thousand (700,000) within the State of Nevada.

9.     Defendant, Steve Sisolak is the Governor of the State of Nevada and is named in this lawsuit in his official capacity only.

### III.

### GENERAL ALLEGATIONS

**A. 18 U.S.C. 2422(a) Clearly and Unambiguously was Enacted to Prevent Persons from Persuading, Inducing, Enticing, and/or Coercing any Person to Travel Across State Lines to Engage in Prostitution.**

10.    On June 25, 1910, the 61st United States Congress passed H.R. 12315, also known as "The Mann Act" (the "Act") (codified as 18 U.S.C. § 2422(a) (2018)), which criminalized the interstate or foreign commerce transport "of any woman or girl for prostitution, debauchery, or for any other immoral purpose." The primary intent was to combat prostitution, immorality, and human trafficking for the purposes of prostitution in the United States.

11.    C.F.R 22 § 40.24(b) (2018) sets forth the meaning of Prostitution as "engaging in promiscuous sexual intercourse for hire."[1]

12.    The Mann Act was amended in 1978, extending coverage to prohibit transportation for immoral purposes from "any woman or girl" to "any individual" and increased the penalties specified in the Act.

13.    The Mann Act was again substantially amended November 7, 1986. In addition to deleting the terms "debauchery" and "other immoral purpose," the new language criminalized coercion and enticement to "travel in interstate or foreign commerce … to engage in prostitution" and removed the requirement for transport on an interstate common carrier. The intent of the Act, specifically to combat prostitution and human trafficking for the purposes of prostitution, remained unchanged.  The current version specifically provides:

---

[1] Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 499, 110 S. Ct. 2510, 2512, 110 L. Ed. 2d 455 (1990). An example of the Court utilizing the C.F.R. meaning of  "reasonable" to define the statutory requirement for what constitutes "reasonable cost" to be paid to healthcare providers.

> Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

U.S.C. 18 § 2422(a).

**B. 18 U.S.C. 1591 Clearly and Unambiguously Was Enacted to Prevent Persons From Causing any Person in the Jurisdiction of the United States From Recruiting, Enticing, Harboring, Transporting, Providing, Obtaining, Advertising, Maintaining, Patronizing, or Soliciting by any Means, a Person to Engage in a Commercial Sex Act.**

14.    On October 28, 2000, the 106th Congress passed H.R. 3244, also known as the "Victims of Trafficking and Violence Protection Act of 2000" (the "TVPA") (codified as 22 U.S.C. § 7101-7114 (2018)), which criminalized human trafficking and related offenses as federal crimes with severe penalties attached and established several methods to prosecute traffickers.

15.    U.S.C. 22 § 7102(4) sets forth the meaning of Commercial Sex Act as "any sex act on account of which anything of value is given to or received by any person."

16.    The issue of trafficking in persons included those trafficked into the commercial sex industry, modern day slavery, and forced labor.

**C. Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) Directly Conflict With the Intent of Federal Law Expressed in 18 U.S.C. 2422(A) and 18 U.S.C. 1591 and Otherwise Perpetuate the Harm Federal Law was Enacted to Redress and Prevent.**

17.    The reason for vesting the power to regulate commerce in Congress was to insure uniformity of regulation against conflicting and discriminating state legislation. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 227, 20 S. Ct. 96, 101, 44 L. Ed. 136 (1899).

18.    "The purpose of Congress is the ultimate touchstone in every pre-emption

case." <u>Wyeth v. Levine</u>, 129 S. Ct. 1187, 1194-1195 (2009) (quoting <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996).

19.     The Congressional intent of the federal law as expressed through the enactment of 18 U.S.C. 2422(a) is clear, certain, and unambiguous, *to wit*, to prevent persons from persuading, inducing, enticing, and/or coercing any person to travel across state lines to engage in prostitution

20.     The Congressional intent of the federal law as expressed through the enactment of 18 U.S.C. 1591 was to ensure just and effective punishment of traffickers and to protect their victims.

21.     Nevada is the only state in the Union which allows commercialized prostitution.

22.     The State of Nevada has allowed brothel operation since the nineteenth century; however, the first officially sanctioned brothel was not in operation until 1971 when the Storey County Commission licensed the Mustang Ranch Brothel.

23.     Thereafter, the Nevada Legislature passed Assembly Bill 550, (Nev. Rev. Stat. 201.354(1)), authorizing prostitution or solicitation for prostitution in Nevada in designated brothels licensed by a county. State law presently allows counties of less than seven hundred thousand (700,000) residents to issue such licenses. Nev. Rev. Stat. 244.345(8).

24.     There are currently twenty-one (21) operational brothels, located throughout seven (7) Nevada counties (Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine).

25.     The State's creation of an intrastate commercialized prostitution market exerts a substantial economic effect, namely, the creation of an interstate and foreign prostitution market; therefore, Nevada's legal brothels, operating under Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), are in violation of and direct conflict with U.S.C. 18 § 2422(a) (2018). <u>Wickard v. Filburn</u>, 317 U.S. 111, 125, 63 S. Ct. 82, 89, 87 L. Ed. 122 (1942) (holding

1   that Congress's power to regulate "commerce" extends to intrastate activities that have an

2   "indirect effect" on trade, viz., home-grown wheat).

3   26.   Under the cover of Nevada law legalizing prostitution, brothels, brothel owners

4   and operators, and the women bought and sold in brothels for sex, actively and intentionally

5   persuade, induce, entice, and coerce men and women to travel in interstate commerce to

6   engage in prostitution by advertising and marketing brothels and the sale of people for sex to

7   individuals outside the State of Nevada through hundreds of websites, social media accounts,

8   and other mass media.  **See Exhibit 1 at 0001-0102, (Examples of Advertising and**

9   **Marketing)**. <u>**See also**</u> **Exhibit 2 at 0103-0106, (Harrison Jacobs,** *The owner of America's*

10  *most famous brothel explains how he promotes a business that's illegal to advertise,*

11  **BUSINESS INSIDER (Oct. 15, 2015, 6:28p.m.),** https://www.businessinsider.com/dennis-hof-

12  explains-how-he-promotes-a-business-that-is-illegal-to-advertise-2015-10.)[2]

13  27.   One former brothel owner explained to the "Business Insider"  in detail how

14  he promoted his brothel business nationally and internationally. Jacobs, *supra*.

15  28.   Clearly, based on the marketing, advertising and brothel owner's own

16  admissions, participants in Nevada's legal brothel industry are, "knowingly persuad[ing],

17  induc[ing], entic[ing], or coerc[ing] … individual[s] to travel in interstate or foreign

18  commerce… to engage in prostitution," in violation of federal law.

19  29.   Moreover, multiple brothel owners have brazenly spoken publicly of their

20  efforts to recruit young adult virgins from across all states and/or countries to auction their

21  virginities at their brothels.  <u>**See**</u> **Exhibit 3 at 0107-0110, (Amy B. Wang,** *'It's My Decision':*

22  *This Woman is Auctioning Off Her Virginity to Help Her Family,* **THE WASHINGTON POST**

23  _____

24  [2]Many individuals sold for sex who are based in Nevada travel. Nearly fourteen percent
    (14%) of individuals who are sold for sex in Nevada have a home base within the State but

25  advertise across multiple cities or other states.  <u>**See**</u> **Exhibit 7 at Page 9, ¶ 3.**

**(October 25, 2016),** https://www.washingtonpost.com/news/wonk/wp/2016/10/25/its-my-decision-this-woman-is-auctioning-off-her-virginity-to-help-her-family/?utm_term=.fc178e48287c.

30.     Brothel owners and operators in Nevada regularly and with impunity violate federal law. For example, one brothel owner and manager would send prostituted women out-of-state to California, Illinois, Georgia, and South Carolina to see established sex buyers whose credit cards were processed at the brothels during the time the women were provisioned, though the sex acts occurred, and the buyers were out-of-state. The prostituted women were placed on airplanes to provision sex acts in the state and city where the out-of-state sex buyer was located. <u>**See** Exhibit 4 at 0111-0114, (Affidavit of Jane Doe Victim 1).**</u>

31.     As another example, while traveling internationally to Puerto Rico and Ireland, one brothel owner would recruit women and conduct interviews for women he sought to recruit to his brothel. *Id.*

32.     Women at the other brothels were transported by brothel drivers to Lake Tahoe where they would cross into California where they were purchased for sex. When the brothel owner became aware of an investigation, drivers were instructed to drop the women off at the state border between Nevada and California and then the women would have to walk over the state line into California and get into a taxi to reach their destinations. *Id.*

33.     While pimped at a Nevada brothel, Deanne Salinger (a woman commonly referred to as "AirForce Amy") travelled with a sex buyer to Hawaii and to Mexico from Nevada to engage in prostitution. *Id.*

34.     As another example, The Moonlight Bunny Ranch brothel advertised a College Loan Match Funds Repayment Program "to recruit and entice more educated," "wholesome-looking" women to engage in prostitution at the brothel. Under this "program," the brothel management promised to match each dollar expended by the women towards repayment of

1  student loans. This advertisement was specifically used to lure women from across the United

2  States to engage in prostitution in the State of Nevada. *Id.*

3       35.    Men from other states and countries are often induced and enticed to travel

4  across state lines to the State of Nevada to engage in prostitution through various marketing

5  campaigns like the "Get Your Grandpa Laid" contest hosted in conjunction with the nationally

6  syndicated Howard Stern Radio Show. **See Exhibit 5 at 0115-0116, (*Media Ramsey- Howard**

7  ***Stern Show- Get Grandpa Laid Contest 10/23/13* YOUTUBE (October 23, 2013)**,

8  https://www.youtube.com/watch?v=8sv3n2kBsuw.

9       36.    Brothels in Nevada would not likely be financially viable without the revenue

10 generated by the efforts of brothel owners, operators and the women being bought and sold

11 to persuade, induce, entice, or coerce individuals to travel in interstate or foreign commerce

12 to engage in prostitution.

13      **C.**    **There is A Positive Correlation Between Legal Prostitution and Illegal Sex**
    **Trafficking Through Interstate and Foreign Commerce.**

14

15       37.    Legal prostitution and sex trafficking are inextricably linked in Nevada as

16 elsewhere in the world where prostitution is legal.  Sex trafficking happens when and where

17 there is a demand for prostitution. **See   Exhibit 6 at 0117-0165 (Seo-Young Cho, Axel**

18 **Dreher, & Eric Neumeyer, *Does Legalized Prostitution Increase Human Trafficking?*,**

19 **WORLD       DEVELOPMENT,      at      pg.      41,      67-82      (2012)**,

20 https://eprints.lse.ac.uk/45198/1/Neumayer    _Legalized_Prostitution_Increase_2012.pdf);

21 **See also Exhibit 7 at 0166-0188  (Crysta N. Price, Terry D. Clark, & Julie Faller,**

22 ***Nevada's Online Commercial Sex Market*, HUMAN TRAFFICKING INITIATIVE, CREIGHTON**

23 **UNIVERSITY                 (2017),**                 https://awakenreno.org/wp-

24 content/uploads/2018/05/FINAL_Nevada_March2018.pdf;) **See also Exhibit 8 at 0189-0196**

25 **(Melissa Farley, *Trafficking for Prostitution: Making the Connections*, AMERICAN**

PSYCHOLOGICAL ASSOCIATION (2007).

38.     On average, in jurisdictions with legal prostitution, there is a statistically significant larger reported incidence of illegal sex trafficking.  *Id*.   This circumstance is the result of the increased demand created by the legal sex market.  As one expert put it, "wherever prostitution is legalized, trafficking to sex industry marketplaces in that region increases." Cho, *supra* at **pg. 3 ¶2.**

39.     The U.S. State Department has explained it is the official U.S. Government position that, "prostitution is inherently harmful and dehumanizing and fuels trafficking in persons." <u>See</u> **Exhibit 9 at 0197-0198 (U.S. DEPARTMENT OF STATE, TRAFFICKING IN PERSONS REPORT at pg. 27 (2007)).**

40.     In 2002, the President of the United States issued a National Security Directive declaring, "The United States Government opposes prostitution and any related activities, including pimping, pandering, or maintaining brothels," because these activities contribute to human trafficking.[3]

41.     The U.S. Justice Department has also named Las Vegas among the 17 most likely destinations for human trafficking.[4]

42.     The links between legal and illegal prostitution in Nevada and the profound harms caused by prostitution to all women are like those in other countries where legal prostitution exists such as the Netherlands and Australia. Wherever legal prostitution exists, sex trafficking increases. Farley, *supra* at **page 3, ¶2-3.**

43.     There is more online advertising for the sex trade in Nevada than in any other

---

[3] National Security Presidential Directive – 22 (December 16, 2002).

[4] Sam Skolnik, *Do we have a human trafficking problem?,* LAS VEGAS SUN, (January 29, 2007).

1 | state.[5]

2 |      44.      Nevada's illegal sex trade is estimated to be twice as large as other states.[6]

3 |      45.      According to a Creighton University Study of Nevada's on-line commercial

4 | sex market published in May of 2018, adjusted for population, Nevada's commercial sex

5 | market is by far the largest of any state.  **See Exhibit 7 at Page 6, ¶ 1**  This circumstance is a

6 | direct result of the legal system used to induce, persuade and entice individuals to enter into

7 | interstate and foreign commerce to engage in prostitution.

8 |      46.      At least five thousand sixteen (5,016) individuals are sold for sex in an average

9 | month in Nevada.   Nevada's number of prostituted persons per capita is sixty-three percent

10 | (63%) higher than the next highest state of New York and more than twice as many per capita

11 | as in California. **See Exhibit 7 at Page 5, ¶ 2**.

12 |      47.      Legalized prostitution appears to have done nothing to stem victimization

13 | within the illicit sex trade—the data shows that prostituted persons in the illegal trade around

14 | licensed brothels are at a similar risk of having been trafficked as those in areas without legal

15 | brothels. **See Exhibit 7 Page 21, ¶4.**

16 | ///

17 | ///

18 | ///

19 | ///

20 | ///

21 | ///

22 |

23 | ───────────────

[5] Melissa Farley, PROSTITUTION AND TRAFFICKING IN NEVADA: MAKING THE CONNECTIONS

24 | (Prostitution Research & Education, 2007).

25 | [6] *Id.*

48.     Prostitution is modern day slavery.[7]  Like those subjected to slavery, the prostituted are subject to domination and to the arbitrary will of another person.   A woman in a Nevada legal brothel explained, "No one really enjoys being sold. It's like you sign a contract to be raped." <u>See</u> **Exhibit 10 at 0199-0211 (Melissa Farley,** *Risks of Prostitution: When the Person Is the Product* **3 Journal of the Association for Consumer Research (2017)),** https://www.journals.uchicago.edu/doi/full/10.1086/695670   citing (Farley 2007b, 34).

49.     Prostitution is inherently an act of sexual coercion, is a form of sexual violence and is integrally connected to sex trafficking, drug abuse, brutality, rape, and murder.

50.     Prostitution and sex trafficking are closely linked. There is no demand for sexually trafficked persons per se.[8]  Rather, it is the prostitution industry by which sexually trafficked persons are exploited. <u>See</u> 22 U.S.C.A. § 7101, (Purpose and Findings" of the

---

[7] U.S. Department of State, *What is Modern Slavery?,*  https://www.state.gov/j/tip/what/. The federal government explained:

> When an adult engages in a commercial sex act, such as prostitution, as the result of force, threats of force, fraud, coercion or any combination of such means, that person is a victim of trafficking. Under such circumstances, perpetrators involved in recruiting, harboring, enticing, transporting, providing, obtaining, patronizing, soliciting, or maintaining a person for that purpose are guilty of sex trafficking of an adult. Sex trafficking also may occur through a specific form of coercion whereby individuals are compelled to continue in prostitution through the use of unlawful "debt," purportedly incurred through their transportation, recruitment, or even their "sale"—which exploiters insist they must pay off before they can be free. Even if an adult initially consents to participate in prostitution it is irrelevant: if an adult, after consenting, is subsequently held in service through psychological manipulation or physical force, he or she is a trafficking victim and should receive benefits outlined in the Palermo Protocol and applicable domestic laws.

[8] Dorchen A. Leighholdt, *Prostitution and Trafficking in Women: An Intimate Relationship*, 2 JOURNAL OF TRAUMA PRACTICE 167, 167-168 (2003).

Trafficking Victims Protection Act) ("Many of these persons [sex trafficking victims] are trafficked into the international sex trade, often by force, fraud, or coercion. The sex industry has rapidly expanded over the past several decades. It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution…."). In fact, prostitution often satisfies the elements of trafficking.[9].

51.     Moreover, in most cases, the very act of prostitution should be considered sex trafficking since the exchange of money (or something of value) to obtain a sex act is an act of sexual coercion.[10]

/ / /

/ / /

/ / /

---

[9] U.N. ESCOR, COMM'N ON HUMAN RIGHTS *Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children*, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda) ("For the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking.")

[10] Melissa Farley, *Prostitution is Sexual Violence*, PSYCHIATRIC TIMES (October 1, 2004), http://www.psychiatrictimes .com/ sexual-offenses/prostitution-sexual-violence; Melissa Farley, Very Inconvenient Truths: Sex Buyers, Sexual Coercion, and Prostitution-Harm-Denial, THE HAMPTON INSTITUTE (February 26, 2016), http://www.hamptoninstitution.org/                                    capitalism-coercion-and-prostitution.html#.WBCyzJMrIRE; and Yael Mellul & Lise Bouvet, *Why France Is Adopting A New Law That Criminalizes The Clients, Not Prostitutes*, HUFF POST (April 7, 2016), http://www.huffingtonpost.com/yaelmellul/why-france-is-adopting-a-_b_9635988.html.  "In these transactions, the money coerces the sex rather than guaranteeing consent to it, making prostitution a practice of serial rape."

52.     According to a 2002 research study[11] of prostituted women in Chicago, nearly all prostituted persons studied had been "victimized by physical assaults". Raphael & Shapiro, *supra* at 18 (showing a table of "12 specific acts of violence [that] are those most frequently experienced by the respondents") ("in escort services, half of the women had ever been raped, and they were also subjected to other forms of violence, including slapping and being grabbed … Even women engaging in prostitution in their own residences – women many view as being in control – reported frequent violence, including 21% having been raped 10 or more times."). This level of violence, especially from the hands of sex buyers, speaks to the inherent danger of being a prostitute, with the most violent aspect of the job being the job itself, interacting with the customer.

53.     Survivors have described their experiences of prostitution as "paid rape," "pay-as-you-go rape," and "being raped for a living."[12] "Indeed, rape is the defining experience of prostitution: the fear of it, the daily hypervigilance required to prevent it, the crushing physical and psychological trauma experienced by victims when it inevitably occurs."[13]

/ / /

/ / /

/ / /

/ / /

---

[11] Raphael, Jody & Deborah L Shapiro, SISTERS SPEAK OUT: THE LIVES AND NEEDS OF PROSTITUTED WOMEN IN CHICAGO 13 (2002).

[12] Rachel Moran, PAID FOR: MY JOURNEY THROUGH PROSTITUTION 112-113 (2013).

[13] Lisa Thompson, PROSTITUTED AND SEXUALLY TRAFFICKED PERSONS ARE RAPE VICTIMS, TOO (2016), HTTPS://WWW.SANE-SART.COM/PROSTITUTED-AND-SEXUALLY-TRAFFICKED-PERSONS-ARE-RAPE-VICTIMS-TOO/.

54.     Nevada's legal brothels are estimated to generate more than seventy-five million dollars ($75,000,000) per year, while Las Vegas's illegal prostitution market is estimated to gross over five billion dollars ($5,000,000,000) per year. **See Exhibit 11 at 0212-0217, (RONALD B. FLOWERS, PROSTITUTION IN THE DIGITAL AGE: SELLING SEX FROM THE SUITE TO THE STREET? at pg. 42-46 (Praeger 2011))**.

55.     Since the legalization of prostitution has been associated with increased sex trafficking, the most vulnerable people in the brothel industry are at increased risk for harm.

56.     Decriminalization of prostitution does not prevent the violence and rape in prostitution, it assents to it. The State has an important government interest in preventing such violence; thus, it has an important government interest in preventing prostitution.

57.     More than thirteen percent (13%) of Nevada prostituted persons are advertised under the age of twenty-one (21).  **See Exhibit 7 at Page 13, ¶ 1**.

58.     More than one (1) out of every ten (10) prostituted persons in Nevada is too young to buy alcohol. These young individuals are almost twice as likely to travel in interstate and foreign commerce while being prostituted compared to those who are twenty-one (21) and older.  **See Exhibit 7 at Page 13, ¶ 2**.

59.     Many prostituted persons are advertised for their youth, regardless of their stated age. For example, phrases like "fresh meat," "brand new," and "daddy's little girl" are all used to connote the youth of prostituted persons. **See Exhibit 7 at Page 13, ¶ 3**.

60.     Youth is an important characteristic sought by sex buyers in Nevada. **See Exhibit 7 at Page 16, ¶ 1**.

61.     Evidence of the importance of youth to sex buyers in Nevada comes from the advertised prices of young prostituted persons. The data shows higher prices are charged for younger females in Nevada.  **See Exhibit 7 at Page 16, Graph 1**.

62.     The data put Nevada in the top ten (10) states in the country in terms of youth

of prostituted persons.  **See Exhibit 7 at Page 13, ¶ 4.**

63.    Thirty percent (30%) of individuals sold for sex in Nevada are based in other states, and another fourteen percent (14%) travel within the State. **See Exhibit 7 at Page 9, ¶ 2.**  Moreover, many of the women prostituted in Nevada brothels are not full-time residents of Nevada, which means that they are being transported in interstate or foreign commerce to Nevada to be bought and sold for sex in the brothels.  Many women prostituted in Nevada brothels travel from out-of-state and are bought and sold for sex in the brothels for short periods of time and then return to their domicile state or country.

64.    For example, in an interview with one media outlet one woman prostituted in a Nevada brothel admitted to residing in another state in the Midwest and commuting to Nevada. In the interview, the woman also admitted that men who pay to have sex with her live in other states and travel in interstate commerce to solicit prostitution.  **See Exhibit 12 at 0218-0227b** (**Alice Little,** ***A Week as a Legal Sex Working in Mound House, NV, on a $267,000 Salary*** **Refinery 29 (Nov. 13, 2017, 1:40pm),** https://www.refinery29.com/money-diary-nevada-legal-sex-worker-salary; ***TMZ.com***, ***Robert Kraft Courted Bt Nevada Prostitutes… It's Legal Here!!! (Feb. 23, 2019, 12:40am)*** https://www.tmz.com/2019/02/23/legal-prostitutes-robert-kraft-sheris-ranch-brothel/ ).

65.    Many of women prostituted in Nevada brothels are controlled by outside pimps: "Despite the fiction that they are "independent contractors," most so-called legal prostitutes have pimps — the state-sanctioned pimps who run the brothels and, in many cases, a second pimp who controls all other aspects of their lives (and takes the bulk of their legal earnings)."[14]  One federal court acknowledged this problem recently citing a study that found that pimps remained common and some assaults against prostituted women occurred within

---

[14] Herbert, Bob (2007-09-11). "Fantasies, Well Meant". The New York Times.

Nevada's legal brothels.   <u>Coyote Publishing, Inc. v. Miller</u>, 598 F. 3d 592, 596 fn2 (2010).

66.     Connections in the Reno/Tahoe area and between Las Vegas and southern California are regional hubs and stand out as particularly important travel routes for those entering and exiting interstate commerce to Nevada to engage in prostitution.  **See Exhibit 7 at Page 21, ¶ 2.**

67.     California is by far the most important source of women who are being prostituted in Nevada from another state. Nearly fifty-five percent (55%) of prostituted women come from California, whereas Arizona, as the next most important source, supplies only about five percent  (5%).  Over the course of a year, women who are being prostituted in Nevada come from every state in the Union and the District of Columbia.  **See Exhibit 7 at Page 9, ¶ 2.**

68.     On October 3, 2018, the Lyon County Sheriff's Office conducted a series of brothel work card compliance checks, assisted by U.S. Immigration and Customs Enforcement officers, following a four (4) month internal audit of the inadequate prostitute registration practices executed by Lyon County staff. **See Exhibit 13 at 0228-0236, (Lyon County Sheriff's Office, Internal Audit Report on Brothel Compliance Requirements    (2018),**   http://media.graytvinc.com/documents/LCSO+Internal+Audit+Report+Brothels.pdf).

69.     The subject inadequate practices include: US immigration law violations, foreign country human trafficking indicators, fraudulent statements, issuance of work cards prior to completing criminal history background checks, and inability to validate out-of-state, U.S., and other foreign national documents to determine identity.

70.     In a statement following the investigations, Sheriff Al McNeil of the Lyon County Sheriff's Office noted, "the discovery of U.S. immigration law violations in our legal brothel system is extremely alarming. The ability to coerce, exploit, and traffic non-U.S.

citizens into Lyon County by foreign criminal enterprises is going to be difficult to detect and deter by our limited capabilities and resources of foreign born applicants."

71.     An audit of the Applications for Brothel Work Permits of Lyon County, NV, discovered that one hundred sixty-eight (168) out of two hundred forty-one (241) applicants for prostitute work cards reside in a state other than Nevada and must travel in interstate commerce, from their state of residence to Nevada, to engage in prostitution at the brothels. *Id.*

72.     Thirty-seven (37) of the women registered for prostitute work cards from Lyon County in 2017-2018 alone have traveled in foreign commerce, from their international permanent residence to Nevada, to engage in prostitution at the brothels. *Id.*

73.     The United Nations Office on Drugs and Crime released a document on Human Trafficking Indicators that lists thirty-six (36) general indicators and twelve (12) sexual exploitation indicators. **See Exhibit 14 0237-0239, (UNITED NATIONS OFFICE ON DRUGS AND CRIME, HUMAN TRAFFICKING INDICATORS),** https://www.unodc.org /pdf/HT_indicators_E_LOWRES.pdf). According to the Lyon County Sheriff's report, many of these indicators were observed during this audit and, therefore, require further investigation. *Id.*

74.     The federal government acknowledges the link between prostitution and trafficking in women and children, as a form of modern-day slavery. **See Exhibit 15 at 0240-0241, (U.S. DEPARTMENT OF STATE, THE LINK BETWEEN PROSTITUTION AND SEX TRAFFICKING (November 24, 2004),** https://2001-2009.state.gov/r/pa/ei/rls/38790.htm).

75.     The women who have been trafficked through Nevada's legal brothel market have been subject to the deprivation of rights, privileges, and immunities secured by the Constitution and Plaintiffs hereby submit this action pursuant to 42 U.S.C. § 1983.

/ / /

**D.**     **Plaintiff Rebekah Charleston Was a Victim of Sex Trafficking and Was Forced to Travel Within Nevada and In Interstate Commerce Across State Lines to Engage in Prostitution at Nevada Brothels, Under the Guise of Being a "Willing" Prostitute.**

76.     Plaintiff Rebekah Charleston ("Ms. Charleston") has been directly harmed as a result of Nevada's statute allowing counties of less than seven hundred thousand (700,000) people to license brothels and regulate prostitution.

77.     Ms. Charleston was born in Texas. After living on the streets homeless as a runaway,  she found solace in the arms of a person who seemed to be a nice older boyfriend. However, soon after, Ms. Charleston realized the true intentions this boyfriend had for her, which was to abuse and sexually exploit her. Soon thereafter, he trafficked Ms. Charleston for purposes of commercial sexual exploitation.  A short time later, Ms. Charleston was traded to another trafficker who would violently abuse her while sexually exploiting her all across the country.

78.     One of the first stops Ms. Charleston's sex trafficker made was to the State of Nevada, where her trafficker forced her to "get a job" at The Moonlight Bunny Ranch brothel.

79.     Ms. Charleston's sex trafficker would send Ms. Charleston and others similarly situated to perform prostitution in the Nevada brothels as a form of punishment.

80.     Ms. Charleston was not permitted to turn down a sex buyer.  None of the acts in which she engaged being consensual, she was a victim of serial rape for profit.

81.     The violence Ms. Charleston was subjected to at the hands of men who bought her was severe and dehumanizing.  Ms. Charleston was violently raped and assaulted numerous times.

82.     Ms. Charleston was not permitted to come and go as she pleased.

83.     Ms. Charleston witnessed countless other women who, like her, were being trafficked inside Nevada's legal brothels.

84.     Ms. Charleston was sexually trafficked at the brothel until her trafficker decided to move her to Las Vegas for greater profits in the illegal sex trade.

85.      During the ten years Ms. Charleston was sexually exploited, mostly in Nevada, Ms. Charleston was forced to work for multiple legal escort agencies in Las Vegas.  Escort agencies in Las Vegas facilitate illegal prostitution to meet the high demand of people traveling to Nevada to purchase sex, most of whom believe it is legal everywhere in the state.  Legal escort agencies in Las Vegas are fronts for human trafficking rings to operate.  One of the agencies Ms. Charleston was forced to work for was actually owned by a pimp named Rome who was a known associate of her trafficker.

86.     This human trafficking ring guised as a legal escort service was successfully and strategically planted in Las Vegas to intercept sex tourists planning to travel from Las Vegas to the near city of Pahrump, NV or Crystal, NV where the closest legal brothels were located.

87.     Las Vegas is a well-known destination for people who are in the market to buy women for sex. The advertising and marketing from legal brothels in places like Nye County and Lyon County persuade, induce and entice people to travel in from across the country and all over the world to purchase prostituted persons in Nevada.

88.     Ms. Charleston was sexually trafficked for more than ten (10) years before she finally escaped when federal authorities became involved.

89.     Nevada was a regular location for Ms. Charleston to be sex trafficked. No matter where else her traffickers would take her, they would always return to Nevada to sell Ms. Charleston and others similarly situated to her because Nevada is the state where there was and is the greatest demand for prostitution whether legal or illegal.

### E. Plaintiff Angela Delgado-Williams Was a Victim of Sex Trafficking and Was Forced To Travel Within Nevada and In Interstate Commerce Across State Lines To Engage In Prostitution, Under the Guise of Being a "Legal Escort."

90.     Plaintiff Angela Delgado-Williams ("Ms. Delgado-Williams") has been directly harmed as a result of Nevada's statute allowing counties of less than seven hundred thousand (700,000) people to license brothels and regulate prostitution.

91.     Sex trafficking, as defined by the Trafficking Victims Protection Act includes:

> the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act, in which the commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age.

92.     Ms. Delgado lived on her own as a seventeen (17) year old adolescent in Houston, Texas. Ms. Delgado worked two jobs to support herself and was attending college. Ms. Delgado-Williams came from an economically marginalized family and neighborhood.

93.     During this vulnerable time in her life, Ms. Delgado-Williams was identified by her first trafficker, Andre McDaniel.[15]  Mr. McDaniel introduced himself to Ms. Delgado-Williams as a "friend" and would work to gain the trust of Ms. Delgado-Williams, enticing her to go to his "modeling studio."

94.     Ms. Delgado-Williams later learned that Mr. McDaniels' "modeling studios"

---

[15]  On Monday, January, 7, 2013, Andre was ordered to serve 96 months in federal prison for his convictions of conspiracy to commit sex trafficking, one count of coercion and enticement, and two counts of transportation in relation to Operation Total Exposure, at the time, the largest domestic sex trafficking case in the Southern District of Texas.   https://www.justice.gov/usao-sdtx/pr/three-sentenced-massive-domestic-sex-trafficking-case.   Mr. McDaniels was shortly thereafter convicted for witness tampering in connection to the same case. https://archives.fbi.gov/archives/houston/press-releases/2013/witness-tampering-lands-convicted-sex-trafficker-more-prison-time .

were illegal brothels disguised as lingerie modeling studios.

95.     Mr. McDaniels leased buildings in strip malls that were located within a mile of every big strip club in Houston.

96.     Mr. McDaniels kept in contact and continued to groom Ms. Delgado-Williams until she reached the age of eighteen (18). When Ms. Delgado turned the age of eighteen (18), Mr. McDaniels increased his recruitment tactics.

97.     Ms. Delgado-Williams had no knowledge of what a pimp was. She just thought Mr. McDaniels was a rich older man that had other girls from Ms. Delgado-Williams's high school working for him. Ms. Delgado-Williams only made the observation that peers who worked for Mr. McDaniels could afford to move away from their poor childhood neighborhood.

98.     The other high school peers that "worked" for Mr. McDaniels never disclosed to Ms. Delgado-Williams the details of what they were doing for Mr. McDaniels at the "modeling studios."

99.     Mr. McDaniels was thirty-six (36) years old and Ms. Delgado-Williams was eighteen (18) years old. Ms. Delgado-Williams later learned that some of the girls who worked for Mr. McDaniels were seventeen (17) years old and others were younger.

100.    Mr. McDaniels eventually started treating Ms. Delgado-Williams like the father she never had.

101.    Mr. McDaniels supplied Ms. Delgado-Williams with marijuana, and he supplied other women and girls with Cocaine.

102.    Ms. Delgado-Williams had no idea what the life of a sex-trafficked woman was; she thought sex-trafficked women were street walkers only.

103.    Mr. McDaniels completely isolated Ms. Delgado-Williams.

104.    Mr. McDaniels groomed Ms. Delgado-Williams to his liking, slowly

1   convincing Ms. Delgado-Williams to change her appearance, such as her hair color.

2       105.    Mr. McDaniels spent thousands of dollars on lingerie for Ms. Delgado-

3   Williams.

4       106.    Eventually, through fraud and coercion, Mr. McDaniels brought Ms. Delgado-

5   Williams to his "modeling studio."

6       107.    The other woman and girls who worked for Mr. McDaniels manipulated Ms.

7   Delgado-Williams and led her to believe that performing sexual acts on men purchasing sex

8   was glamorous and that "working" for Mr. McDaniels was not different than anything she

9   would do for any other boyfriend, except she would get paid extremely well.

10      108.    In the beginning, due to the systemized coercion and dehumanization, Ms.

11  Delgado-Williams minimized  the trauma of performing sexual acts on sex buyers since she

12  was surrounded by other young women trafficked by Mr. McDaniels and his brothers.

13      109.    Ms. Delgado-Williams was swiftly forced into performing hand jobs on sex

14  buyers before she could make sense of the details.

15      110.    Ms. Delgado-Williams was not permitted to leave the illegal brothels for

16  periods as long as twenty-four (24) hours.

17      111.    Ms. Delgado-Williams did not even know how to perform some of the sexual

18  positions the sex buyers were demanding.

19      112.    Ms. Delgado-Williams started out by performing hand jobs, and eventually the

20  sex buyer would complain, and another girl would come in the room to finish the service the

21  sex buyer desired, whether it was vaginal or anal sex.

22      113.    Mr. McDaniels continued to manipulate and groom Ms. Delgado-Williams by

23  giving her special treatment and hiding the fact that the sex buyers were unhappy with Ms.

24  Delgado-Williams being uncomfortable performing sexual acts such as vaginal or anal sex on

25  sex buyers.

114.   Ms. Delgado-Williams was always the last one to come to the "Cattle Call" in hopes that a sex buyer would see a different sex trafficked woman first, so she would not have to perform sexual acts.

115.   Ms. Delgado-Williams was confused and afraid.

116.   Mr. McDaniels would tell some of the sex buyers that Ms. Delgado-Williams was underage. One sex buyer actually paid Ms. Delgado-Williams to dress like a cheerleader and meet him at the high school bleachers.

117.   Despite Ms. Delgado-Williams's distress with performing any sex acts on the sex buyers, she eventually found herself being sex trafficked, full-time for Mr. McDaniels, and thereby performing any sex act requested by the sex buyer.

118.   In common with predator grooming, suddenly, just like the rest of the girls working for Mr. McDaniels Ms. Delgado-Williams swiftly no longer received special treatment from Mr. McDaniels, and she rapidly found herself giving all of the money she earned from sex buyers to Mr. McDaniels.

119.   Ms. Delgado-Williams was only permitted to go "home" from the "modeling studio" to the shared living quarters where all the women and girls being sexually exploited by Mr. McDaniels were forced to live 1 day a week, and sometimes not at all. This was also the case with the other women and girls that worked for Mr. McDaniels.

120.   Fortunately, Ms. Delgado-Williams was able to break free from Mr. McDaniels.

121.   Subsequently, Ms. Delgado-Williams ended up stripping at a strip club chain in Houston, Texas.

122.   While Ms. Delgado-Williams was engaged by the Houston strip club, the club was cognizant of the fact that Ms. Delgado-Williams was a victim of human trafficking.

123.   The Houston strip club took advantage of the fact that Ms. Delgado-Williams

1   was a victim of human trafficking and sold her for sex in the strip clubs.

2        124.   The Houston strip club not only sold Ms. Delgado-Williams for sex but

3   generally encouraged prostitution and sex trafficking within the clubs.

4        125.   The strip club would provide special treatment to the women who were sent

5   through the clubs by pimps. Women sent through the clubs by pimps were able to interrupt

6   and take over dances from other women in the clubs without pimps.

7        126.   When the managers of the strip clubs would get upset, they would fire the entire

8   group of women dancing for the night and rehire them for an extortion fee.

9        127.   Ms. Delgado-Williams was introduced to a very violent trafficker through the

10   Houston strip club.

11        128.   While under the sexual servitude to the violent trafficker, Ms. Delgado-

12   Williams found herself browsing through the classified ads in an effort to escape.

13        129.   On or about early 2006, Ms. Delgado-Williams responded to an advertisement

14   for a job posted by Tarnita Woodward, an employee of Jamal Rashid also known as "Mally

15   Mall."

16        130.   Mr. Rashid owned many shell corporations to disguise his escort service, and

17   listed Ms. Woodward as the registered owner of many of these shell companies.

18        131.   Ms. Delgado-Williams was hired to work for Mr. Rashid's company, VIP

19   Entertainment in Dallas, Texas.

20        132.   Ms. Delgado-Williams found herself landing in Las Vegas where the demand

21   for illegal prostitution was the highest in the illegal sex trade, since sex buyers travel from all

22   over the country and world to engage in prostitution in Nevada.

23        133.   VIP Entertainment, enticed Ms. Delgado-Williams to travel across state lines

24   from Texas to Las Vegas, Nevada to be sex trafficked, under the guise of working for an

25   upscale escort service.

134. Much like Ms. Delgado-Williams's first trafficker, Mr. Rashid used methods of fraud to entice the women working for him into thinking that the work performed was glamorous and that the women were like "Play Boy Bunnies" and he was like Hugh Hefner.

135. In the beginning, the grooming tactics of her sex trafficker allowed for Ms. Delgado-Williams to keep thirty percent (30%) of any monies earned from the escort services and required her to give Mr. Rashid the remaining seventy percent (70%).

136. After subjugation was established by her trafficker, Ms. Delgado-Williams found herself giving one hundred percent (100%) of the monies earned from "escorting services" to Mr. Rashid.

137. Ms. Delgado-Williams quickly became a "priority girl."

138. Priority girls would give all of their incomes to Jamal Rashid.

139. Mr. Rashid explained it was necessary for him to receive all of the monies, because he would in turn take care of the victims living expenses.

140. Mr. Rashid was entering the music industry, and he was recognized as a major pimp in the illegal sex trade in Las Vegas, Nevada.

141. Mr. Rashid and his employees began to control every aspect of Ms. Delgado-Williams's money, from booking her rooms when she traveled from Las Vegas, Nevada to Chicago, Illinois and Boston, Massachusetts, to providing Ms. Delgado-Williams a small allowance to cover only food and a hotel while she was traveling to see sex buyers outside the State of Nevada.

142. The only time Ms. Delgado-Williams would hear from Mr. Rashid, instead of one of his two assistants, was when there was something wrong with the money drops or deposits to the banks Wells Fargo and Bank of America.

143. Most of the sex buyers were under the gross misconception that prostitution was legal in all of Nevada, and the escort service took advantage of this misconception.

144.    Ms. Delgado-Williams most frequently interacted with sex buyers who traveled to Nevada for the sole purpose of purchasing sex, whether it was for a newly divorced "party," a bachelor "party," or a corporate CEO wishing to privately cheat on his wife, the sex buyers traveled across state lines to purchase sex from victims of sex trafficking.

145.    In Ms. Delgado-Williams's experiences with sex buyers, she most frequently observed that they had the misconception that prostitution was legal in Las Vegas.

146.    The human trafficking ring guised as a legal escort service was successfully and strategically planted in Las Vegas, Nevada to intercept sex tourists planning to travel from Las Vegas, Nevada to the near city of Pahrump, Nevada or Crystal, Nevada where the closest legal brothels were located.

147.    As a direct result of the legal brothel establishments legally operating, the demand for sex was and is higher in Las Vegas, Nevada.

148.    Not only did the legal brothels' sex buyers feed the success of the human trafficking ring guised as an escort service, but it also was another avenue for women to be sex trafficked. Naturally, being a sex trafficked woman, Ms. Delgado-Williams knew other women in the sex industry. Ms. Delgado-Williams personally knew numerous women working in the brothels who were trafficked and sexually exploited in the brothels.

149.    The escort service trafficked Ms. Delgado-Williams by plane from Las Vegas, Nevada to perform sex acts for money in large cities such as Dallas, Texas, Los Angeles, California, Chicago, Illinois and Boston, Massachusetts. After Ms. Delgado-Williams performed sex acts for money on sex buyers in these large cities, she was trafficked back to Las Vegas. Nevada.

150.    Ms. Delgado-Williams was arrested as a result of being trafficked for purposes of prostitution.

151.    When Ms. Delgado-Williams was on probation for her prostitution charges,

Mr. Rashid coerced her to violate her probation by continuing to sell sex acts performed by on sex buyers, by assuring Ms. Delgado-Williams that he had a "dream team" of lawyers that could get them out of anything.

152.    Mr. Rashid used the money from sex trafficking the women to pay for the production of his music. Mr. Rashid now works for Grammy award-winning artists, and lives in a multi-million-dollar home in Encino, California. Mr. Rashid has not faced any criminal charges for the illegal sex trade he engaged in.

153.    Eventually, Ms. Delgado-Williams was arrested by Chicago police in Chicago, Illinois, while being sex trafficked by Mr. Rashid's company. Ultimately, Ms. Delgado-Williams served thirteen (13) months in jail.

154.    After serving her time, Mr. Rashid tried to recruit Ms. Delgado-Williams to return back to his "Escort Service."

155.    Ms. Delgado-Williams moved to Los Angeles, California, where Mr. Rashid had multiple community apartments for the women and girls who worked for him to use while they were traveling to be bought for sex from sex buyers or for escort services.

156.    While in Los Angeles, California, Mr. Rashid forced Ms. Delgado-Williams to perform oral sex on him.

157.    While working for Mr. Rashid, Ms. Delgado-Williams understood that she belonged to "the Game" and/or the "Pimp and Ho" subculture. Ms. Delgado-Williams was threatened and brainwashed into believing that if she were to prostitute as a "free agent" or without the representation of a trafficker that she would be opening herself up to be assaulted or robbed by sex buyers.

158.    Ms. Delgado-Williams was constantly threatened that if she did not have Mr. Rashid pimping her out, she would run into another sex trafficker and be treated worse.

159.    Mr. Rashid tore down Ms. Delgado-Williams's identity and self-worth so

much that he made her believe the only "job" she would ever be able to obtain was one where she sold sexual acts to sex buyers.

160.    Eventually after going back and forth between being sex trafficked by Mr. Rashid and working in the strip clubs, Ms. Delgado-Williams ended up in the strip clubs again, where Ms. Delgado-Williams met her final sex trafficker.

161.    Ms. Delgado-Williams's final sex trafficker came to her with empty promises of love, and empty promises of retiring her from being a sex trafficked woman.

162.    Ms. Delgado-Williams was frightened to realize that her final sex trafficker was extremely abusive.

163.    Any time Ms. Delgado-Williams would try to escape from the abuse of her sex trafficker he would intervene by coercing her and severely physically assaulting her.

164.    Eventually Ms. Delgado-Williams escaped from her final sex trafficker.

165.    After Ms. Delgado-Williams escaped she moved to a condominium in Las Vegas, Nevada that had a lack of security. One morning Ms. Delgado Williams's final sex trafficker came to her doorsteps with a bouquet of roses and tried to kill Ms. Delgado-Williams.

166.    After almost losing her life, Ms. Delgado-Williams was able to escape the grip of sex traffickers.[16]

167.    Though Ms. Delgado-Williams suffers from post-traumatic stress disorder from her near-death assault when her sex trafficker attempted to kill her, she suffers more

---

[16] On May 22, 2018, Tyree Wright was sentenced to serve nine and a half (9 ½) years in prison for his charges of sex-trafficking, second degree kidnapping, and battery with use of a deadly weapon resulting in substantial bodily harm.    https://www.fox5vegas.com/news/valley-victim-confronts-abusive-pimp-during-his-sentencing/article_ec3c3c29-9355-5664-b58d-3b50b1e5ed69.html

from the flashbacks of her memories of being sold and exploited by sex buyers.

168.   To this day, Ms. Delgado-Williams still suffers from the trauma from her sex trafficking experiences. Ms. Delgado–Williams cannot enjoy the relaxation of a normal vacation with her family because of the violence she experienced in hotel rooms across this country, the majority of which occurred in Las Vegas, Nevada, just miles from legal brothels.

169.   Las Vegas, Nevada, is a well-known sex tourism destination for people who are in the market to buy women for sex. The advertising and marketing from legal brothels in places like Nye County and Lyon County persuade, induce and entice people to travel from all over the country and the world to purchase prostituted and sex trafficked persons in the State of Nevada.

170.   Nevada was a regular location for Ms. Delgado-Williams to be sex trafficked. No matter where her traffickers would take her, they would always return to Nevada to sell Ms. Delgado-Williams, and others similarly situated to her, because Nevada is the state where there was and is the greatest demand for prostitution whether legal or illegal.

**F.   Plaintiff Leah Albright-Byrd Was a Victim of Sex Trafficking and Was Forced to Travel Within Nevada and In Interstate Commerce Across State Lines To Engage In Prostitution.**

171.   Plaintiff Leah Albright-Byrd ("Ms. Albright-Byrd") has been directly harmed as a result of Nevada's statute allowing counties of less than seven hundred thousand (700,000) people to license brothels and regulate prostitution.

172.   Like many of the young girls who are manipulated into a life of sex trafficking under the guise of prostitution, Ms. Albright-Byrd came from a broken, abusive home.

173.   Ms. Albright-Byrd had been molested at the age of four (4) by a friend of the family.

174.   At the age of fourteen (14), after one especially emotionally upsetting argument with her father, Ms. Albright-Byrd called her best friend who was also fourteen (14)

1    and had been raped by her uncle and father, and they ran away from their Sacramento homes.

2        175.    They spent the next several weeks living with different friends and sleeping on

3    floors in strangers' homes.

4        176.    There were predators looking for someone like Ms. Albright-Byrd, someone

5    who was vulnerable, without money, a home, or anyone watching out for her.

6        177.    While on the streets, Ms. Albright-Byrd and her friend were approached by a

7    twenty (20) year old drug dealer who said she and her friend could stay at his home as long as

8    they went to school.

9        178.    That requirement made Ms. Albright-Byrd think he cared about her. But soon

10   after, he insisted that the girls contribute to the household. Her trafficker required they either

11   sell drugs or sell themselves.

12       179.    Ms. Albright-Byrd's trafficker coerced her into sex trafficking by using

13   manipulative tactics to misrepresent that sex trafficking was less harmful than selling drugs.

14       180.    Since Ms. Albright-Byrd had no intention of returning home so she stayed with

15   other underage teen runaway girls to be sold for sex to older men daily.

16       181.    Soon after, Ms. Albright-Byrd was introduced to her first trafficker, and his

17   step brother.

18       182.    In October of 1998, Ms. Albright-Byrd was trafficked from Sacramento,

19   California to Reno, Nevada.

20       183.    Though many people have the misconception that a state with legalized

21   prostitution creates a safer environment for women in the sex industry, Reno, NV is actually

22   one of the first places where Ms. Albright-Byrd feared for her life when she was cornered by

23   a threatening "John."

24       184.    For the next four years, Ms. Albright-Byrd was trafficked by pimps on the

25   streets and online.

185.    Though her pimps wanted her to "work" the casinos, she was too young, so she was forced to walk the streets of downtown Reno, NV to solicit sex buyers.

186.    In November 1998, Ms. Albright-Byrd was trafficked from Reno to Las Vegas, NV.

187.    While trying to solicit sex buyers in Las Vegas, Ms. Albright-Byrd and her friend were arrested for not having identification in the casinos.

188.    Ms. Albright-Byrd and her friend were taken to a runaway facility that was not locked down. They ultimately ran away from the runaway facility.

189.    It was at this time that Ms. Albright-Byrd and her friend realized the two pimps that trafficked them down to Las Vegas, had abandoned Ms. Albright-Byrd and her friend.

190.    Out of desperation, Ms. Albright and her friend started to walk up and down the street in Las Vegas, when they were approached by a man in his late 50's early 60's in a purple station wagon.

191.    The man offered to give Ms. Albright and her friend a ride, but he ended up being a pimp. He sold them for sex in Las Vegas for two days.

192.    During this time, Ms. Albright-Byrd was transported to different cities within the State of Nevada and across state lines to the Bay Area in California to be sold for sex.

193.    At the age of 16, Ms. Albright-Byrd ended up getting placed into the hands of the original drug dealer who took her in when she ran away at the age of 14.

194.    From the age of 16 until the age of 18, Ms. Albright-Byrd was exploited by this trafficker traveling from the Bay Area in California to Reno for as little as a weekend to make money off the sex tourism demand from Hot August Nights[17], to staying as long as

[17] Hot August Nights was interestingly created to fill a void in tourism during the month of August in Reno and is clearly primarily funded by tourists traveling from all over the country into Nevada to participate and spectate.

several weeks or a month to sell sex to the locals off the streets in downtown Reno and in the casinos.

195.    Ms. Albright-Byrd most frequently witnessed sex buyers have the misconception that prostitution was legal in Reno, NV.

196.    As a direct result of the legal brothel establishments legally operating, the demand for sex was higher in Reno.

197.    While Ms. Albright-Byrd was in Reno being exploited, her trafficker introduced her  to one of his other victims. This victim was being trafficked into the Bunny Ranch legal brothel.

198.    The only thing Ms. Albright-Byrd remembers about the other victim is the victim was forced to give all of her money to the trafficker that she earned from the Bunny Ranch.

199.    Ms. Albright-Byrd was also trafficked from the Bay Area down to Las Vegas, NV since the demand for sex was so high, she would generally stay in Las Vegas for longer periods of time from one week to multiple months.

200.    Las Vegas is a well-known destination for people who are in the market to buy women for sex. The advertising and marketing from legal brothels in places like Lyon County and Nye County persuade, induce and entice people to travel in from across the country and all over the world to purchase prostituted persons in Nevada.

201.    Nevada advertises as a sex tourism state, so most sex buyers were under the gross misconception that prostitution was legal in all counties of Nevada, and the sex traffickers took advantage of this misconception.

202.    Notably, Ms. Albright-Byrd was under the gross misconception that prostitution and sex trafficking was legal in Nevada.

203.    When Albright-Byrd would attempt to leave, her pimp assaulted her. He would

1  assault her on city streets, and no one would call the police.

2       204.    Besides walking the streets and "working" in the casinos, Ms. Albright-Byrd's

3  pimp would take pictures of her posted them on internet sites where they got rated for their

4  performances.

5       205.    Ms. Albright-Byrd most frequently interacted with sex buyers in Las Vegas

6  whom traveled to Nevada for the sole purpose of purchasing sex.

7       206.    Nevada was a regular location for Ms. Albright-Byrd to be sex trafficked. No

8  matter where else her traffickers would take her, they would always return to Nevada to sell

9  Ms. Albright-Byrd and others similarly situated to her because Nevada is the state where there

10  was and is the greatest demand for prostitution whether legal or illegal.

11       207.    It was not until years later, when Ms. Albright-Byrd had escaped from the cycle

12  of abuse, was she able to realize the victimization, exploitation, and abuse that had occurred

13  to her.

14       208.    Years after Ms. Albright-Byrd was able to escape of the life of being a sexually

15  exploited victim of sex trafficking, she learned again of a terrible act of violence that happened

16  to one of her friends whom she introduced to the "life." Her good friend was murdered in Las

17  Vegas from a violent sex buyer.

18       209.    The most disturbing instances of violence happened to Ms. Albright-Byrd and

19  her friends in the only State in the Union where Prostitution is legal. Notwithstanding the fact

20  that these Statutes are in direct conflict with the Mann Act and the Victims of Trafficking and

21  Violence Protection Act of 2000, it is clear that the legalized prostitution has not kept the

22  streets of the illegal sex trade safer.  In fact, it has made them worse.

23  / / /

24  / / /

25  / / /

## IV.

## FIRST CAUSE OF ACTION

### Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment

### State Created Danger

210.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

211.    By disregarding federal law, the acts of Defendants, including, but not limited to, authorizing a legalized commercial prostitution market to operate in the State, have created the danger that has led to irreparable harm to Plaintiffs and other victims of sex trafficking by exposing them to the dangers of sex trafficking and prostitution without protections from the inherent dangers the federal law was enacted to prevent.

212.    As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer actual, continual, and potential injury to their health and safety.

## SECOND CAUSE OF ACTION

### Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment

### Deprivation of Federal Rights

213.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

Section 1983 of 42 U.S.C. provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

214.    As a direct result of Nevada State officials and lawmakers disregarding United

States Code, the Plaintiffs and similarly situated Jane Doe victims who have been prostituted in the State of Nevada from out-of-state, have been deprived of their federal rights which have been provided to them under the Mann Act (U.S.C. 18 § 2422(a)) and the TVPA (22 U.S.C. § 7101-7114).   The federal law is clear on its face in prohibiting traveling in interstate and foreign commerce to engage in the act of prostitution or human trafficking.  Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat.  244.345(8) unconstitutionally conflict with federal law and create an impermissible legal environment where brothels, brothel owners and operators, and women being bought and sold in brothels encourage, persuade and entice individuals into interstate and foreign commerce to engage in prostitution.

215.    The continued enactment of Nev. Rev. Stat.  201.354(1) and Nev. Rev. Stat. 244.345(8) and each and every county ordinance enacted under these statutes is unconstitutional.

216.    By enacting Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), Nevada has created and nurtured an industry that directly violates the Mann Act, and therefore, the State of Nevada is the proximate cause of the continued frequent acts of the brothel owners, and the women sold in the brothels who knowingly persuade, induce, entice, or coerce men and women to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution and at times, human trafficking.

## THIRD CAUSE OF ACTION

### Declaratory/Injunctive Relief –

### Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8)

### Are Preempted by Both The Mann Act (U.S.C. 18 § 2422(a))

### and the TVPA (22 U.S.C. § 7101-7114) and are in Violation of

### The Supremacy Clause of The U.S. Constitution

217.    Plaintiffs reallege and incorporate by reference all prior and subsequent

paragraphs as if fully incorporated herein.

218.   On June 25, 1910, the 61st United States Congress passed H.R. 12315, also known as "The Mann Act" (the "Act") (codified as 18 U.S.C. § 2422(a) (2018)), which criminalized the interstate or foreign commerce transport of "any woman or girl for prostitution, debauchery, or for any other immoral purpose."

219.   C.F.R. 22 § 40.24(b) sets forth the meaning of Prostitution as "engaging in promiscuous sexual intercourse for hire."  The Mann Act specifically provides:

> Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

U.S.C. 18 § 2422(a).

220.   The Congressional intent of the federal law as expressed through the enactment of 18 U.S.C. 2422(a) is clear, certain, and unambiguous, *to wit*, to prevent persons from persuading, inducing, enticing, and/or coercing any person to travel across state lines to engage in prostitution.

221.   On October 28, 2000, the 106th Congress passed H.R. 3244, also known as the "Victims of Trafficking and Violence Protection Act of 2000" (the "TVPA") (codified as 22 U.S.C. § 7101-7114), which criminalized human trafficking and related offenses as federal crimes with severe penalties attached and established several methods to prosecute traffickers.

222.   Sex trafficking, as defined by the Trafficking Victims Protection Act includes all pimping and sex buying. And the definition of trafficking in the Palermo Protocol states that prostitution carried out by "the abuse of power or of a position of vulnerability" is sex trafficking and that consent is no defense when power and vulnerability have been abused. Prostitution carried out by "force, fraud, or coercion" is not a requirement for sex

trafficking but for a "severe form of trafficking."

223.   U.S.C. 22 § 7102(4) sets forth the meaning of Commercial Sex Act as "any sex act on account of which anything of value is given to or received by any person."

224.   The Congressional intent of the federal law as expressed through the enactment of 18 U.S.C. 1591 was to ensure just and effective punishment of traffickers and to protect their victims.

225.   There are three ways in which federal law will preempt state law: (1) Congress explicitly defines the extent to which its enactment preempts state law, or "express" preemption; (2) state law regulates conduct in a field that Congress intended federal government to occupy exclusively, or "field" preemption; and (3) state law actually conflicts with federal law, or "conflict" preemption. Motus v. Pfizer, Inc. 127 F. Supp.2d 1085, 1091 (Ca. C.D. 2000). Here, Nevada law is preempted by way of "conflict" with Federal law.

226.   Nevada's intrastate commercialized prostitution market exerts a substantial economic effect, namely, the creation of an interstate and foreign prostitution market; therefore, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) are in direct conflict with and violation of U.S.C. 18 § 2422(a) and 22 U.S.C. § 7101-7114.

227.   By disregarding federal law, the acts of Defendants, including, but not limited to authorizing a legalized commercial prostitution market to operate in the State, have created the danger that has led to irreparable harm to Plaintiffs and other victims of sex trafficking by exposing them to the dangers of sex trafficking and prostitution without protections from the inherent dangers the federal law was enacted to prevent.

228.   Because the brothel industry in Nevada openly and notoriously persuades, induces, entices, and coerces individuals to travel in interstate commerce to commit acts of prostitution, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) cannot exist simultaneously with 18 U.S.C.§ 2422(a) and 22 U.S.C. § 7101-7114 and thereby is preempted

and in violation of the Supremacy Clause of the U.S. Constitution.

**V.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     For an Order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, licensing brothels unconstitutional, null and void as preempted by federal law;

B.     A preliminary and permanent injunction be issued prohibiting the State of Nevada and all of its political subdivisions from implementing, enforcing, or putting into force and effect Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8);

C.     For an order requiring that: 1) the State allocate funds in an amount not less than Two Million Dollars ($2,000,000) per year to the State Contingency Account specifically for people seeking to exit the sex trade ("Nevada Sex Trade Exit Fund") and receive services such as mental health services, rent assistant, job training, scholarships, funding for childcare, medical treatments, tattoo removal, etc. 2) The Nevada Sex Trade Exit Fund require that all recipients of money from The Nevada Sex Trade Exit Fund provide proof of having been prostituted in Nevada through Nevada's legal brothels as a result of the enactment of Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345-(8); 3) Any person  who was ever in brothel ownership or brothel management is ineligible to receive funding from the Nevada Sex Trade Exit Fund; and 4)  The Nevada Sex Trade Exit Fund remain funded and running for ten (10) years from the date Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) is declared null and void.

/ / /

/ / /

/ / /

1   D. For an award of reasonable attorneys' fees, costs, and litigation expenses plus

2 interest accruing thereon, in their favor at the maximum rate allowed by law; and

3   E. For such other relief as the Court or jury may deem just or equitable.

4 DATED this 18th day of March, 2019.  HUTCHISON & STEFFEN, PLLC

5

6             By: /s/ *Jason D. Guinasso*

7             JASON D. GUINASSO, ESQ. (SBN# 8478)
              *Attorney for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>VERIFICATION</u>

2     STATE OF _Texas_____ )
                               ) ss.
3     _____Tarrant_____ )

4          I, Rebekah Charleston, being first duly sworn, under penalty of perjury, do hereby

5     depose and say:

6          I am a Plaintiff in this action, and I have read the foregoing First Amended Complaint,

7     know the contents of the First Amended Complaint and the matters stated therein are true of

8     my own knowledge, except for those matters stated on information and belief, and, as to those

9     matters, I believe them to be true.

10    DATED: This 18 day of March, 2019.        _____
11                                               Rebekah Charleston

12
      SUBSCRIBED and SWORN to before me
13
      this 18 day of March, 2019.
14
      _____
15    NOTARY PUBLIC

      A AZIZ MOHAMED
      Notary Public, State of Texas
      Comm. Expires 10-24-2022
      Notary ID 130004564

16

17

18

19

20

21

22

23

24

25

VERIFICATION

STATE OF *TEXAS* )
) ss.
*DALLAS COUNTY* )

      I, Angela Delgado-Williams, being first duly sworn, under penalty of perjury, do hereby depose and say:

      I am a Plaintiff in this action, and I have read the foregoing First Amended Complaint, know the contents of the First Amended Complaint and the matters stated therein are true of my own knowledge, except for those matters stated on information and belief, and, as to those matters, I believe them to be true.

DATED: This 18th day of March, 2019.

_____
Angela Delgado-Williams

SUBSCRIBED and SWORN to before me this ___ day of March, 2019.

_____
NOTARY PUBLIC

KEITH SEGURA
Notary Public, State of Texas
My Commission Expires
September 16, 2019

1

<u>VERIFICATION</u>

2 STATE OF ~~TEXAS~~ )

3 ~~DALLAS~~ ) ss. )

4       I, Leah Albright-Byrd, being first duly sworn, under penalty of perjury, do hereby

5 depose and say:

6       I am a Plaintiff in this action, and I have read the foregoing First Amended Complaint,

7 know the contents of the First Amended Complaint and the matters stated therein are true of

8 my own knowledge, except for those matters stated on information and belief, and, as to those

9 matters, I believe them to be true.

10

DATED:  This 18th day of March, 2019.

11                        Leah Albright-Byrd

12

SUBSCRIBED and SWORN to before me

13

this 18th day of March, 2019.

14

15 NOTARY PUBLIC

16 GULZAR MOHAMMED
Notary Public, State of Texas
Comm. Expires 06-04-2021
17 Notary ID 129445821

18

19

20

21

22

23

24

25

**List of Exhibits**
**See Appendix to Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief**

| Description | Vol No. | Page Nos. |
|---|---|---|
| Exhibit 1 - Examples of Advertising and Marketing | I | 0001-0102 |
| Exhibit 2 - Harrison Jacobs, The owner of America's most famous brothel explains how he promotes a business that's illegal to advertise, Business Insider (2015) | I | 0103-0106 |
| Exhibit 3 - Amy B. Wang, 'It's my decision': This woman is auctioning off her virginity to help her family, The Washington Post (2016) | I | 0107-0110 |
| Exhibit 4 - Affidavit of Jane Doe Victim 1 | I | 0111-0114 |
| Exhibit 5 - YouTube link of Howard Stern "Get My Grandpa Laid Contest" | I | 0115-0116 |
| Exhibit 6 - Seo-Young Cho, Axel Dreher & Eric Neumayer, *Does Legalized Prostitution Increase Human Trafficking?,* WORLD DEVELOPMENT (2012) | I | 0117-0165 |
| Exhibit 7 - Crysta N. Price, Terry D. Clark, & Julie Faller, Nevada's Online Commercial Sex Market, Human Trafficking Initiative, Creighton University (2017)) | I | 0166-0188 |
| Exhibit 8 - Melissa Farley, Trafficking for Prostitution: Making the Connections American Psychological Association (2007) | I | 0189-0196 |
| Exhibit 9 - U.S. DEPARTMENT OF STATE, TRAFFICKING IN PERSONS REPORT AT PG. 27 (2007) | I | 0197-0198 |
| Exhibit 10 - Melissa Farley, Risks of Prostitution: When the Person Is the Product 3 Journal of the Association for Consumer Research (2017) | I | 0199-0211 |
| Exhibit 11 - Ronald B. Flowers, Prostitution in the Digital Age: Selling Sex From the Suite to the Street? at pgs. 42-46 (Praeger 2011) | I | 0212-0217 |
| Exhibit 12 - Alice Little, A Week as a Legal Sex Working in Mound House, NV on a $267,000 Salary Refinery 29 (2017); TMZ.com, Robert Kraft Courted Bt Nevada Prostitutes... It's Legal Here!!! (Feb. 23, 2019, 12:40am) | I | 0218-0227b |

| Description | Vol No. | Page Nos. |
|---|---|---|
| Exhibit 13 – Lyon County Sheriff's Office, Internal Audit Report on Brothel Compliance Requirements (2018) | I | 0228-0236 |
| Exhibit 14 - United Nations Office on Drugs and Crime, Human Trafficking Indicators | I | 0237-0239 |
| Exhibit 15 - U.S. Department of State, The Link Between Prostitution and Sex Trafficking (November 24, 2004) | I | 0240-0241 |