JASON D. GUINASSO, ESQ. (SBN# 8478)
HUTCHISON & STEFFEN, PLLC
500 Damonte Ranch Parkway, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
Facsimile: (775) 201-9611
jguinasso@hutchlegal.com
*Attorney for Plaintiffs Rebekah Charleston*
*Angela Delgado-Williams; and*
*Leah Albright-Byrd*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| REBEKAH CHARLESTON; ANGELA DELGADO-WILLIAMS; and LEAH ALBRIGHT-BYRD; <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF NEVADA; STEVE SISOLAK, in his capacity as Governor of the State of Nevada, and the LEGISLATURE OF THE STATE OF NEVADA; <br><br> Defendants. | Case No.: 3:19-cv-00107-MMD-WGC <br><br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS STATE OF NEVADA AND GOVERNOR STEVE SISOLAK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br> **(ECF No. 22)** |

Plaintiffs Rebekah Charleston, Angela Delgado-Williams, and Leah Albright-Byrd (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, JASON D. GUINASSO, ESQ., and the law offices of HUTCHISON & STEFFEN, PLLC, hereby oppose the April 3, 2019 *Motion to Dismiss* (ECF No. 22) filed by Defendants State of Nevada and Governor Steve Sisolak (hereinafter collectively referred to as "Nevada and Sisolak").

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.**   <u>**INTRODUCTION**</u>

This Court should not dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (ECF No.12). Plaintiffs have plead sufficient facts and related claims for relief to invoke the jurisdiction of this Court. In this regard, Plaintiffs have plead sufficient facts and claims for relief to show that they have suffered injuries that are both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." Moreover, Plaintiffs have plead sufficient facts and claims for relief in their First Amended Complaint to show there is a causal link between the injury and the conduct of Defendants. To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). On motion to dismiss for failure to state a claim, court must presume all factual allegations of complaint to be true and draw all reasonable inferences in favor of nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987). For purposes of motion to dismiss, material allegations of complaint are taken as admitted and complaint is to be liberally construed in favor of plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969); *Keniston v. Roberts*, 717 F.2d 1295 (9th Cir.1983).

This lawsuit is much more than a "policy debate about the merits of legalized prostitution…" as the State of Nevada and the Governor have callously suggested in their Motion to Dismiss. This lawsuit is about redressing specific and real harms inflicted upon the Plaintiffs and thousands of others similarly situated by the State of Nevada and its political subdivisions. In this regard, this lawsuit specifically seeks a court order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the related ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, licensing brothels unconstitutional, null, and void as preempted

by federal law; and, a preliminary and permanent injunction be issued prohibiting the State of Nevada and all of its political subdivisions from continuing to implement, enforce, or put into force and effect Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8). Additionally, this lawsuit also requests an order for the State to create and fund a "Nevada Sex Trade Exit Fund" to provide mental health services, rent assistance, job training, scholarships, and funding for medical treatments for women prostituted through Nevada's legal brothels. This remedy is appropriate and within the Court's authority to redress injuries caused by State laws that cause harm to Plaintiffs and countless others similarly situated to plaintiffs.

Plaintiffs, Ms. Charleston, Ms. Delgado-Williams and Ms. Albright-Byrd, have been irreparably harmed. By disregarding federal law, the acts of Defendants State of Nevada, et al., including, but not limited to, authorizing a legalized commercial prostitution market to operate in the State, have created the danger that has led to the irreparable harm suffered by the Plaintiffs and other victims of sex trafficking by exposing them to the dangers of sex trafficking and prostitution (i.e., serial rape, sexual servitude, sexual and physical assault, psychological trauma, bodily injury, and risk of sexually transmitted diseases) without protections from the inherent dangers federal law was enacted to prevent. Further, Plaintiffs submit that, because the brothel industry in Nevada openly and notoriously persuades, induces, entices, and coerces individuals to travel in interstate commerce to buy people for acts of prostitution, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) cannot exist simultaneously with 18 U.S.C.§ 2422(a) and 22 U.S.C. § 7101-7114 and thereby is preempted and in violation of the Supremacy Clause of the U.S. Constitution.

Sex trafficking, as defined by the Trafficking Victims Protection Act, includes all pimping and sex buying. The State's creation of an intrastate commercialized prostitution market exerts a substantial economic effect, namely, the creation of an interstate and foreign

prostitution market; therefore, Nevada's legal brothels, operating under Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), are in violation of and direct conflict with 42 U.S.C. § 1983; the federal Mann Act, codified at 18 U.S.C. §§ 2421–2424 (Mann Act); the Victims of Trafficking and Violence Protection Act of 2000, codified at 22 U.S.C. §§ 7101–7114 (TVPA).

Only 7 counties in the United States have legal prostitution in licensed brothels. All of those counties are located in the State of Nevada. These counties have populations of less than 700,000, but Nevada's legal brothels are estimated to generate more than seventy-five million dollars ($75,000,000) per year, while at the same time fueling Nevada's illegal prostitution market, which in Las Vegas is estimated to gross over five billion dollars ($5,000,000,000) per year.[1] Since the legalization of prostitution is directly linked to increased sex trafficking, the most vulnerable people in the brothel industry are at increased risk for harm. Nevada's illegal sex trade is estimated to be twice as large as other states.[2] At least five thousand sixteen (5,016) individuals are sold for sex in an average month in Nevada.[3] The State of Nevada has not only failed to enact, uphold, and conform to federal law with respect to prostitution and sex trafficking, but it has also allowed Nevadans and those sexually trafficked to Nevada to be exploited and to become victims to this exploitative industry, thus fostering the existence of a supply chain of organized sexual exploitation.

---

[1] *See* **Exhibit 1** at **0001-0006 (Ronald B. Flowers, PROSTITUTION IN THE DIGITAL AGE: SELLING SEX FROM THE SUITE TO THE STREET? at pg. 42-46 (Praeger 2011))**.

[2] Melissa Farley, PROSTITUTION AND TRAFFICKING IN NEVADA: MAKING THE CONNECTIONS (Prostitution Research & Education, 2007).

[3] *See* **Exhibit 2** at **0013, ¶ 2 (Crysta N. Price, Terry D. Clark, & Julie Faller, Nevada's Online Commercial Sex Market, HUMAN TRAFFICKING INITIATIVE, CREIGHTON UNIVERSITY (2017), https://awakenreno.org/wp-content/uploads/2018/05/FINAL_Nevada_March2018.pdf).**

Plaintiffs submit in their First Amended Complaint that the foregoing circumstances are a direct result of Nevada's legal system that must induce, persuade, entice, and coerce individuals to enter into interstate and foreign commerce to engage in the purchase of human beings for sex in order to remain economically viable. Without the inflow of individuals into interstate and foreign commerce to engage in prostitution, the legal system would collapse. Moreover, legalized prostitution has exacerbated the victimization of women within the illicit sex trade; the data shows that prostituted persons in the illegal trade around licensed brothels are at a similar risk of having been trafficked as those in areas without legal brothels.[4] The majority of men who buy women for sex come from out-of-state. Likewise, the women bought, sold, and trafficked to Nevada come from other states and countries outside the State of Nevada. These men and women enter into interstate and foreign commerce and come to Nevada to engage in prostitution as a result of the unfettered advertising and marketing of Nevada's legal brothels outside the State of Nevada through hundreds of websites, social media accounts, and other mass media used to persuade, induce, and entice men and women to come to Nevada to engage in prostitution in direct violation of federal law.[5] Consequently, thousands of women, just like the Plaintiffs in this case, are illegally trafficked to the State of Nevada to satisfy the demand of tens of thousands of sex buyers who come to Nevada expecting and demanding to purchase and sexually consume these women. The legal system Nevada has created is in conflict with the federal laws specifically enacted to stop trafficking and prostitution nationally and internationally.

In summary, Plaintiffs have asserted in their First Amended Complaint that, by disregarding federal law, the acts of Defendants in authorizing and perpetuating legalized commercial prostitution in the state, have directly and indirectly caused irreparable harm to

---

[4] *See* **Exhibit 2 (0029, ¶4).**
[5] *See* **Exhibit 8 at 0172-0279 (EXAMPLES OF ADVERTISING AND MARKETING OF BROTHELS).**

Plaintiffs and other victims of sex trafficking by exposing them to the dangers of sex trafficking and prostitution without protections from the inherent dangers federal law was enacted to prevent. Further, Plaintiffs submit that, because the brothel industry in Nevada openly and notoriously persuades, induces, entices, and coerces individuals to travel in interstate commerce to commit acts of prostitution, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) cannot exist simultaneously with 18 U.S.C.§ 2422(a) and 22 U.S.C. § 7101-7114 and thereby is preempted and in violation of the Supremacy Clause of the U.S. Constitution. In accordance with the foregoing, Plaintiffs respectfully request that this Court give Plaintiffs an opportunity to prove up their claims for relief and deny Defendants' *Motion to Dismiss (*ECF No. 22).

## II. PLAINTIFFS HAVE SUFFICIENTLY PLEAD CLAIMS FOR RELIEF THAT ARE JUSTICIABLE.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional ...." *Sun Valley Gasoline, Inc. v. Ernst Enters*., 711 F.2d 138, 140 (9th Cir. 1983). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (*citing* White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial attack is based on the challenger's assertion that allegations in the complaint are "insufficient on their face to invoke federal jurisdiction." *Id*. A factual attack disputes the validity of allegations that, if true, would invoke federal jurisdiction. *Id*.

## A. PLAINTIFFS HAVE STANDING TO BRING THIS LAWSUIT.

Standing is a threshold matter central to the court's subject matter jurisdiction. *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 985 (9th Cir.2007); *see also Summers v. Earth Island Inst*., 555 U.S. 488, 129 S.Ct. 1142, 1148, 173 L.Ed.2d 1 (2009) (Article III limits judicial power to "cases" and "controversies"). Constitutional standing has three elements. To establish

standing, a plaintiff must show that he or she has suffered or is threatened with an injury that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical;" that there is a causal link between the injury and the conduct of which the plaintiff complains— that is, that the injury is "fairly traceable" to the challenged conduct; and that the injury is "likely" to be "redressed by a favorable decision." *Id.,* 511 F.3d at 985 (*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotations omitted)); *see also Skaff v. Meridien North America Beverly Hills*, LLC, 506 F.3d 832, 837 (9th Cir.2007). *Moeller v. Taco Bell Corp*., 816 F.Supp.2d 831, 849 (N.D.Cal., 2011).

The requirement of justiciability arises from Article III of the Constitution, which limits the judicial power of federal courts to cases and controversies. It has long been the rule that no federal court has jurisdiction to declare any statute void for repugnance to the Constitution except as it is called upon to adjudge the legal rights of litigants in actual controversies. *Associated Students for University of California at Riverside v. Attorney General of U. S*., 368 F.Supp. 11, 16–17 (C.D.Cal., 1973) (*citing Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

Here, Plaintiffs have plead sufficient facts and related claims for relief to invoke the jurisdiction of this Court.  In this regard, Plaintiffs have plead sufficient facts and claims for relief to show that they have suffered injuries that are both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  Moreover, Plaintiffs have plead sufficient facts and claims for relief to show there is a causal link between the injury and the conduct of which the plaintiffs complain.  All of the injuries claimed by the Plaintiffs are "fairly traceable" to the State of Nevada's conduct and, if the Court were to rule in Plaintiffs favor at the conclusion of litigation in this contested case, the injuries Plaintiffs and those similarly situated have suffered are likely to be redressed by a favorable decision.  However, at this stage of the

litigation, the complaint does <u>not</u> have to prove that Plaintiffs are entitled to the relief they are requesting in the complaint, rather the complaint must plead sufficient facts and claims to invoke federal jurisdiction. Plaintiffs have plead sufficient facts and claims to invoke the jurisdiction of this Court to redress real and continued harms to the Plaintiffs and those similarly situated.

## B. A "CASE OF ACTUAL CONTROVERSY" HAS BEEN PRESENTED BY PLAINTIFFS FOR WHICH THIS COURT CAN PROVIDE DECLARATORY RELIEF.

Declaratory relief may be sought as means to challenge the constitutionality of a federal law or state statute or local ordinance. *Doe v. Gallinot* (9th Cir. 1981) 657 F2d 1017. The declaratory remedy is committed to the sound discretion of the court. *Mechling Barge Lines v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317, 322 (1961); *Public Service Commission v. Wycoff Co*., 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291, 294-95 (1952); *Brillhart v. Excess Insurance Co*., 316 U.S. 491, 494-98, 62 S.Ct. 1173, 1175-77, 86 L.Ed. 1620, 1625-27 (1942). *Doe v. Gallinot*, 657 F.2d 1017, 1024–25 (C.A.Cal., 1981). The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *MedImmune, Inc. v. Genentech, Inc*., 127 S.Ct. 764, 770, 549 U.S. 118, 126 (U.S.,2007).

The phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *Id.* at 240, 57 S.Ct. 461. (Id.) The standards for determining whether a particular declaratory-judgment action satisfies the case-or-controversy requirement—*i.e.,* "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief. *MedImmune, Inc. v. Genentech, Inc*., 127 S.Ct. 764, 766, 549 U.S. 118, 118 (U.S.,2007) (*quoting, Maryland Casualty Co. v. Pacific Coal & Oil*

*Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826). Article III of the Constitution limits the judicial power to the adjudication of "Cases" or "Controversies." *MedImmune, Inc. v. Genentech, Inc.*, 127 S.Ct. 764, 777, 549 U.S. 118, 137 (U.S.,2007).

In the context of declaratory judgment actions, federal courts have provided a uniform framework for assessing whether an Article III case or controversy exists. In the constitutional sense, a "Controversy" is "distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." *Ibid.* (*citing* United *States v. Alaska S.S. Co.,* 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920)). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." 300 U.S., at 240–241, 57 S.Ct. 461. Finally, "[i]t must be a real and substantial controversy ..., as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.,* at 241, 57 S.Ct. 461. *MedImmune, Inc. v. Genentech*, Inc., 127 S.Ct. 764, 777, 549 U.S. 118, 138 (U.S.,2007).

In this case, Plaintiffs have sufficiently plead facts that are not hypothetical, and further have plead sufficient facts to establish that an actual controversy exists; therefore, Plaintiffs are entitled to invoke this Court's jurisdiction and have this Court consider their request for declaratory relief. Specifically, the Plaintiffs have asserted in their First Amended Complaint that the unconstitutional actions of Defendants State of Nevada, et al., including, but not limited to, authorizing a legalized commercial sex trafficking and prostitution market to operate in the State, has created a legal industry that has exposed Plaintiffs and other similarly situated to Plaintiffs to the dangers and resulting injuries of sex trafficking and prostitution (i.e., serial rape, sexual servitude, sexual and physical assault, psychological trauma, bodily injury, and risk of sexually transmitted diseases) without regard to the protections that the federal law was enacted to prevent. Further, Plaintiffs submit that, because the brothel industry causes individuals to

travel in interstate and foreign commerce to buy people for acts of prostitution, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) cannot exist simultaneously with 18 U.S.C.§ 2422(a) and 22 U.S.C. § 7101-7114 and thereby is preempted and in violation of the Supremacy Clause of the U.S. Constitution.  Therefore, Plaintiffs have asked this Court for an order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, licensing brothels unconstitutional, null, and void as preempted by federal law.

### C. PLAINTIFFS HAVE ADEQUATELY PLEAD FOR INJUNCTIVE RELIEF TO PUT A STOP TO THE SUBSTANTIAL, REPETITIVE, AND CONTINUING HARMS SUSTAINED BY THE PLAINTIFFS AND OTHERS SIMILARLY SITUATED TO PLAINTIFFS.

The standing formulation for a plaintiff seeking prospective injunctive relief is simply one implementation of *Lujan*'s requirements. The plaintiff must demonstrate that he has suffered or is threatened with a "concrete and particularized" legal harm, *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, coupled with "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As to the second inquiry, he must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "[P]ast wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy." *Lyons,* 461 U.S. at 103, 103 S.Ct. 1660.

However, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669. In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief. *Graham v. Fed. Emergency Mgmt. Agency,* 149 F.3d 997, 1003 (9th Cir.1998) (recognizing that "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision" but "only that a favorable decision is *likely* to redress" their injuries) *Bates v. United*

*Parcel Service, Inc.*, 511 F.3d 974, 985–86 (C.A.9 (Cal.),2007). "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (*citing* O'Shea v. Littleton*,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

The Ninth Circuit has repeatedly held that "the deprivation of constitutional rights unquestionably constitutes irreparable injury" *County of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537 (N.D.Cal., 2017) *(quoting Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144–45 (9th Cir. 2013). "[E]ven where the constitutional injury is structural, "the constitutional violation alone, coupled with the damages incurred, can suffice to show irreparable harm." *County of Santa Clara v. Trump*, 250 F.Supp.3d 497, 538 (N.D.Cal., 2017)(*quoting* American Trucking, 559 F.3d at 1058).

By disregarding federal law, the acts of Defendants constitute a clear violation of the Supremacy Clause of the Constitution, including, but not limited to, authorizing a legalized interstate and foreign commercial prostitution and sex trafficking market to operate in the State in violation of clear and unambiguous federal laws prohibiting interstate and foreign prostitution and sex trafficking. Further, the State of Nevada laws permitting prostitution in counties with populations of less than 700,000 people has created the specific dangers the federal laws were enacted to prevent which has directly resulted in irreparable harm to Plaintiffs and other similarly situated victims of sex trafficking. Unless and until this Court issues a permanent injunction prohibiting the State of Nevada and all of its political subdivisions from implementing, enforcing, or putting into force and effect Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) and the resulting county ordinances, Plaintiffs and others similarly situated to Plaintiffs will continue to be irreparably harmed. Moreover, an injunction will not only cut off

the harms caused to Plaintiffs but will prevent other similarly situated plaintiffs from suffering the same harms.

In their Motion to Dismiss, the State of Nevada and Governor Sisolak have argued that Plaintiffs' First Amended Complaint should be dismissed because the Plaintiffs' allegations do not "meet the requirement that they are realistically threatened with a repetition of the conduct" that is subject to this action. (ECF No 22 at pg. 8 ¶ 1). Essentially, Defendants appear to be arguing that the Plaintiff's case is moot despite the fact that the harm complained about is substantial, repetitive, and continuing.

In general, a case becomes moot "'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S. Ct. 1181, 1183, 71 L. Ed. 2d 353 (1982) (*quoting* United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980)). The Court has recognized an exception to this rule when a case is "capable of repetition, but evades review." *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) decided that in the absence of a class action, the "capable of repetition, yet evading review" doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 349, 46 L. Ed. 2d 350 (1975).

Based on the facts and allegations presented to this Court in their First Amended Complaint, Plaintiffs are victims of sex trafficking under 22 U.S.C. § 7102(9)(A) and under the alternate definition provided in 22 U.S.C. § 7102(9)(B). Plaintiffs were induced to travel through interstate commerce to the State of Nevada to engage in commercial sex through fraud, which the traffickers used to obtain their cooperation in traveling throughout the United States. The

traffickers used force and coercion in the form of physical abuse, intimidation, and psychological abuse to directly induce Plaintiffs to travel into interstate commerce to engage in commercial sex in Nevada brothels. Additionally, Plaintiffs are victims of involuntary servitude as defined by Nev. Rev. Stat. 200.463. But for the State of Nevada's laws permitting legal prostitution, Plaintiffs would not have been trafficked through interstate commerce into the State to engage in commercialized sex in Nevada brothels.

It is difficult, if not impossible, for victims of sex trafficking to avail themselves of the protections of federal law, the Constitution, and the federal court while they are being trafficked because victims of sex trafficking, involuntary sexual servitude, and trafficking in persons are inherently prevented from access to the legal and civil remedies during their period of victimization. Even after escaping the control of their trafficker, survivors of sex trafficking can be among the most difficult crime victims to assist. Often victims resist help, refusing to see themselves as victims and returning to their traffickers.[6] Further, the physical and psychological effects of sex trafficking and prostitution, endure long after victims are freed from their context of sexual exploitation. Sexual violations are inflicted in and on the body, the place where one's consciousness resides. Thus, a survivor can never entirely escape or be free from the setting where the violations took place. Plaintiffs and similarly situated individuals experience a "reasonable expectation" and "demonstrated possibility" that they would be subjected to revictimization. In this case, "the challenged governmental activity … is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122, 94 S. Ct. 1694, 1698, 40 L. Ed. 2d 1 (1974).

---

[6] https://www.reuters.com/article/trafficking-victims-usa/sex-trafficking-victims-may-push-rescue-away-u-s-experts-say-idUSL1N1972LK

Nevada's legal system is the direct and proximate cause of the injuries Plaintiffs sustained as a result of being trafficked to Nevada. If Nevada did not permit legal prostitution, Plaintiffs would not have been trafficked to Nevada. The legal system commodifies women and creates an expectation and demand that women can be bought and sold in Nevada legally. Legal prostitution and sex trafficking are inextricably linked in Nevada as elsewhere in the world where prostitution is legal. Sex trafficking happens when and where there is a demand for prostitution.[7] On average, in jurisdictions with legal prostitution, there is a statistically significantly larger reported incidence of illegal sex trafficking. As one expert put it, "wherever prostitution is legalized, trafficking to sex industry marketplaces in that region increases."[8] The U.S. State Department's official government position is that, "prostitution is inherently harmful and dehumanizing and fuels trafficking in persons."[9] The links between legal and illegal prostitution in Nevada and the profound harms these cause all women are seen in other countries where legal prostitution exists such as the Netherlands and Australia. Wherever legal prostitution exists, sex trafficking increases.[10]

---

[7] *See* **Exhibit 3** at **0030-0078 (Seo-Young Cho, Axel Dreher, & Eric Neumeyer, Does Legalized Prostitution Increase Human Trafficking?, WORLD DEVELOPMENT, at pg. 41, 67-82 (2012),** **https://eprints.lse.ac.uk/45198/1/Neumayer _Legalized_Prostitution_Increase_2012.pdf);** *See also* **Exhibit 2** at **0007-0029;** *See also* **Exhibit 4** at **0079-0086 (Melissa Farley, Trafficking for Prostitution: Making the Connections, AMERICAN PSYCHOLOGICAL ASSOCIATION (2007);** *See also* **Exhibit 5** at **0087-0116 (Shapiro & Hughes, Decriminalized Prostitution: Impunity for Violence and Exploitation, UNIVERSITY OF RHODE ISLAND (2017).** *See also* **Exhibit 6** at **0117-0169 (Research Report, Who Buys Sex? Understanding and Disrupting Illicit Market Demand, DEMAND ABOLITION (Nov., 2018), https://www.demandabolition.org/wp-content/uploads/2019/02/Who-Buys-Sex.pdf**

[8] Cho, *supra* at pg. 3 ¶2.

[9] *See* **Exhibit 7** at **0170-0171 (U.S. DEPARTMENT OF STATE, TRAFFICKING IN PERSONS REPORT at pg. 27 (2007));** Case studies published by researchers Niklas Jakobsson and Andreas Kotsadam support a causal link between criminalizing buying sex and reduced human trafficking. Jakobsson and Kotsadam found that trafficking of persons for commercial sexual exploitation is least prevalent in countries where prostitution is illegal and most prevalent in countries where prostitution is legalized.

Nevada's argument in support of its Motion to Dismiss that its legal system is "agnostic" is not true. For example, Nevada local governments with populations of less than 700,000, which are political subdivisions of the State and who can only exercise specific enumerated powers expressly granted by the State, receive hundreds of thousands of dollars in brothel taxes and fees. Local governments are only permitted to enact promulgate and enforce ordinances within the authority granted to them by the State. *See City of Reno v. Reno Police Protective Ass'n*, 98 Nev. 472, 475, 653 P.2d 156, 158 (1982) (allowances provided by the general laws of the state may not, absent a special dispensation of the legislature, be prohibited by local ordinances). These local governments under the color of state law are permitted to act as defacto pimps who get their cut of what prostituted women charge interstate and foreign travelers who come to Nevada brothels to engage in prostitution.[11] Meanwhile, local governments with populations of more than 700,000 who are prohibited from legalizing prostitution in licensed brothels, like Las Vegas, aggressively promote prostitution as a means to encourage tourism to Nevada.[12] Las Vegas is estimated to bring in over five billion dollars ($5,000,000,000) per year from interstate and foreign travelers who come to Nevada to engage in prostitution. Further, last year in recognition of the tourism dollars brought to the State by prostitution, the 2018 Nevada Day Celebration titled "A State of Economic Diversity" showcased "legal prostitution" as a party of the "extremely diverse economic makeup" of Nevada's economy. [13]

---

[10]Farley, *supra* at page 3, ¶2-3; In 2005, a study focused on 11 European Union countries requested by the European Parliament's committee on Women's Rights and Gender Equality and performed by Transcrime found that stricter prostitution laws seem to produce fewer human trafficking victims.

[11] *See* **Exhibit 9** at **0280-0282 (**Lyon County Annual Budget at pages 13, 32); *See also* **Exhibit 10** at **0283-0285 (Nye County Annual Budget 14, 110)**.

[12] *See* **Exhibit 11** at **0286-0309** (Articles **on Branding and Marketing Efforts of Las Vegas for "Sin City")**; *see also* **Exhibit 12** at **0310-0476 (Kateri M. Grillot, WHAT HAPPENED IN VEGAS?: THE USE OF DESTINATION BRANDING TO INFLUENCE PLACE ATTACHMENTS (2007);** *see also* **Exhibit 13** at 0477-0478 (Sin City Chamber of Commerce references).

[13] *See* **Exhibit 14** at **0479-0480 (Nevada Day 2018 Website).**

Moreover, Nevada government officials and leaders within the political subdivisions of Nevada openly embrace and encourage individuals into interstate and foreign commercial travel to engage in prostitution. State lawmakers will often capitalize on Nevada's notoriety for encouraging people to come to Nevada to engage in prostitution in order to legalize and encourage the legalization of other federally prohibited commercial activities.[14]

Nevada's actions and inactions unavoidably conflict with the federal law and policy established to prevent the exact harms that Plaintiffs assert. The federal government explicitly criminalizes prostitution. The Mann Act, now codified as U.S.C. 18 § 2422(a) (2018), specifically provides "[w]hoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce … **to engage in prostitution**, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." (emphasis added) Further, C.F.R 22 § 40.24(b) (2018) sets forth the meaning of Prostitution as "engaging in promiscuous sexual intercourse for hire." It is facially clear this statute is designed specifically to combat prostitution and human trafficking for the purposes of prostitution.

Even if Nevada was "agnostic" with regard to legalized prostitution and the dicta cited in support of that statement were accepted as true, it is non-sequitur to this cause of action. The injuries sustained by Plaintiffs arise out of both Nevada's misfeasance and nonfeasance.

---

[14] *See* **Exhibit 15** at **0481-0493 (Minutes from Assembly Committee on Government Affairs, May, 12, 2017** at **page 12; Exhibit E PowerPoint presentation by Senator Segerblom); (Legislator stated in support of his efforts to create lawful places for tourists to use marijuana publicly, "Nevada is known for its legal vices and pleasure, which is why many people come here. We allow some things other states do not, things everyone may not condone but are nonetheless going on within a couple of miles of this building," and again, "To those of you who are worried about Nevada's reputation, Nevada has a history of endorsing exotic activities [page 3, (Exhibit E)]. About five miles over the hill in Mound House are brothels, so the idea that we might think a marijuana social club would be inappropriate for Nevada does not seem realistic.").** *See also* **Exhibit 16** at **0494-0498 (Campaign Contribution Reports from Brothels and Brothel Owners to State Officials).**

Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention. *Weitrum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 49, 539 P.2d 36, 41 (1975). Federal law explicitly criminalizes all commercial travel in interstate and foreign commerce to engage in prostitution. Men and women would not travel to Nevada to engage in prostitution in violation of federal law but for Nevada's legal system that creates a perceived safe haven for those seeking to purchase women for sexual intercourse. The Mann Act applies each and every time a person enters into Nevada to engage in prostitution and/or is induced, persuaded, …. to enter the State of Nevada to engage in prostitution. Nevada's system of legalization cannot co-exist with the federal law so long as individuals are encouraged to travel to Nevada through interstate and foreign commerce. The mere existence of the legal system in Nevada encourages this conflict with federal law because it is the only state in the country that permits prostitution in brothels.

### D. 11TH AMENDMENT IMMUNITY DOES NOT APPLY.

The Eleventh Amendment immunizes states, an arm of the state, its instrumentalities, or its agencies from suits brought in federal courts. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995). There are three exceptions to this rule: (1) "Congress may abrogate that immunity pursuant to its lawmaking powers"; (2) "a state may waive its Eleventh Amendment immunity by consenting to suit"; and (3) "immunity does not apply when the plaintiff" sues a state official in his or her official capacity for prospective injunctive relief. *Steshenko v. Gayrard*, 70 F.Supp.3d 979, 988–89 (N.D. Cal. 2014); *see Ex Parte Young*, 209 U.S. 123, 166, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997). Moreover, the Eleventh Amendment limits claims brought under § 1983. *Lawrence*

*Livermore Nat'l Lab.*, 131 F.3d at 836,839 (9ᵗʰ Circ. 1997).

Under the *Ex parte Young* doctrine, immunity does not apply when Plaintiffs choose to sue a state official in his or her official capacity for prospective injunctive relief. *Steshenko v. Gayrard*, 44 F.Supp.3d 941, 949 (N.D.Cal., 2014) (*quoting* S*eminole Tribe of Fla. v. Florida,* 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). The Eleventh Amendment confirms that "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Green v. Mansour*, 106 S.Ct. 423, 425–26, 474 U.S. 64, 68 (U.S.Mich.,1985) *(quoting Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Because of the Eleventh Amendment, states may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity. *Id.,* at 99, 104 S.Ct., at 907. The landmark case of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), created an exception to this general principle by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State. *Id.,* at 159–160, 28 S.Ct., at 453–54. The theory of *Young* was that an unconstitutional statute is void, *id.,* at 159, 28 S.Ct., at 453–54, and therefore does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.,* at 160, 28 S.Ct., at 454. *Young* also held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law. *Id.* at 155–156, 159, 28 S.Ct., at 452–53.

Here, the Defendants are not entitled to immunity because Plaintiffs are seeking prospective injunctive relief by requesting that this Court enter a preliminary and permanent injunction prohibiting the State of Nevada and all of its political subdivisions from implementing, enforcing, or putting into force and effect Nev. Rev. Stat. 201.354(1) and Nev.

Rev. Stat. 244.345(8).

### III. PLAINTIFFS' FIRST AMENDED COMPLAINT CONTAINS SUFFICIENT FACTS THAT, ACCEPTED AS TRUE, STATE A CLAIM TO RELIEF.

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679, 129 S.Ct. 1937. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint ... as true and ... in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). A court should ask, "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bell Atlantic v. Twombly*, 127 S.Ct. 1955, 1969 n.8 (2007) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974)). On motion to dismiss for failure to state a claim, the Court must presume all factual allegations of complaint to be true and draw all reasonable inferences in favor of nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987).

### A. PRE-EMPTION AND THE SUPREMACY CLAUSE.

The preemption doctrine stems from the Supremacy Clause of the United States

Constitution, which provides:

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the judges in every state shall be bound thereby, any Thing in the Constitution or laws of any State to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

This means that when federal and state law conflict, federal law prevails and state law is preempted. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1476 (2018). Therefore, "state laws that conflict with federal law[s] are without effect." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (internal quotations omitted). Conflicts between federal and state law are resolved in favor of federal law. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819); *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992).

Preemption can be express or implied. Preemption is "express" if a federal statute explicitly addresses the domain of state law that is or is not preempted, and it is implied if the structure and purpose of federal law, but not its actual words, preempt state law. *See Cipollone*, 505 U.S. at 516. The implied preemption doctrine is itself divided into two types: field preemption and conflict preemption. Field preemption applies where a state law seeks to "regulate conduct in a field that Congress intended the Federal Government to occupy exclusively." *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). "[U]nder field preemption, preemption is implied when congressional enactments so thoroughly occupy a legislative field, or touch a field in which the federal interest is so dominant, that Congress effectively leaves no room for states to regulate conduct in that field." *Id.* Conflict preemption applies when a direct conflict exists between federal and state law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Conflict preemption is further subdivided into two types, one based on the impossibility of complying with both federal and state law and the other

based on the notion that the state law frustrates the purposes of the federal law.

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (*quoting Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). In determining congressional intent, the Court must first consider whether Congress made its intent to preempt state law clear through express language in a statute. *Oneok, Inc. v. Learjet,* Inc., 135 S.Ct. 1591, 1595(2015). Even when a statute does not expressly refer to preemption, Congress may implicitly preempt state legislation through either field preemption or conflict preemption. *Id*.

Sex trafficking, as defined by the Trafficking Victims Protection Act, includes all pimping and sex buying. Nevada's creation of an intrastate commercialized prostitution market exerts a substantial economic effect, namely, the creation of an interstate and foreign prostitution market; therefore, Nevada's legal brothels, operating under Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), are in violation of and direct conflict with 42 U.S.C. § 1983; the federal the "Mann Act" (codified at 18 U.S.C. §§ 2421–2424) and the "Victims of Trafficking and Violence Protection Act of 2000", codified at 22 U.S.C. §§ 7101–7114 (TVPA).

On June 25, 1910, the 61st United States Congress passed H.R. 12315, also known as the "Mann Act" (the "Act") (codified as 18 U.S.C. § 2422(a) (2018)), which criminalized the interstate or foreign commerce transport "of any woman or girl for prostitution, debauchery, or for any other immoral purpose." The primary intent was to combat prostitution, immorality, and human trafficking for the purposes of prostitution in the United States.

The Mann Act has since been amended, extending coverage from "any woman or girl" to "any individual," deleting the terms "debauchery" and "other immoral purpose," criminalizing coercion and enticement to "travel in interstate or foreign commerce … to engage in prostitution," and removing the requirement for transport on an interstate common carrier. The

intent of the Act, specifically to combat prostitution and human trafficking for the purposes of prostitution, remained unchanged.  The current statute specifically provides:

> Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 2422(a) (2018).

On October 28, 2000, the 106th Congress passed H.R. 3244, also known as the "Victims of Trafficking and Violence Protection Act of 2000" (the "TVPA") (codified as 22 U.S.C. § 7101-7114 (2018)), which criminalized human trafficking and related offenses as federal crimes with severe penalties attached and established several methods to prosecute traffickers.  The purpose of this to legislation is to address trafficking in persons. The law provides a three-pronged approach that includes prevention, protection, and prosecution.  The issue of trafficking in persons included those trafficked into the commercial sex industry, modern day slavery, and forced labor.  Contrary to Nevada and Sisolak's inaccurate assertions, the Congressional intent of the federal law as expressed through the enactment of 18 U.S.C. 2422(a) is clear, certain, and unambiguous, *to wit*, to prevent persons from persuading, inducing, enticing, and/or coercing any person to travel across state lines to engage in prostitution.

### B.  NEVADA LAW IS PREEMPTED BY FEDERAL LAW.

Plaintiffs assert in their First Amended Complaint that the Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) are invalid under two theories of preemption: (1) field preemption based on The Mann Act" (the "Act") (codified as 18 U.S.C. § 2422(a) (2018), which its intent is clear to prevent persons from persuading, inducing, enticing, and/or coercing any person to travel across state lines to engage in prostitution and also Victims of Trafficking and Violence Protection Act of 2000" (the "TVPA") (codified as 22 U.S.C. § 7101-7114) which criminalized

human trafficking and related offenses as federal crimes with severe penalties attached and established several methods to prosecute traffickers; and (2) conflict preemption as to two federal laws, The Mann Act and the TVPA. In Plaintiffs' First Amended Complaint, Plaintiffs sufficiently allege a claim for field and conflict preemption.

## 1. FIELD PREEMPTION

Field preemption occurs when states are precluded from regulating conduct in a field that Congress "has determined must be regulated by its exclusive governance." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013). Field preemption can be inferred from a regulation that is "so pervasive ... that Congress left no room for the [s]tates to supplement it or where there is a federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id*. at 1022–23 (internal quotation marks omitted). Congress, through the Mann Act and the TVPA, intended to occupy the entire field of prostitution and sex trafficking, thus leaving no room for the Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8). The Mann Act does not expressly refer to preemption, however it should be inferred that the Congressional intent in enacting the Mann Act was to preempt state laws from the substantive provisions of the legislation. Accordingly, "even when a statute does not expressly refer to preemption, Congress may implicitly preempt state legislation through either field preemption or conflict preemption." *Knox v. Brnovich*, 907 F.3d 1167 (C.A.9 (Ariz.), 2018).

## 2. CONFLICT PREEMPTION

Conflict preemption occurs when state law conflicts with a federal statute. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Conflict preemption has two forms: impossibility and obstacle preemption. Id. at 372, 120 S.Ct. 2288. Impossibility preemption occurs where "it is impossible for a private party to comply with

both state and federal law." *Id*. Obstacle preemption occurs "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id*. at 373, 120 S.Ct. 2288 (internal quotation marks and alterations omitted). Both forms of conflicting state law are "nullified" by the Supremacy Clause. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873, 120 S. Ct. 1913, 1921, 146 L. Ed. 2d 914 (2000) (*citing* Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982), *United States v. Locke*, 529 U.S. 89, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000); *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

Plaintiffs' First Amended Complaint, as plead, sets forth sufficient facts to facially establish and make evident that Nevada's laws permitting counties to license brothels is in direct conflict with the objectives of the Mann Act to prevent commercial prostitution and sex trafficking through interstate and foreign commerce. As an obstacle to the full purposes and objectives of Congress, Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the brothel licensing ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties obstruct the accomplishment of Congress' purposes and objectives of the Mann Act and are therefore preempted.

## IV.   **CONCLUSION**

For the reasons stated above, this Court should deny Defendants State of Nevada and Governor Steve Sisolak's Motion to Dismiss Plaintiffs' First Amended Complaint.

DATED this 21st day of May, 2019.   HUTCHISON & STEFFEN, PLLC

By: /s/ *Jason D. Guinasso*
JASON D. GUINASSO, ESQ. (SBN# 8478)
*Attorney for Plaintiffs*

# CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of Hutchison & Steffen, PLLC, over the age of 21 years, and not a party to nor interested in the within action. I certify that on this date, the foregoing was electronically filed with the United States District Court. Electronic service of the foregoing document shall be made in accordance with the Master Service List as follows:

Gregory Louis Zunino GZunino@ag.nv.gov, sgeyer@ag.nv.gov
Kevin C. Powers      kpowers@lcb.state.nv.us
Gus W Flangas      gwf@fdlawlv.com, cjm@fdlawlv.com, lmr@fdlawlv.com
Jessica K Peterson      jkp@fdlawlv.com, fi@fdlawlv.com


Dated this May 21, 2019.


/s/ A. Otutaha
Employee of Hutchison & Steffen, PLLC

**List of Exhibits**
**APPENDIX OF EXHIBITS TO PLAINTIFFS' OPPOSITION TO DEFENDANTS STATE OF NEVADA AND GOVERNOR STEVE SISOLAK'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 22)**

| Description | Volume Number | Bates Range |
|---|---|---|
| EXHIBIT 1- RONALD B. FLOWERS, PROSTITUTION IN THE DIGITAL AGE: SELLING SEX FROM THE SUITE TO THE STREET? at pg. 42-46 (Praeger 2011) | I | 0001-0006 |
| Exhibit 2- Crysta N. Price, Terry D. Clark, & Julie Faller, Nevada's Online Commercial Sex Market, HUMAN TRAFFICKING INITIATIVE, CREIGHTON UNIVERSITY (2017), https://awakenreno.org/wp-content/uploads/2018/05/FINAL_Nevada_March2018.pdf | I | 0007-0029 |
| Exhibit 3- Seo-Young Cho, Axel Dreher, & Eric Neumeyer, Does Legalized Prostitution Increase Human Trafficking?, WORLD DEVELOPMENT, at pg. 41, 67-82 (2012), https://eprints.lse.ac.uk/45198/1/Neumayer _Legalized_Prostitution_Increase_2012.pdf | I | 0030-0078 |
| Exhibit 4- Melissa Farley, Trafficking for Prostitution: Making the Connections, AMERICAN PSYCHOLOGICAL ASSOCIATION (2007) | I | 0079-0086 |
| Exhibit 5- Shapiro & Hughes, Decriminalized Prostitution: Impunity for Violence and Exploitation, UNIVERSITY OF RHODE ISLAND (2017) | I | 0087-0116 |
| Exhibit 6- Research Report, Who Buys Sex? Understanding and Disrupting Illicit Market Demand, Demand Abolition (Nov., 2018) | I | 0117-0169 |
| Exhibit 7- U.S. DEPARTMENT OF STATE, TRAFFICKING IN PERSONS REPORT at pg. 27 (2007) | I | 0170-0171 |
| Exhibit 8- Examples Of Advertising And Marketing Of Brothels | II | 0172-0279 |
| Exhibit 9- Lyon County Annual Budget | II | 0280-0282 |
| Exhibit 10- Nye County Annual Budget | II | 0283-0285 |
| Exhibit 11- Articles on Branding and Marketing Efforts of Las Vegas for "Sin City" | II | 0286-0309 |
| Exhibit 12- Kateri M. Grillot, WHAT HAPPENED IN VEGAS?: THE USE OF DESTINATION BRANDING TO INFLUENCE PLACE ATTACHMENTS (2007) | III | 0310-0476 |
| Exhibit 13- Sin City Chamber of Commerce references | III | 0477-0478 |
| Exhibit 14- Nevada Day 2018 Website | III | 0479-0480 |
| Exhibit 15- Minutes from Assembly Committee on Government Affairs, May, 12, 2017 at page 12; Exhibit E PowerPoint presentation by Senator Segerblom | III | 0481-0493 |
| Exhibit 16- Campaign Contribution Reports from Brothels and Brothel Owners to State Officials | III | 0494-0498 |