---

Table 2: Regional Jackknife, Human Trafficking and Prostitution, Ordered Probit, imputed

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| Legal prostitution dummy | 0.704* | 0.794*** | 0.603* | 0.565* | 0.696** | 0.652** | 0.677** |
| | (1.84) | (2.63) | (1.91) | (1.84) | (2.47) | (2.32) | (2.34) |
| Rule of law | -0.390 | -0.641** | -0.552* | -0.536 | -0.631* | -0.537* | -0.506 |
| | (1.26) | (2.02) | (1.94) | (1.91) | (1.80) | (1.80) | (1.61) |
| (log) population | 0.177 | 0.193* | 0.152 | 0.362*** | 0.284*** | 0.226** | 0.231** |
| | (1.61) | (1.94) | (1.43) | (3.67) | (2.68) | (2.44) | (2.43) |
| (log) GDP per capita | 0.588* | 0.749** | 0.486 | 0.691** | 0.788** | 0.660** | 0.595** |
| | (1.91) | (2.44) | (1.60) | (2.15) | (2.52) | (2.37) | (2.05) |
| Democracy dummy | 0.886* | 0.730* | 0.898** | 0.631 | 0.788** | 0.761** | 0.753* |
| | (1.66) | (1.75) | (2.19) | (1.45) | (2.00) | (1.98) | (1.93) |
| (log) migrant stock | 0.188* | 0.255** | 0.453*** | 0.146 | 0.170 | 0.220** | 0.204** |
| | (1.68) | (2.34) | (3.76) | (1.34) | (1.59) | (2.21) | (1.96) |
| Share of catholics | 0.002 | -0.006 | -0.007 | -0.007 | -0.007* | -0.006 | -0.007 |
| | (0.26) | (1.38) | (1.56) | (1.44) | (1.72) | (1.46) | (1.56) |
| East Asia dummy | 1.085* | | 0.248 | -0.152 | 0.222 | 0.266 | 0.158 |
| | (1.82) | | (0.30) | (0.22) | (0.30) | (0.38) | (0.22) |
| Developing Europe dummy | -0.068 | -1.023* | | -1.143* | -0.993 | -1.020* | -1.089* |
| | (0.10) | (1.67) | | (1.80) | (1.63) | (1.72) | (1.76) |
| Latin America dummy | -1.426** | -1.680*** | -1.813*** | | -1.612*** | -1.628*** | -1.651*** |
| | (2.10) | (3.16) | (3.17) | | (3.03) | (3.18) | (3.06) |
| MENA dummy | 0.309 | -0.654 | -1.068 | -0.981 | | -0.705 | -0.793 |
| | (0.76) | (1.06) | (1.50) | (1.58) | | (1.24) | (1.34) |
| South Asia dummy | 0.396 | -0.358 | -1.213* | -0.739 | -0.452 | | -0.626 |
| | (0.47) | (0.55) | (1.75) | (1.20) | (0.72) | | (0.96) |
| Sub-Sahara Africa dummy | | -0.812 | -1.220 | -1.037 | -0.744 | -0.826 | |
| | | (1.25) | (1.55) | (1.55) | (1.16) | (1.34) | |
| Sample without: | Western Europe | East Asia | Developing Europe | Latin America | MENA | South Asia | Sub-Sahara Africa |
| Number of countries | 70 | 109 | 98 | 96 | 105 | 113 | 105 |

Absolute t-statistics in parentheses; * (**, ***) indicates significance at 10 (5, 1) percent level.

40

Table 3: Extreme Bounds Analysis (EBA), Ordered Probit, imputed

| Variable | Avg. Beta | Avg.Std.Err | %Sign. | CDF-U |
|---|---|---|---|---|
| Latin America dummy | -1.63 | 0.55 | 1.00 | 1.00 |
| (log) migrant stock | 0.26 | 0.10 | 1.00 | 0.99 |
| (log) GDP per capita | 0.73 | 0.30 | 0.95 | 0.99 |
| Legal prostitution dummy | 0.65 | 0.28 | 1.00 | 0.99 |
| Rule of law | -0.59 | 0.28 | 0.84 | 0.97 |
| Developing Europe dummy | -1.06 | 0.60 | 0.52 | 0.95 |
| Democracy dummy | 0.71 | 0.43 | 0.55 | 0.93 |
| (log) population | 0.18 | 0.10 | 0.62 | 0.92 |
| Share of Catholics | -0.01 | 0.00 | 0.29 | 0.91 |
| Sub-Sahara Africa dummy | -0.76 | 0.67 | 0.01 | 0.86 |
| MENA dummy | -0.66 | 0.59 | 0.00 | 0.86 |
| East Asia dummy | 0.44 | 0.73 | 0.00 | 0.72 |
| South Asia dummy | -0.37 | 0.66 | 0.00 | 0.70 |

Notes: Variables are sorted according to their CDF(0). All results are based on 3,303 regressions. 'Avg. beta' reports the average coefficient while 'Avg S.E.' indicates the average standard error of all regressions. '%Sig' shows the percentage of regressions in which the coefficient is statistically different from zero at the 5 percent level at least. 'CDF-U' shows the (unweighted) mass of the larger part of the distribution of the estimated coefficients (i.e., the value is always greater or equal to 0.5). The criterion for a variable we consider as robust is a value of 0.9 or above.

0071



Figure 1: Partial Leverage Plot of the Effect of Prostitution on Reported Human Trafficking

Appendix A. Degree of Human-Trafficking Inflows

| Number of Sources | Index Ranking | Total Number of Countries |
|---|---|---|
| 0[a] | 0 (No) | 24 |
| 1 | 1 (Very low) | 29 |
| 2-3 | 2 (Low) | 27 |
| 4-10 | 3 (Medium) | 50 |
| 11-24 | 4 (High) | 21 |
| 25-40 | 5 (Very high) | 10 |

Source: UNODC (2006, p.118)

[a] The Index does not explicitly specify a ranking for countries with no inflow of human trafficking.

Appendix B. Distribution of Countries across Categories of Human-Trafficking Inflows

| Very High | High | Medium | Low | Very Low |
|---|---|---|---|---|
| Belgium | Australia | Albania | Aruba | Algeria |
| Germany | Austria | Argentina | Bangladesh | Bhutan |
| Greece | Bosnia and | Bahrain | Belize | Brazil |
| Israel | Herzegovina | Benin | Brunei Darussalam | Burundi |
| Italy | Cambodia | Bulgaria | Congo, Republic of | Chad |
| Japan | Canada | Burkina Faso | Costa Rica | Chile |
| Netherlands | China | Cameroon | Ecuador | Congo, Democratic |
| Thailand | Hong Kong, China | Cote d'Ivoire | Egypt | Republic of |
| Turkey | SAR | Croatia | Haiti | Djibouti |
| United States of | Taiwan Province of | Curacao | Indonesia | Dominica |
| America | China | Dominican | Iraq | Ethiopia |
| | Cyprus | Republic | Ireland | Fiji |
| | Czech Republic | El Salvador | Kyrgyzstan | Gambia |
| | Denmark | Equatorial Guinea | Lao People's | Georgia |
| | France | Estonia | Democratic | Honduras |
| | India | Finland | Republic | Jamaica |
| | Kosovo, | Gabon | Libyan Arab | Liberia |
| | (Serbia and | Ghana | Jamahiriya | Malawi |
| | Montenegro) | Guatemala | Luxembourg | Maldives |
| | Pakistan | Hungary | Mali | Morocco |
| | Poland | Iceland | Niger | Mozambique |
| | Saudi Arabia | Iran | Oman | Republic of |
| | Spain | Kazakhstan | Paraguay | Moldova |
| | Switzerland | Kenya | Romania | Senegal |
| | United Arab | Kuwait | Slovenia | Sierra Leone |
| | Emirates | Latvia | Sri Lanka | Slovakia |
| | United Kingdom | Lebanon | Uganda | Sudan |
| | | Lithuania | United Republic of | Tajikistan |
| | | Macao, China SAR | Tanzania | Trinidad and |
| | | Malaysia | Uzbekistan | Tobago |
| | | Mexico | Yemen | Zambia |
| | | Myanmar | | Zimbabwe |
| | | New Zealand | | |
| | | Nigeria | | |
| | | Norway | | |
| | | Panama | | |
| | | Philippines | | |
| | | Portugal | | |
| | | Qatar | | |
| | | Republic of Korea | | |
| | | Russian Federation | | |
| | | Serbia and | | |
| | | Montenegro | | |
| | | Singapore | | |
| | | South Africa | | |
| | | Sweden | | |
| | | Syrian Arab | | |
| | | Republic | | |
| | | The former | | |
| | | Yugoslav | | |
| | | Republic of | | |
| | | Macedonia | | |
| | | Togo | | |
| | | Ukraine | | |
| | | Venezuela | | |
| | | Viet Nam | | |

0074

Source: UNODC (2006, p.20)

0075

Appendix C. Prostitution Regimes



Source: US Department of State, Country Reports on Human Rights Practice (1999-2008) and various issues of CEDAW country reports

Appendix D. Descriptive Statistics (estimation sample, Table 1, column 8)

| Variables | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|
| Human trafficking inflows | 2.56 | 1.46 | 0.00 | 5.00 |
| Legal prostitution dummy | 0.47 | 0.50 | 0.00 | 1.00 |
| Rule of law | 0.19 | 0.99 | -1.57 | 2.00 |
| (log) population | 16.08 | 1.72 | 12.29 | 20.91 |
| (log) GDP per capita | 8.90 | 1.05 | 6.92 | 10.83 |
| Democracy dummy | 0.62 | 0.49 | 0.00 | 1.00 |
| (log) migrant stock | 5.79 | 1.74 | 0.99 | 10.05 |
| Share of Catholics | 33.94 | 38.40 | 0.00 | 97.30 |
| East Asia dummy | 0.06 | 0.25 | 0.00 | 1.00 |
| Developing Europe dummy | 0.15 | 0.36 | 0.00 | 1.00 |
| Latin America dummy | 0.17 | 0.38 | 0.00 | 1.00 |
| MENA dummy | 0.08 | 0.28 | 0.00 | 1.00 |
| South Asia dummy | 0.03 | 0.16 | 0.00 | 1.00 |
| Sub-Sahara Africa dummy | 0.10 | 0.30 | 0.00 | 1.00 |

47

## Appendix E. Sources and Definitions

| Variables | Definition | Source |
|---|---|---|
| Human trafficking inflows | Reported incidences of human trafficking inflows. Score 0 (no flows) and 5 (very high flows). | UNODC (2006) |
| Legal prostitution dummy | Dummy indicating whether or not a country allows prostitution. 1 being legal and 0 otherwise. | US Dept. of State (1999-2008) |
| Legal brothel dummy | Dummy indicating whether or not a country allows brothel/pimping. 1 being legal and 0 otherwise. | US Dept. of State (1999-2008) |
| Rule of law | Index in the range of -2.5 to 2.5, with higher values corresponding to better outcomes. | Kaufmann et al. (2009) |
| (log) population | Log of a country's total population. | World Bank (2011) |
| (log) GDP per capita | Log of GDP per capita, PPP (constant 2005 international $). | World Bank (2011) |
| Democracy dummy | Indicates whether multiple parties are legally allowed and exist outside the regime front, and whether the selection of the executive and the legislature involve an either direct or indirect mandate from an electorate. | Cheibub et al. (2009) |
| (log) migrant stock | Stock of migrants. | UNDP (2010) |
| Share of Catholics | Share of Catholics in overall population. | Encyclopedia Britannica Book (2001) |
| Regional dummies | Dummies for the regions East Asia dummy, Developing Europe, Latin America, Middle East and North Africa (MENA), South Asia and Sub-Sahara Africa. | World Bank (2010) |
| Media Freedom | Freedom of the Press Index. Score 0 (best) to 100 (worst). | Freedom House (2009) |
| Tourism inflows | Annual number of foreign visitors in a country. | World Bank (2011) |
| Share of Protestants | Share of Protestants in overall population. | Encyclopedia Britannica Book (2001) |
| Share of Muslims | Share of Muslims in overall population. | Encyclopedia Britannica Book (2001) |
| Urbanization | Share of a country's population living in cities. | World Bank (2011) |
| Trade (% of GDP) | Trade in percent of GDP. | World Bank (2011) |
| Prosecution index | Index assessing the level of governmental efforts to punish and prosecute traffickers and other related offenders (such as employers of trafficking victims, law enforcement officials who collude with traffickers, and clients of services provided by human trafficking victims). | Cho et al. (2011) |
| Protection index | Index assessing the level of governmental efforts to protect and assist the victims of human trafficking. | Cho et al. (2011) |
| Prevention index | Index assessing the level of governmental efforts to prevent and combat human trafficking. | Cho et al. (2011) |
| Right government | The share of right-wing governments in power over the 1990-95 period. | |
| Unemployment, male | Unemployment, male (in percent of the male labor force). | World Bank (2011) |
| Unemployment, female | Unemployment, female (in percent of the male labor force). | World Bank (2011) |
| Employment, agriculture | Employment in agriculture (in percent of total employment). | World Bank (2011) |
| Literacy rate | Literacy rate, adult total (in percent of people ages 15 and above). | World Bank (2011) |
| Mortality rate | Mortality rate, under-5 (per 1,000). | World Bank (2011) |
| Visa restrictions | The number of foreign countries whose nationals need a visa to enter the country under observation (in 2004). | Neumayer (2006) |
| Visa restrictions 2 | The number of foreign countries whose nationals need a visa to enter the country under observation (in 2004), counting visa provision at border as visa-free access. | Neumayer (2006) |
| Language dummies | Dummies for English speaking, French speaking, Spanish speaking, Portuguese speaking, and German speaking countries. | CIA (2010) |
| Legal origin dummies | Dummies for British, Socialist, French, German, and Scandinavian legal origin. | La Porta et al. (1998) |

0078



**EXHIBIT 4**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MELISSA FARLEY,**
**TRAFFICKING FOR PROSTITUTION:**
**MAKING THE CONNECTIONS, AMERICAN**
**PSYCHOLOGICAL ASSOCIATION  (2007)**

**(0079-0086)**

**EXHIBIT 4**

1

Trafficking for Prostitution: Making the Connections
Melissa Farley
American Psychological Association
115th Annual Convention August 17, 2007 San Francisco[1]

I'm going to talk about false distinctions in the field of trafficking for prostitution, about denial, and about the issue of consent/and choice - which is one aspect of denial.  I'll end by talking about some UN agreements that challenge these false distinctions between prostitution and trafficking.

Sex trafficking is coercing or selling or renting a person in a situation of sexual exploitation, such as prostitution or pornography.  Trafficking happens whenever women, men, or children are recruited and then exploited in the sex industry. Prostitution is the destination point for sex trafficking.

The sex industry, like any other industry, has domestic and international sectors, marketing sectors, a range of physical locations out of which it operates in each community, is controlled by many different owners and managers, and is constantly expanding as technology, law, and public opinion permit. The false distinction between voluntary and forced prostitution puts both victims and law enforcement in an impossible bind.

Alesia Adams joked about the lack of services for prostituted teens in Atlanta. "What do I have to do to get some help here?  Take these girls across the border in a bus, then bring them back into the U.S., and say, 'Here, I've got some trafficked girls, now can we get some funding for services?" Adams was challenging the lack of funds for women and children who are domestically, but not internationally, trafficked into prostitution.

Things are not always what they seem.

Jody Williams, founder of Sex Workers Anonymous in Las Vegas, is coauthor of a chapter in the 2007 book, *Prostitution and Trafficking in Nevada: Making the Connections* on subjugation of women in prostitution by pimp mind control, has devoted her life to helping women escape prostitution.  She's been out of prostitution many years, and talks about the time she was on a talk show with a well known pimp and several women who prostituted in his legal Nevada brothel.  The women spoke glowingly of how much fun prostitution was, how rich they were getting, how glamorous the life was to the talk show host.   Jody spoke about the harms of prostitution, including legal prostitution.   At the end of the show, as the pimp was talking to the host, one of the women whispered to Jody that she needed help, saying she was there under captivity, that he had a

gun, had threatened her life, and could she go with Jody in her car.  Jody went out the door with the woman, who left her purse and jacket on the chair, running for her life.

Under duress from pimps or traffickers or cult leaders, women hide their coerced status in prostitution just as they do in religious cults, and just captives or children hide their abused status, blaming themselves, feeling invisible, mistrusting almost everyone even especially those that seem to offer help, since there have been so many betrayals.

Slavery in the United States had cover narratives much like those used today on the talk show that Jody participated in.   The level of psychological and physical coercion against the women on the talk show, the psychological abuse, sexual abuse, familial and community neglect– were carefully concealed by a woman who was under the terrorist control of a pimp.  How do we ignore what is in front of us?  How can we look at people doing what we would never want to do – perfom sex acts with 5-20 anonymous strangers a day – and conclude that a particular 20 year old just loves to do that because she has a smile and an attitude?  It takes a village to create a prostitute and we're that village.

As Judith Herman said some years ago, most people refuse to believe how bad it really is for women. Actively refuse.   Pimps and traffickers count on peoples' ignorance about prostitution/trafficking, their refusal to believe their senses, and their willingness to buy his program.    This is accomplished by exploiting people's fears and vulnerabilities and by the deceptive use of language.

Victim/survivors struggle to protect themselves from further harm by dissociation and denial.   Barb Strachan at DIGNITY House in Phoenix explained.

> There's a protective denial. You have to convince yourself and everyone around you that it's great. You tell the lie – "I like it" – so much that you believe it yourself.  You make it OK by saying, 'I haven't been beat up today.  I haven't lost all my money today.'  Women have to justify it:  they can't tell themselves or anyone else the reality of it or else they'd die.  Until you step out of prostitution, you don't realize what the emotional wreckage is.

Because we still know little about prostitution and trafficking, we are vulnerable to thinking inside the conceptual and legal boxes constructed for us by politicians, lawyers, and perpetrators.  We can no longer afford to be limited by someone else's definition of what the problem is.  As psychologists, we look for evidence-based phenomena.  We must reject definitions and demographics foisted

3

on us by politically-driven government organizations or by the False Memory syndrome Foundation, or by biased scientists who tell us for example that global heating does not really exist.

Psychologists cannot let politicians decide what torture is or is not. We cannot let the False Memory syndrome Foundation define what incest is or is not. And we cannot let the pimp lobby tell us that prostitution is work and that the only people we should be focusing on are children who are trafficked with a gun to their head from Romania.

There is an evolving public awareness about the human rights violations of sex trafficking in Nevada and elsewhere in the United States. This awareness and public outrage about trafficking, however, exists primarily for victims who have been transported across an international border. Although physical violence may or may not occur, in all cases of trafficking for prostitution there is psychosocial coercion that happens in contexts of sex and race inequality and under conditions of poverty or financial stress, and often a history of childhood abuse or neglect. Women may legally and seemingly voluntarily migrate from a poorer to a wealthier part of the world, for example with a work permit and the promise of a good job from a "friend" who turns out to be a trafficker. Once she has migrated, away from home and community support, she is dependent on traffickers and their networks. At that point the pimp/trafficker's psychological and physical coercion expands while her options for escape rapidly shrink.

Domestic and international trafficking have similar adverse effects on the victim. The psychological harms of trafficking and the resulting traumatic stress are much the same as the psychological harm done to women who are in the legal brothels but who have not crossed an international border. Salgado described a trafficking syndrome resulting from repeated harm and humiliation against a person who is kept isolated and living in prisoner-of-war-like conditions. International trafficking, just like prostitution and domestic trafficking, is extremely likely to result in posttraumatic stress disorder (PTSD). Both domestically and internationally trafficked women experience terror, despair, guilt regarding behaviors that run counter to their cultural or religious beliefs, blame themselves for the abuse perpetrated on them by pimps and buyers, feel a sense of betrayal not only by family and pimps but also by governments that fail to help them.

Domestic trafficking - the sale of women in prostitution from poorer to more prosperous sex markets within a single country - can be as devastating for

4

the women as international trafficking. This is true in countries where there is assumed to be significant wealth such as New Zealand and the United States as well as countries where there is more visible poverty such as India and Zambia.

> The apparently civilized transaction between elite prostitutes and their clients in luxury hotels is underpinned by the same logic that underpins the forcible sale of girls in a Bangladeshi brothel. This logic is premised on a value system that grades girls and women - and sometimes men and boys - according to their sexual value. (Louise Brown)

The economic and social forces that channel young, poor, and ethnically marginalized women into prostitution are evident in post-Katrina New Orleans. Survivors of prostitution and advocates for homeless teenagers in Las Vegas have reported that in the two years following the economic devastation of hurricane Katrina, many young women previously pimped in New Orleans were domestically trafficked to Las Vegas. New Orleans, an economically stressed area with a long history of race discrimination, was the source region for young and poor African American girls. Las Vegas, with its thriving sex businesses, was the domestic traffickers' destination market for the girls.

There is a pyramid-like hierarchy in prostitution. At the top are a very few women who service a few men for a lot of money in a short period of time in their lives - and then they get out, or are bought by one man who supports them. In the middle section of the pyramid are women who need the money, who have had the option of sexual exploitation as a survival mechanism made very real to them by a history of incest or childhood sexual abuse, and who may face an emergency situation such as escaping a violent partner, losing a job, or having children with special needs. The farther you descend in the hierarchy, the greater the numbers of women in prostitution, and the less meaningful any discussion of choice is for them. At the bottom of the hierarchy are the largest number of women in prostitution, those who are the poorest and who have enormously restricted life choices. Many of these women have been physically coerced into prostitution.

The theory that some women choose prostitution ignores the facts that women do not have equal rights with men and that people of color are discriminated against in the United States. Choice depends on the freedom to choose. The lowest earning workers in most cultures are single women who are

5

raising children. In 2005 a minimum wage full-time worker could not afford an average priced one-bedroom apartment anywhere in the United States.

As a woman in a Nevada brothel patiently told me, "no one likes to be sold for sex," whether it's legal or illegal, located indoors or outside, in a gentleman's club or in a gentleman's car. Yet wherever there's prostitution, the pimps' and johns' debate flames up about whether women in prostitution really like it, whether they consent, whether it's voluntary or not.

In spite of women's longing to escape all types of prostitution, some observers have theorized a false distinction between voluntary and coerced prostitution. Pimps bait us with the myth that there is a vast gulf between what they call "freely chosen" prostitution and the physically coerced trafficking of women and children. But is there really such a grand difference, or are some forms of coercion simply more visible than others? How do you know what's behind the mask of a smiling twenty-three year old who is stripping and turning tricks in the VIP lounge of the strip club? What was her life like before she started prostituting? How many people early on defined her as a little whore while she was sexually abused as a child by family members and neighbors? Did she recently escape a violent husband or partner? Does she have children to support and no job that pays enough? Was she unable to afford to go to college? Was she (for whatever reason) emotionally and economically vulnerable and then tricked and brainwashed by a pimp?

For many reasons, people may "choose" what is deeply harmful to themselves, sometimes because they've grown up seeing themselves in a limited or damaged way. Because they had no alternatives, battered women for many years were assumed to be freely choosing to return to violent partners when in fact they were terrorized into returning under conditions of restricted economic resources. Our culture itself – as the APA's recent report on the sexualization of girls indicates - limits women's ability to reject the consent that is taken for granted.

A woman in Lusaka, Zambia said, "Yes, I made the choice to prostitute, my children are hungry and I have to feed them." A woman in West Bengal, India said that she prostituted because it was "better pay for what was expected of her in her last job, anyway." Echoing the Indian woman's sentiment, lap dancers in U.S. strip clubs felt the same way about the futility of avoiding workplace sexual harassment. In 2003, Juliana Beasley interviewed and photographed U.S. lap

6

dancers. ."Many dancers I interviewed spoke of harassment working in so-called straight jobs, she commented, Their attitude was, 'If I'm going to be sexually objectified, I might as well get paid for it.'"

We live in a world where women are increasingly channeled into prostitution as their opportunities for work in other sectors of the economy shrink. Women in U.S. prostitution joke about the "welfare-to-prostitution" trend that has occurred subsequent to the removal of government-assisted educational programs, job training, housing, and childcare. Women are coerced into prostitution by the actions of politicians who remove public supports by shutting down essential social services, who de-fund housing programs and educational opportunities for the poor, and who vote to eliminate food subsidies for vulnerable women and children.

Most discussions of choice and consent erase the fact that prostitution is intrinsically sexually exploitive. Whether or not an individual woman is able to decrease prostitution's physical damage, whether she has relatively more or less money in the bank as backup protection, whether or not she is slightly more protected in prostitution by class and race privilege, and whether or not she is protected from sexually transmitted disease by the john's use of a condom - prostitution nonetheless remains harmful. Consent is not a meaningful concept when a woman acquiesces to prostitution out of fear, despair, and a lack of alternatives. In prostitution, the conditions which make genuine consent possible are absent: physical safety, equal power with customers, and real alternatives.

The pimp's defense is usually that she consented to prostitution. Traffickers offer us the lie that women consent to trafficking. While women may initially consent to prostitution, they rarely know how bad it is going to be, and they never know the prison-like or slave-like circumstances in which they will often be prostituted. A trafficker who operated illegal brothels in 13 states including Nevada was arrested for transporting women from Latin America into prostitution. After his arrest, he argued in court that he gave the women cell phones, let them keep "some of their earnings," and that they had "some periods of freedom." He claimed the women consented but what exactly did they consent to? To being coerced to turn a dozen tricks a day in exchange for having a cell phone, a few dollars, and some pimp-specified amount of freedom?

Two international agreements confront the flawed notion that women "freely consent" to prostitution, and make clear statements opposing prostitution

7

and trafficking. The first is the United Nations 1949 Convention which declares that trafficking and prostitution are incompatible with individual dignity and worth. The 1949 UN Convention addresses the harms of prostitution to *consenting adult women whether or not they were transported across national boundaries.* A second United Nations document views trafficked women as victims, not criminals. The 2000 Palermo Protocol like the 1949 Convention declares that consent is irrelevant to whether or not trafficking has occurred. It encourages states to develop legislative responses to men's demand for prostitution and establishes a method of international judicial cooperation that would permit prosecution of traffickers and organized criminals. The Palermo Protocol also addresses a range of other forms of sexual exploitation including pornography.

The U.S. federal legal requirement that coercion to trafficking be visible as force, fraud, or deception - reflects a failure to understand the psychological control, the invisible mental coercion, and the terrorist control exercised by johns and pimp/traffickers over women who are vulnerable because of sex, race, and poverty. It's time for a change, so that we can simultaneously provide services for victims and work toward an end to the institution of prostitution, as the Swedish government did in 2000. The Swedes decriminalized prostitution for the victims, while at the same time levying felony-level penalties against johns, pimps, and traffickers. It works.

Much of this talk is based on excerpts from Melissa Farley (2007) *Prostitution and Trafficking in Nevada: Making the Connections.* Prostitution Research & Education: San Francisco.

———————————————————

# EXHIBIT 5

Shapiro & Hughes, Decriminalized Prostitution: Impunity for Violence and Exploitation, UNIVERSITY OF RHODE ISLAND (2017)

**(0087-0116)**

# EXHIBIT 5

# University of Rhode Island

## From the SelectedWorks of Donna M. Hughes

2017

# Decriminalized Prostitution: Impunity for Violence and Exploitation

Melanie Shapiro, Esq
Donna M. Hughes, Dr.

 This work is licensed under a Creative Commons CC_BY-NC-ND International License.

Available at: https://works.bepress.com/donna_hughes/94/



0088

# DECRIMINALIZED PROSTITUTION:
# IMPUNITY FOR VIOLENCE AND EXPLOITATION

*Melanie Shapiro, Esq.*[*] *and Donna M. Hughes, Ph.D.*[**]

## INTRODUCTION

From 1980 to 2009, prostitution in Rhode Island was decriminalized.[1]  Prostitution was not prohibited or regulated by law if it was performed indoors.[2]  The lack of laws or regulations created a unique and permissive legal, economic, and cultural environment for the growth of sex businesses.[3]  Although a few counties in Nevada have legalized prostitution,[4] no other state or county has decriminalized prostitution in recent decades.[5]  During the twenty-nine year period from 1980 to 2009, sexual exploitation and violence against women and girls were integrated into the economic development of Rhode Island's urban areas.[6]  The growth of sex

[*] Melanie Shapiro is an immigration attorney based in Dedham, Massachusetts.  She is licensed to practice in Massachusetts, the First Circuit Court of Appeals, the District Court for the Federal District of Massachusetts, and the Board of Immigration Appeals.  She is the co-founder of Citizens Against Trafficking.  Shapiro received her Juris Doctorate from Roger Williams University School of Law, where she was a Public Interest Scholar.  Email: melanie@melanieshapiroesq.com.

[**] Donna M. Hughes holds the Eleanor M. and Oscar M. Carlson Endowed Chair in Women's Studies.  She is a Professor in Gender and Women's Studies with an Affiliation with Sociology and Anthropology (Criminology and Criminal Justice) at the University of Rhode Island.  Email: donnahughes@uri.edu.  This Article is dedicated to Representative Joanne Giannini, without whose leadership and perseverance, Rhode Island would not have the laws needed to end the violence and sexual exploitation described in this Article.  The authors of this Article thank Colonel Stephen M. McCartney, Chief of Warwick Police, for giving the authors access to police records relating to Philip Markoff's assault and robbery attempt in 2009.

1. Edward Achorn, *New Landscape of the Sex Biz*, PROVIDENCE J., Dec. 22, 2009, at B7.

2. *Id.*

3. *See* W. Zachary Malinowski, *The Sex Business in Providence: "Why Here,"* PROVIDENCE J., Apr. 21, 2002, at A1.

4. Michael Martinez, *What to Know About Nevada's Legal Brothels*, CNN (Oct. 19, 2016, 6:50 AM), http://www.cnn.com/2015/10/14/us/lamar-odom -nevada-brothels/.

5. *See id.*

6. Donna M. Hughes, *Top U.S. Official on Trafficking Says Lack of Prostitution Law Creates a "Zone of Impunity" for Traffickers*, DIGITALCOMMONS@URI 1 (Aug. 14, 2009), https://works.bepress.com/donna _hughes/56/.

businesses led to the capital city of Providence being called the "red light district" of New England.[7]

The lack of laws controlling prostitution impeded police from investigating and stopping serious crimes and prevented officials from arresting pimps, traffickers, and sex buyers.[8]  According to Luis CdeBaca, former Ambassador at Large to Combat Human Trafficking and Director of the Office to Monitor and Combat Trafficking in Persons in the U.S. State Department, decriminalized prostitution created a "zone of impunity in which police [could not] go, and where traffickers [could] exploit their prey."[9]

This Article describes the growth of sex businesses in Rhode Island from 1980 to 2009 and the harmful activities—particularly violence against women, sexual exploitation, and slavery—that were endemic to it.  It describes how individual criminals, organized crime groups, and mainstream business people, such as landlords and lawyers, exploited women and girls for profit and pleasure.

For over a decade, from 1998 to 2009, the violent nature of these businesses became increasingly known to law enforcement, other government officials, and the public.[10]  With increased awareness, momentum grew for legal reform to prohibit prostitution, sex trafficking, and the employment of underage teens in sex businesses.[11]  In 2009, the Rhode Island General Assembly passed three unprecedented laws to end these practices.[12]

This Article on decriminalized prostitution is important for contemporary debate.  Around the world, there are both small groups and large agencies, such as UN Women[13] and Amnesty International, that advocate for the decriminalization of prostitution.[14]  One such group is suing the state of California to decriminalize prostitution using the same legal argument and strategy that created decriminalized prostitution in Rhode Island in 1980.[15]  The authors of this Article believe the findings reported

---

    7.  W. Zachary Malinowski, *Sex Industry Expands at Startling Pace*, PROVIDENCE J., Apr. 23, 2002, at A1.

    8.  Hughes, *supra* note 6, at 1.

    9.  *Id.*

    10.  *See infra* Subparts I.C–I.D.

    11.  *See infra* Subpart I.G.

    12.  11 R.I. GEN. LAWS §§ 11-34.1-1 to -14, 11-67-1 to -18 (2009); 28 R.I. GEN. LAWS § 28-3-9.1 (2009); 2009 R.I. Pub. Laws 185 (repealing provisions that decriminalized prostitution).

    13.  UN Women, *Note on Sex Work, Sexual Exploitation, and Trafficking*, NSWP (Oct. 9, 2013), http://www.nswp.org/sites/nswp.org/files/UN%20Women %27s%20note%20on%20sex%20work%20sexual%20exploitation%20and %20trafficking.pdf.

    14.  Darren Geist, *Amnesty International's Empty Promises: Decriminalization, Prostituted Women, and Sex Trafficking*, 1 DIGNITY: J. ON SEXUAL EXPLOITATION & VIOLENCE 1, 1 (2016).

    15.  Brief for Plaintiffs-Appellants at 13–14, Erotic Serv. Provider Legal, Educ. & Res. Project v. Gascón, No. 16-15927 (9th Cir. Sept. 30, 2016).

0090

herein on Rhode Island's twenty-nine year experience with decriminalization are an important contribution to the debate.

*Methods*

This Article is a descriptive case study—its historical analysis of three decades of decriminalized prostitution is based on court records, police records, interviews, and media reports on crimes and other activities in Rhode Island's sex businesses. Information was collected about spa-brothels from print and online advertisements, publicly available corporate records from the Office of the Secretary of State, and municipal tax assessment records. Shapiro conducted extensive research on the brothels and developed a database to analyze patterns of activities.

During the twenty-nine-year history of decriminalization, there were no empirical studies of prostitution or the sex businesses. The most comprehensive and analytical stories on the subject were written by local investigative reporters for the *Providence Journal*, the largest newspaper in Rhode Island.[16] This case study includes exhaustive research into local newspaper stories on prostitution-related reporting.

There is no other comparable legal model of complete decriminalization of indoor prostitution in contemporary western countries. Therefore, this Article only focuses on the decriminalization of indoor prostitution in Rhode Island.

## I. DECRIMINALIZATION OF INDOOR PROSTITUTION

In Rhode Island, from 1980 until 2009, engaging in prostitution in an indoor location was decriminalized and unregulated.[17] This unusual legal status resulted from two converging actions in the 1970s.

In the late 1970s, residents in some areas of Providence (the capital city of Rhode Island) were calling for the city to act on the problem of street prostitution.[18] Residents complained about the harassment of female residents and the impact on their community.[19] At the time, prostitution was a felony that resulted in complicated and drawn out prosecutions and appeals.[20] While

---

16. *See, e.g.*, Malinowski, *supra* note 7, at A1.

17. Achorn, *supra* note 1.

18. Matthew J. Smith, *How I Advanced the Cause*, PROVIDENCE J., June 20, 2009, at Commentary 6.

19. Michael A. Hiltzik, *Prostitution Not a Victimless Crime in West End*, PROVIDENCE J., Sept. 30, 1979.

20. The applicable statutory section at the time read as follows:

It shall be unlawful for any person to secure, direct or transport, or offer to secure, direct or transport another for the purpose of prostitution, or for any other lewd or indecent act; or to loiter in or near any thoroughfare or public or private place for the purpose of

awaiting trials, prostitutes returned to soliciting on the streets.[21]  A member of the West Broadway Council on Crime commented that the law was "as useful as a screen door in a submarine."[22]  To more effectively curb street prostitution, law enforcement, judges, and residents advocated for the penalty to be reduced from a felony to a misdemeanor to streamline the judicial process.[23]

In 1976, Margo St. James, founder of COYOTE ("Call Off Your Old Tired Ethics"), a prostitutes' rights organization, began a legal campaign to decriminalize prostitution.[24]  COYOTE, COYOTE Rhode Island, and Jane Doe (an anonymous prostitute) sued the Providence Police Chief and the Rhode Island Attorney General on behalf of all Rhode Island prostitutes.[25]  The plaintiffs claimed that the prostitution law was unconstitutional on a number of grounds but primarily based their claim on sex discrimination.[26]  Jane Doe testified on behalf of female prostitutes.[27]  She claimed they were discriminated against because the Providence Police arrested more women than men for prostitution violations.[28]  The arrest records showed that COYOTE's claim that more women were being arrested than men was accurate.[29]

In May 1980, the Rhode Island General Assembly amended the state prostitution law.[30]  The publicly stated intent was to decrease the penalty for soliciting for prostitution from a felony to a misdemeanor in order to make the court process faster and easier.[31]

---

inducing, enticing, soliciting, or procuring another to commit lewdness, fornication, unlawful sexual intercourse or any other indecent act; or to commit or in any manner induce, entice, or solicit, or procure a person in any thoroughfare, or public or private place or conveyance to commit any such act; or to receive or offer or agree to receive any person into any place, structure, house, building, room, or conveyance for the purpose of committing any such acts, or knowingly permit any person to remain therein for any such purposes, or to, in any way, aid or abet or participate in any of the acts or things enumerated herein.

Any person found guilty under this section, shall be subject to imprisonment in the adult correctional institutions not to exceed five (5) years.

11 R.I. GEN. LAWS § 11-34-5 (1956) (amended 1980 and repealed 2009).

   21.  Thomas E. Walsh, *Smith Bill Would Speed Decisions on Prostitutes*, PROVIDENCE J., Mar. 19, 1980, at B1.

   22.  Thomas E. Walsh, *Legislators Get Message from West Enders and 'Yea' Bill to Change Prostitution Laws*, PROVIDENCE J., Mar. 22, 1980, at A8.

   23.  Hiltzik, *supra* note 19.

   24.  *See* COYOTE v. Roberts, 502 F. Supp. 1342, 1344 (D.R.I. 1980).

   25.  *Id.*

   26.  *Id.* at 1344–45.

   27.  *See* Transcript at 14–46, *COYOTE*, 502 F. Supp. 1342.

   28.  *See COYOTE*, 502 F. Supp. at 1344–45.

   29.  *Id.* at 1352–53.

   30.  11 R.I. GEN. LAWS § 11-34-8(a) (1980) (repealed 2009).

   31.  *See* Walsh, *supra* note 21, at B1.

The resulting new law banned loitering for prostitution, which was defined as standing or wandering "in or near any public street," or stopping or attempting "to stop motor vehicles, for the purpose of prostitution."[32]    The new law made the offense—loitering for indecent purposes—a misdemeanor instead of a felony.[33]    In addition, apparently without the full awareness of many of the legislators, the same bill repealed the laws pertaining to soliciting or engaging in prostitution.[34]    In fact, the legislation removed all reference to soliciting to engage in prostitution, except for loitering along a street.[35]  This deletion effectively decriminalized prostitution as long as it was performed indoors.

The new prostitution law legally separated indoor and outdoor prostitution: loitering for prostitution became known as "outdoor prostitution," and prostitution off the street or inside a building became known as "indoor prostitution."[36]  Following the revision of the prostitution law, if a commercial sex act took place indoors, no laws or regulations—including zoning regulations—applied to it.  As a result, from 1980 to 2009, indoor commercial sex acts were legal and unregulated.

## A.    *Growth of Prostitution in Rhode Island*

The lack of law criminalizing or regulating commercial sex acts allowed for the growth of sex businesses in Rhode Island.  By 2002, Providence was known as "New England's red-light district."[37]  There were "strip clubs, gay bathhouses, an under-21 strip club, a private swinger's club, massage parlors and sex video stores," and a club for bondage and other fetishes.[38]  Commercial sex was a form of economic development for the city of Providence.[39]  An investigative reporter described it this way: "In recent years, the sex industry has exploded in [Providence], and a dreary industrial strip along Allens Avenue has become the most densely concentrated red-light district in New England."[40]

---

32.   11 R.I. GEN. LAWS § 11-34-8(a).

33.   *Id.*

34.   COYOTE v. Roberts, 523 F. Supp. 352, 357–58 (D.R.I. 1981).

35.   *See* 11 R.I. GEN. LAWS § 11-34-8; COYOTE v. Roberts, 502 F. Supp. 1342, 1348 (D.R.I. 1980) (noting the new legislation added the phrase "for pecuniary gain" to section 11-34-5 but seemed "to have decriminalized the sexual act [of prostitution] itself," and thus it appeared "to the Court that § 11-34-5 now outlaw[ed] only certain preliminary or preparatory activities . . . and then only when pecuniary gain [was] somehow involved").

36.   *R.I. Looks to Close Prostitution Loophole*, CBS NEWS (June 18, 2009, 1:37 PM), http://www.cbsnews.com/news/ri-looks-to-close-prostitution-loophole/.

37.   *See* Malinowski, *supra* note 3, at A1.

38.   *Id.*

39.   *Id.*

40.   *Id.*

With the growth of sex businesses, Rhode Island cities, and particularly Providence, became sex tourist destinations.[41] Although it is a small state, three interstate highways—Interstates 95, 195, and 295—run through Rhode Island.[42]  In 2002, a *Providence Journal* investigative report on the growth of the sex industry described a typical night at a local strip club named Cheaters:

> Chartered buses pull up to the curb outside the gaudy pink building on Allens Avenue with the flashing police light on the roof.  Hundreds of cars pack the lots and side streets.  Next door, dozens of pedestrians, almost all men, venture into a windowless brick warehouse.   The visitors, many from Massachusetts and Connecticut, are in pursuit of a common goal: sex.[43]

After it was decriminalized, indoor prostitution became well known.  Rhode Island saw a proliferation of brothels that advertised as "spas," or "health centers" and offered "acupressure," "body work," "table showers," or "body rubs," performed, for the most part, by Asian women.[44]  For example, some of these ads, found online or in the *Providence Phoenix's* "Adult Entertainment" section, featured photos of scantily clad, young Asian women and suggestive phrases, such as "Top Class Orient Beauty," "New Young Asian Girls," "Have a tantalizing Asian woman will ease your stress" and "Hot Asian Girls."[45]  A senior Providence Police officer from the Investigative Division commented on the number of men visiting the Asian spa-brothels, "[W]hen we sent a detective [to an Asian brothel] to go in and get propositioned, it's eleven o'clock in the morning and he's waiting in line.  They're packed at 11 am."[46]

The prostitution industry became so normalized that on one occasion when Providence Police raided a Korean spa-brothel, they found an ATM inside that allowed men to get cash on site.[47]

---

41.  *Id.*

42.  *Travel Information*, R.I. DEP'T TRANSP., www.dot.ri.gov/travel/ (last visited Mar. 28, 2017).

43.  Malinowski, *supra* note 3, at A1 (emphasis omitted).

44.  *See* Amanda Milkovits, *Crackdown Leads to Closing of Providence 'Spas,'* PROVIDENCE J. (Feb. 28, 2015), http://www.providencejournal.com/article /20150228/NEWS/150229286.

45.  Advertisements on file with authors.

46.  Rebecca Johnson, Sex Trafficking and Prostitution in Rhode Island: Brothels Busted 21 (Fall 2005) (unpublished student course paper, University of Rhode Island) (on file with author).

47.  *Id.* at 24.

Businesses or individuals could openly advertise their services, although many still used euphemisms and code terms.[48]

Although many of the sex businesses were located in Providence, there were many others in cities and towns throughout the state.[49] In suburban Middletown, Rhode Island, where two spa-brothels advertised services and sex buyers wrote online reviews about whether the women had performed to their satisfaction, a town official tried to maintain a normalized view of the brothels.[50] He told a city employee not to call them "brothels."[51]

Other than a few investigative journalism articles, there was no research on the burgeoning sex industry at the time. One recent, unpublished study documented the increase in the size of the sex industry in Rhode Island while prostitution was decriminalized.[52] The study used two sources to measure the increase in prostitution.[53] The researchers counted the number of advertisements for "massage parlors" in a local weekly newspaper, the *Providence Phoenix*, from January 1, 2000, to December 31, 2008.[54] The "Adult Entertainment" section was the main venue for Asian brothel advertisements.[55] There were also advertisements for strip clubs, "modeling agencies," dominatrices, and other types of prostitution, but the researchers did not count these commercial sex services in their study.[56] The study found that the number of advertisements for "massage parlors" doubled during a six-year period.[57]

The researchers also counted the number of reviews by men for female prostitutes on the *Erotic Review*.[58] They collected 90,000 records from this online site from 1998 to 2008.[59] They found that the number of reviews increased twelve-fold during the

48. Melanie Shapiro, Sex Trafficking and Decriminalized Prostitution in Rhode Island 54 (Apr. 2009) (unpublished Senior Honors thesis, University of Rhode Island), http://digitalcommons.uri.edu/srhonorsprog/135.

49. *Id.* at 51.

50. Melanie Shapiro, *Media Attention Gets Inspections at Middletown Spa-Brothel*, DIGITALCOMMONS@URI (July 27, 2009), https://works.bepress.com/donna_hughes/65/.

51. *Id.*

52. *See generally* Scott Cunningham & Manisha Shah, *Decriminalizing Indoor Prostitution: Surprising Implications for Sexual Violence and Public Health* (Nat'l Bureau of Econ. Research, Working Paper No. 20281, 2014), http://papers.nber.org/tmp/10223-w20281.pdf (finding that the decriminalization of indoor prostitution increased the size of the indoor prostitution market).

53. *Id.* at 11.

54. *Id.*

55. Shapiro, *supra* note 48, at 54.

56. Cunningham & Shah, *supra* note 52, at 34.

57. *Id.* at 11.

58. *Id.*

59. *Id.* at 12.

measurement period—from an average of 3.6 to 44.8 per week.[60] The number of unique prostitutes reviewed increased from an average of 2.6 to 37.4 per week.[61]  Between 2003 and 2007, there was a 200% increase in the number of prostitutes being reviewed on this site.[62]  In 2009, the Providence Police estimated that there were about forty brothels in Providence.[63]  It is not clear if they counted strip clubs and "gentlemen's clubs."  Based on Shapiro's own findings, most brothels counted by police were spa-brothels advertising Asian women.[64]  And even though indoor prostitution was not illegal, many other brothels operated underground.[65]

Men on the sex buyer forums reported that they traveled from other states to Rhode Island because they did not fear being arrested for buying sex in Rhode Island.  For example, one sex buyer from a town in Massachusetts close to the Rhode Island border wrote, "No reason to visit [a brothel in Massachusetts] when you are just 5 miles away from the safety of the RI border."[66]  Another sex buyer referred to Rhode Island as "a buyer's paradise."[67]  A sex buyer from New York wrote, "I decided to take the 3 hour trip yesterday . . . .  Very nice."[68]  One man from China, who had a layover at the local airport, wrote that he took the time to come to Providence to buy sex.[69]  Shapiro observed many sex buyers arriving at the brothels in cars with out-of-state license plates.[70]

As the number of sex businesses increased, they sometimes impinged on the safe operation of other businesses around them.  In 2008, owners of a children's toy store in Middletown, Rhode Island,

---

60.  *Id.*

61.  *Id.*

62.  *See id.*  An earlier version of this study notes the 200% increase specifically.  *See* Scott Cunningham & Manisha Shah, Decriminalizing Prostitution: Surprising Implications for Sexual Violence and Public Health 15 (Aug. 2013) (unpublished manuscript), http://frihetspartiet.net/dokumenter /decriminalizing-surprising.pdf.

63.  Simmi Aujla & Jennifer Levitz, *Legal Prostitution Under Pressure in Rhode Island*, WALL ST. J., Sept. 5, 2009, at A5.

64.  *See* Shapiro, *supra* note 48, at 51.

65.  *Id.* at 52–54.

66.  Guest123, *Massage Parlor Reports: Rte 1A Wellness AMP in Plainville*, USA SEX GUIDE (Oct. 23. 2008, 10:22 PM), http://www.usasexguide.info/forum /showthread.php?4067-MassageParlorReports&p=718491&viewfull=1#post7184 91.

67.  DaddysLookin, *Massage Parlor Reports: A New One?*, USA SEX GUIDE (Oct. 24, 2008, 8:32 AM), http://www.usasexguide.info/forum/printthread.php ?t=4067&pp=15&page=137.

68.  Torq465, *Massage Parlor Reports: Dt*, USA SEX GUIDE (May 29, 2006, 11:45 AM), http://www.usasexguide.info/forum/showthread.php?4067-Massage -Parlor-Reports/page887.

69.  *See* Lao Ma, *Massage Parlor Reports: Asian Fantasies*, USA SEX GUIDE (Feb. 1, 2009, 09:01 AM), http://www.usasexguide.info/forum/showthread.php ?4067-Massage-Parlor-Reports&p=762696&viewfull=1#post762696.

70.  Shapiro, *supra* note 48, at 136.

were driven out of their retail location because of a spa-brothel next door.[71]  Middletown is a medium-sized, suburban town in Rhode Island, distant from the dense sex-industry area of Providence.[72]  The police were unable to shut down the brothel that was operating next to the toy store, and the landlord was unwilling to evict it.[73]  The toy store owners, who found drug paraphernalia in the parking lot, were worried about the reputation of their child-centered business.[74]  Additionally, one of the store owners, an Asian woman, was often mistaken for a prostitute by men seeking to buy sex.[75]  In one frightening incident, an Asian woman fled the brothel and came into their store looking for help.[76]  She could only speak a few words of English, but indicated through hand gestures and use of the word "fuck" that she was being forced to engage in prostitution.[77]  She warned the store owners about the danger the spa-brothel posed to their little girl, who often was with them in the store.[78]  The owners had her wait in a back room while they called the police, but when they went to check on her, she had disappeared.[79]

Most of the Asian brothels advertised as mainstream businesses, such as health clubs, spas, or massage parlors.[80]  Shapiro noted many connections between the brothels and other, more mainstream, business people, such as lawyers, property owners, landlords, and public officials.[81]  During the political discussion about ending decriminalized prostitution, the authors often heard comments that business people in the state liked the large number of commercial sex venues because they enhanced the convention business for Providence.[82]  Men liked coming to meetings and conventions in Rhode Island because they could buy sex legally while they were in the state.[83]  One *Providence Journal* columnist

---

71.  Aujla & Levitz, *supra* note 63, at A5.

72.  *See* R.I. HISTORICAL PRES. COMM'N, HISTORIC AND ARCHITECTURAL RESOURCES OF MIDDLETOWN, RHODE ISLAND: A PRELIMINARY REPORT 1 (1979).

73.  Melanie Shapiro & Donna M. Hughes, *Middletown Loses Children's Science Center Due to Inaction Against Brothel*, DIGITALCOMMONS@URI (July 17, 2009), https://works.bepress.com/donna_hughes/66/.

74.  *Id.*

75.  *Id.*

76.  Melanie Shapiro & Donna M. Hughes, *Asian Woman Fled Brothel in Middletown Last Year*, DIGITALCOMMONS@URI (July 16, 2009), https://works.bepress.com/donna_hughes/58/.

77.  *Id.*

78.  *Id.*

79.  *Id.*

80.  Shapiro, *supra* note 48, at 52.

81.  *See id.* at 120–46 (discussing a variety of information regarding various brothels, including ownership, registration, and history).

82.  *See* Johnson, *supra* note 46, at 25.

83.  Melanie Shapiro & Donna M. Hughes, *Behavior and Attitudes of Johns*, DIGITALCOMMONS@URI (Sept. 12, 2009), https://works.bepress.com/donna _hughes/59/.

referred to prostitution as the "under-the-table sector of the state economy."[84]  These interconnections showed the sex businesses were sources of money for more mainstream, even well-known, business people and public officials.

Many of the brothels retained the same lawyers to serve as their registered agents and to defend them against licensing, building, or health code violations.[85]  One of the lawyers had real estate dealings with the owner of one of the brothels.[86]  A former Providence mayor owned at least one building with space leased to a brothel—a brothel that was part of a major federal smuggling and sex trafficking investigation.[87]  Although many people may have viewed the Asian spas as separate from the mainstream community, in fact, local business people worked with and derived profit from the sex businesses.[88]

The open commercial environment for prostitution attracted sex industry businesses, pimps, madams, traffickers, and organized crime.[89]  Asian spa-brothels were the focus of the limited amount of research done on decriminalized prostitution.[90]  There has been no contemporary or historic research done on other types of prostitution, such as the prostitution occurring at strip clubs, private clubs, hotels, and residential brothels.  After the new prostitution and human trafficking laws were passed, sex traffickers who were arrested told police they came from out-of-state and brought victims with them because indoor prostitution was legal in Rhode Island.[91]

## B.  Increase in Asian Spa-Brothels

New brothels opened at an increasing pace as brothel operators learned that Rhode Island lacked laws prohibiting or regulating indoor prostitution.[92]  Concurrently, sex buyers learned about decriminalized prostitution, and the demand for sex businesses

---

84.  Edward Fitzpatrick, *Prostitution Has No Place in R.I. Economy*, PROVIDENCE J. (Jan. 15, 2009, 9:06 AM), http://archive.li/KQJ9T.

85.  *See* Shapiro, *supra* note 48, at 120–46 (listing the registered agents for the brothel business).

86.  *Id.* at 66.

87.  *See* Lynn Arditi, *Providence Journal: "Paolino Versus the Spa,"* KELLY & MANCINI, P.C. (Dec. 2, 2009), http://kellymancini.com/paolino-versus-the-spa/; *see also* Affidavit of Won Yoon at 12–13, United States v. Kim, No. 1:06-cr-00605-CBA-RLM (E.D.N.Y. Aug. 14, 2006).

88.  *See* Shapiro, *supra* note 48, at 55–56.

89.  *See* Amanda Milkovits, *Two Men Indicted for Trafficking in Providence, N. Providence*, PROVIDENCE J., Dec. 11, 2010, at A4.

90.  *See* Shapiro, *supra* note 48, at 51.

91.  *See* Milkovits, *supra* note 89, at A4.

92.  W. Zachary Malinowski, *Busloads Come to Providence for New England's 'XXX' Haven. (The Providence Journal)*, HIGHBEAM RES. (May 2, 2002), https://www.highbeam.com/doc/1G1-85599917.html.

increased.[93]  The most visible expansion was in Asian spa-brothels.[94]  The commanding officer of the investigative division of the Providence Police commented on the increase of Asian brothels from 1999 to 2005 and the nature of their business:

> In Providence, . . . there has been a number of what we call "oriental spas" that have popped up.  [Also in] Johnston, [and] Cranston, but mainly in Providence.  All of them, in my experience, have women who are Korean who are in these so-called massage parlors that are not actually massage parlors.  They are houses of prostitution, brothels . . . . [T]hey are performing sex acts for money, so its [sic] prostitution.[95]

Shapiro documented the increase in the number of Asian brothels from 1998 until 2009.[96]  She found that in 1998, there were two or three Asian spa-brothels.[97]  Eight years later, in 2006, there were ten to twelve.[98]  By the end of 2008, there were twenty-two.[99]  Then over just a five-month period from January 2009 until April 2009, ten new spa-brothels opened, bringing the total to thirty-one.[100]  This rapid and accelerating growth occurred during a period when decriminalized prostitution was being discussed in the media.

## C.  *Organized Crime and the Sex Businesses*

Crimes ranging from assault, sexual slavery, and murder, to extortion and racketeering occurred in connection with the decriminalized sex business in Rhode Island.  The perpetrators ranged from individual criminals to regional mafia groups and international, organized crime networks.

Even before the passage of the Trafficking Victims Protection Act in 2000, and the awareness raising campaigns about human trafficking that followed,[101] Rhode Island police officers, who had

---

93.  *Id.*

94.  Shapiro, *supra* note 48, at 51.

95.  Johnson, *supra* note 46, at 18–19.

96.  Shapiro, *supra* note 48, at 51.

97.  *Id.*

98.  *Id.*

99.  *Id.*

100.  *Id.*; Melanie Shapiro & Donna M. Hughes, *Brothel List by Senate District, Rhode Island, May 2009*, DIGITALCOMMONS@URI (May 31, 2009), https://works.bepress.com/donna_hughes/61/.

101.  *Trafficking Victims Protection Act*, FIGHT SLAVERY NOW! (Nov. 29, 2009), https://fightslaverynow.org/why-fight-there-are-27-million-reasons/the-law-and-trafficking/trafficking-victims-protection-act/trafficking-victims-protection-act/.

contact with the prostitution businesses, recognized the slavery-like conditions in which the women lived and worked.[102]

In 1998, Providence Police raided an Asian brothel disguised as a health club.[103]   Police exposed the fraudulent nature of the business when they found that the exercise machines in the club were not plugged in.[104]   During the raid, officers seized $14,000 and a bag of pink condoms.[105]   The commander of the Providence Police Special Services Division said, "This was like slavery . . . .   [The women] worked 16- to 18-hour days.   They didn't get paid.   They just got tips."[106]   The investigation found that the traffickers brought victims from Southeast Asia to Flushing, New York, and then transported them to Providence.[107]   The traffickers forced the women to pay their travel and living expenses and only permitted them to keep cash tips.[108]   The police noted that one of the women had cigarette burn marks on her forearm, a possible sign of torture.[109]

In 2005, the head of the investigative division of the Providence Police commented on what he had observed in the Asian brothels:

> The Koreans have limited [English] language [skills] and no support from family and friends.   They are isolated; they live and eat in these places.   Everything is provided for them. They just don't walk out the door . . . .   [I]t seems to me that they are more restrained and less free to leave.   Although they do leave to go to the store, walk a dog.   They usually go in pairs.   But where are they going to go? . . .   They don't take their ID's [sic] with them.   They only take small amounts of money . . . .     When I see girls that are watched over, transported, told what to do, provided for, I think there is some restraint there.[110]

As awareness of the likely trafficking of women in the Asian spa-brothels grew, the Providence Police wanted to be able to speak to the women and offer them services instead of arresting them.[111] The head of the investigative division explained, "We went to the International Institute and we got a Korean woman who could translate for us [during the raid].   [The translator] was visibly upset

---

102.   Jonathan D. Rockoff, *Police Allege Club Was a Brothel; the Providence Police Say That Women from Southeast Asia Were Brought to Club Osaka to Work as Prostitutes to Pay Off Their Passage to the United States*, Providence J., Nov. 24, 1998, at B1.
103.   *Id.*
104.   *Id.*
105.   *Id.*
106.   *Id.*
107.   *Id.*
108.   *Id.*
109.   *Id.*
110.   Johnson, *supra* note 46, at 19–20.
111.   *Id.* at 25–26, 29.

to see [women from her country] trapped in this situation."[112]  The translator also explained the many challenges to assisting women in the Asian brothels.  She told the police, "[The Asian women in the brothels are] not going to readily and willingly speak to you because the women in my country are not as valued as the men.  They are subservient and they have a different role . . . ."[113]

Shapiro found that women in the Asian brothels were often moved from state to state, as part of a larger network.[114]  They were usually at one location for a couple of weeks to a few months.[115]  The head of the investigative division of the Providence Police made the same observation about one spa-brothel they raided, which was "probably the biggest massage parlor in the state."[116]  Following a raid on the brothel, he said,

> "We went in yesterday . . . .  There were six girls, three of them I knew from past encounters there.  Three of them I didn't, and I learned they had only been there for three days.  One was from Georgia; others were from NY, New Jersey.  One had no ID; one had Korean currency mixed in with her American, U.S. currency.  They all have their bags packed—they're always ready to go. They don't set up residence or stay for a long time.  So they move from place to place.  Is that trafficking?  It seems to me [it is]."[117]

During the raid, the police found an Asian woman on a couch with a serious untreated foot infection.[118]  They took her to the hospital for treatment.[119]

Several Asian spa-brothels were also part of a regional, organized crime network with international connections.[120]  In 2006, two spa-brothels in Rhode Island were included in a federal investigation regarding women being smuggled from Korea into the Northeast United States.[121]  The regional network of brothels, which stretched from Massachusetts to Georgia, was managed from a base in New York.[122]  Using a wiretap, investigators caught a Rhode

---

112.  *Id.* at 22.
113.  *Id.*
114.  Shapiro, *supra* note 48, at 60, 74–75.
115.  *Id.* at 59.
116.  Johnson, *supra* note 46, at 19.
117.  *Id.* at 19–20.
118.  Phillip Gara, *Managers of Spa Prostitution Fronts Arrested for Unlicensed Massage*, BROWN DAILY HERALD (Nov. 28, 2005), http://www.browndailyherald.com/2005/11/28/managers-of-spa-prostitution-fronts-arrested-for-unlicensed-massages/.
119.  *Id.*
120.  *See* Rockoff, *supra* note 102, at B1.
121.  *See* Affidavit of Won Yoon, *supra* note 87, at 3, 6, 12–13.
122.  *Id.* at 6–7.

Island brothel manager ordering women with green cards for her spa-brothel.[123]

Traffickers in this network coerced women into prostitution.[124] The traffickers targeted women in Korea who wanted to come to the United States to work and support their families.[125] The traffickers used legal or fraudulent documents to get the women into the United States through immigration.[126] In some cases, the traffickers smuggled the women into the country.[127] The traffickers charged inflated fees for travel, food, and rent for women staying at the brothels.[128] The women usually had to live in squalid conditions.[129] The U.S. Attorney's Office stated, "In some instances, the women were threatened or led to believe that if they left the prostitution business before paying off their debts, they would be turned over to United States law enforcement or immigration authorities, or that their families in Korea would be harmed."[130]

In the regional investigation, federal agents arrested thirty-one people, closed twenty brothels, and freed seventy women.[131] This case demonstrated that spa-brothels in Rhode Island were involved in large-scale smuggling and trafficking organized crime networks.

As awareness about the sex trafficking of Asian women grew, the *Providence Journal* became a strong, consistent voice against decriminalized prostitution.[132] The *Journal*'s editorials frequently condemned the exploitation of women in the brothels and advocated for new prostitution laws.[133] The deputy editorial pages' editor wrote about the condition of the women in the Asian spa-brothels:

> [They are] trapped in dirty brothels, day and night, fearful of being beaten or killed if they try to leave . . . . [T]hey serve men with their bodies from the time they get up until they go

---

123. *Id.* at 12.

124. *See id.* at 7; Press Release, U.S. Attorney's Office, E. Dist. of N.Y., 31 Korean Nationals Arrested Throughout the Northeastern United States in Federal Human Trafficking Case (Aug. 16, 2006), https://www.justice.gov/archive/usao/nye/pr/2006/2006Aug16.html.

125. *See* Press Release, U.S. Attorney's Office, E. Dist. of N.Y., *supra* note 124.

126. *See id.*; Affidavit of Won Yoon, *supra* note 87, at 6.

127. *See* Press Release, U.S. Attorney's Office, E. Dist. of N.Y., *supra* note 124.

128. *See* Shapiro, *supra* note 48, at 60–61.

129. *See id.* at 61.

130. *See* Press Release, U.S. Attorney's Office, E. Dist. of N.Y., *supra* note 124.

131. Amanda Milkovits, *Federal Sweep Shutters City Spa*, PROVIDENCE J., Aug. 18, 2006, at B1.

132. *See, e.g.*, Edward Achorn, *One Business R.I. Can Do Without*, PROVIDENCE J., Apr. 10, 2007, at B5.

133. *See, e.g.*, *id.*

to sleep.  They sleep on filthy mattresses and cook from Sterno cans in a back room.  They are essentially slaves.[134]

The high-profit sex businesses were also targets for extortion by organized crime groups.[135]  Rhode Island is the home of the largest Italian organized crime group in New England—La Cosa Nostra.[136]  This mafia network has a long history of criminal involvement with Providence strip clubs going back decades.[137]  The strip clubs in Providence were known hangouts for mafia figures.[138]

In the mid-1990s, members of the Patriarca crime family of the La Cosa Nostra, including a known violent enforcer, targeted a local businessman and a restaurant owner for extortion.[139]  They used the basement of the Satin Doll, a Providence strip club, to threaten and beat up the businessman.[140]  In 1995, the Rhode Island U.S. Attorney's Office charged three men with extortion.[141]  Three dancers from the club witnessed the incident.[142]  The enforcer was called "one of the most ruthless mobsters ever to run the streets of Rhode Island."[143]  At the enforcer's trial, the dancers testified.[144]  Two of them were so frightened they wept and refused to point him out in the courtroom.  The third woman misidentified the enforcer when asked.[145]  The enforcer was sentenced to life imprisonment.[146]

In 2011 and 2012, a multi-state federal investigation of organized crime resulted in charges against 127 people from seven crime families in four northeastern states.[147]  According to U.S. Attorney General Eric Holder, the law enforcement sweep was "the

---

134.  *Id.*

135.  Press Release, U.S. Attorney's Office, Dist. of R.I., Longtime Rhode Island Mob Boss, Associate Among 91 Leaders, Members, and Associates of La Cosa Nostra Families in Four Districts Charged with Racketeering and Related Federal Crimes, Including Murder and Extortion: 127 Individuals Charged in Providence; Brooklyn, N.Y.; Manhattan, N.Y.; and Newark, N.J. (Jan. 20, 2011), https://archives.fbi.gov/archives/boston/press-releases/2011/bs012011a.htm.

136.  *Id.*

137.  Malinowski, *supra* note 3, at A1.

138.  *Id.*

139.  Tom Mooney, *Ouimette Accused of Shakedowns; The Mobster and Two Others Are Charged with Demanding Cash from Two Businessmen*, PROVIDENCE J., Mar. 21, 1995, at A1.

140.  *Id.*

141.  United States v. DeLuca, 137 F.3d 24, 30 (1st Cir. 1998); United States v. DeLuca, 945 F. Supp. 409, 411 (D.R.I. 1996).

142.  W. Zachary Malinowski, *Mobsters Ouimette, DeLuca Are Convicted of Extortion Facing Life in Prison, Ouimette Tells Reporters: 'Just Another Day,'* PROVIDENCE J., Oct. 27, 1995, at A1.

143.  W. Zachary Malinowski, *Three Strikes and He's in*, PROVIDENCE J., Feb. 2, 1996, at A1.

144.  *Id.*

145.  *Id.*

146.  *Id.*

147.  WPRI, *Mafia Bust Charged 127 People - 6pm Version*, YOUTUBE (Jan. 20, 2011), https://www.youtube.com/watch?v=mCH8eAb8CoA.

largest single day operation against the mafia in the FBI's history, both in terms of the number of defendants arrested and charged and the scope of the criminal activity."[148]  Law enforcement charged leaders and members of the La Cosa Nostra, including the New England Patriarca crime family, with racketeering and extortion for coercing Providence strip clubs to pay $2000 to $6000 per month for "protection."[149]  Federal investigators estimated that the organized crime groups extorted between $800,000 and $1.5 million from Providence strip clubs, including the Satin Doll, the Cadillac Lounge, Cheaters, Club Desire, and The Foxy Lady.[150]

According to the federal indictment, the racketeering conspiracy in Rhode Island dated back to the mid-1980s.[151]  The New York-based Gambino crime family conspired with the Patriarca crime family to extort protection money from the strip clubs in Rhode Island.[152]  U.S. Attorney General Eric Holder called members of La Cosa Nostra "among the most dangerous criminals in our country."[153]

In Rhode Island, the former and acting heads of the New England La Cosa Nostra crime families were convicted and imprisoned.[154]  In total, nine leaders, underbosses, or members of this Rhode Island organized crime group were convicted of offenses related to extortion of adult entertainment businesses in Rhode Island.[155]

These cases demonstrate that brothels were often run by organized crime networks,[156] and strip clubs, where there was

---

148.  *Id.*

149.  *See* Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, New England Crime Boss Sentenced to 78 Months in Federal Prison (Nov. 14, 2012), https://www.justice.gov/opa/pr/new-england-crime-boss-sentenced-78-months -federal-prison; Press Release, U.S. Attorney's Office, Dist. of R.I., *supra* note 135; *see also* W. Zachary Malinowski, *Mobster Enters Plea in Racketeering Conspiracy*, PROVIDENCE J., Feb. 23, 2012, at A5.

150.  Laura Crimaldi, *Ex-NE Mob Boss Gets 5 1/2 Years in RI Strip Club Plot*, MASS LIVE (May 11, 2012), http://www.masslive.com/news/index.ssf/2012 /05/ex-ne_mob_boss_luigi_baby_shac_1.html.

151.  Third Superseding Indictment at 5–6, United States v. Dinunzio, No. 11-004-02S (D.R.I. Sept. 22, 2011).

152.  *See* Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Alleged Acting New England Crime Boss Anthony Dinunzio Charged in Racketeering and Extortion Conspiracy (Apr. 25, 2012), https://www.justice.gov/opa/pr /alleged-acting-new-england-crime-boss-anthony-dinunzio-charged-racketeering -and-extortion; *see also* Jess Bidgood, *Man Said to Be Acting Head of New England Mob is Held*, N.Y. TIMES, Apr. 26, 2012, at A14.

153.  WPRI, *supra* note 147.

154.  Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, *supra* note 149.

155.  *Id.*

156.  *See, e.g.*, Sentencing Memorandum at 2, United States v. Kim, No. 1:06-cr-00605-CBA-RLM (E.D.N.Y. Mar. 3, 2007) (No. 141) (noting the defendant

prostitution,[157] were often targeted by organized crime groups for extortion. Decriminalized prostitution facilitated the operation of crime networks and made sex businesses a soft target for traditional organized crime groups.

### D.    Murders, Assaults, and Armed Robberies

Women in prostitution are often victims of violent crimes by men other than pimps and traffickers.[158] They are targeted for robberies because they often have cash and are not likely to make police reports.[159]

Serial killers often target women in prostitution because they are vulnerable, and some men have a particular hatred of prostitutes.[160] In Rhode Island, between 2003 and 2004, Jeffrey S. Mailhot killed three prostitutes.[161] Though Mailhot visited a local strip club regularly, he picked up his victims on the street in an area known for prostitution in the city of Woonsocket.[162] He strangled the three women at his apartment, dismembered them with a handsaw, and disposed of their bodies in garbage bags thrown into trash bins around the city.[163] Searchers found body parts from one of the victims in the local landfill.[164]

Mailhot also assaulted and choked two other women who escaped.[165] One of the surviving victims said Mailhot did nothing to frighten her "until [they] got to the house."[166] She added,

> It doesn't justify whether [sic] I am a prostitute or I am walking the streets . . . . There are three women who were my friends who are dead right now . . . . And one of them could've

"was a member of a wide-ranging conspiracy that operated brothels along the East Coast" for two years).

157. Melanie Shapiro, *Prostitution at the Strip-Clubs in Providence*, DIGITALCOMMONS@URI (Aug. 7, 2009), https://works.bepress.com/donna_hughes /101/.

158. *See* WARWICK POLICE DEP'T, NARRATIVE FOR SERGEANT ROBERT E AVIZINIS NO. 09-10479, at 2–3 (2009).

159. *Id.*

160. Kenna Quinet, *Prostitutes as Victims of Serial Homicide: Trends and Case Characteristics, 1970-2009*, 15 HOMICIDE STUD. 74, 81–82 (2011).

161. Cynthia Needham, *Guilty Pleas End Ordeal - Court Hears How Mailhot Dismembered 3 Women*, PROVIDENCE J., Feb. 16, 2006, at A1.

162. Cynthia Needham, *Woonsocket Man Indicted on 3 Counts of Murder*, PROVIDENCE J., Dec. 11, 2004, at A3.

163. Needham, *supra* note 161, at A1.

164. Cynthia Needham, *An Awful Search: Digging in the Dump for Body Parts*, PROVIDENCE J., Sept. 19, 2004, at A1.

165. *See* Cynthia Needham, *On Tape, Mailhot Describes Killings*, PROVIDENCE J., Feb. 23, 2006, at B1.

166. Tom Mooney, *She Survived Encounter with Suspect*, PROVIDENCE J., July 21, 2004, at A1.

been me . . . .   Just because we have a drug problem doesn't mean we are bad people.[167]

The body of one woman was found in a local landfill.[168]  The bodies of two of the women were never found.[169]  When arrested in 2004, Mailhot confessed to murdering three women.  He was sentenced to life in prison.  Mailhot was not the only individual to violently attack prostitutes in Woonsocket—prostitutes in the area were targeted by multiple perpetrators.[170]  For example, one of the women Mailhot murdered had previously been kidnapped and beaten by another man.[171]

In the spring of 2009, there were two well-publicized, serious attacks and robbery attempts on women engaged in prostitution.[172]  The first was a robbery attempt in a Warwick hotel by Philip Markoff—known as the "Craigslist Killer."[173]  In Boston, Markoff had robbed prostitutes to pay off gambling debts.[174]  He murdered one woman and assaulted at least one other one, although there was evidence that he had robbed other victims.[175]

In Rhode Island, Markoff attempted to rob a woman at gunpoint in a hotel room in Warwick.[176]  The victim and her husband, who was previously arrested for pandering (pimping), traveled to Rhode Island from Nevada each month to work the strip clubs.[177]  The

---

167.  *Id.*

168.  Cynthia Needham, *The Mailhot Chronology*, PROVIDENCE J., Feb. 16, 2006, at C1.

169.  Cynthia Needham, *supra* note 161, at A1.

170.  *See* Cynthia Needham, *Victim's Slaying Forces State to Drop Charges*, PROVIDENCE J., July 20, 2005, at D4 (describing an instance where one prostitute was victimized in two high-profile violent crimes, the latter of which was her murder at the hands of Jeffrey S. Mailhot).

171.  *Id.*

172.  *See Accused Craigslist Killer Faces Charges in Rhode Island*, CNN (May 4, 2009), http://www.cnn.com/2009/CRIME/05/04/craigslist.hotel.assault/; Debra Cassens Weiss, *Lawyer Tells Police She Was Assaulted While Working as an Escort*, ABA J.: DAILY NEWS (May 6, 2009, 11:22 AM), http://www.abajournal.com/news/article/lawyer_tells_police_she_was_assaulted_while_working_as_an_escort.

173.  Karen Lee Ziner, *A Close Call with Craigslist Killer*, PROVIDENCE J., Apr. 1, 2011, at A1.

174.  Michele McPhee et al., *Police Say Craigslist Killer Owed Gambling Debts*, ABC NEWS (Apr. 21, 2009), http://abcnews.go.com/GMA/story?id=7387628&page=1.

175.  Beverly Ford & Helen Kennedy, *Suspected 'Craigslist Killer' Phillip Markoff Charged with Assault of a Stripper in Rhode Island*, N.Y. DAILY NEWS (May 4, 2009), http://www.nydailynews.com/news/suspected-craigslist-killer-phillip-markoff-charged-assault-stripper-rhode-island-article-1.377718.

176.  WARWICK POLICE DEP'T, SUPPLEMENTAL NARRATIVE FOR OFFICER JEDIDIAH D PINEAU NO. 09-10479, at 1–2 (2009); Ziner, *supra* note 173, at A1.

177.  *See* Ziner, *supra* note 173, at A1; *see also* WARWICK POLICE DEP'T, SUPPLEMENTAL NARRATIVE FOR DETECTIVE JAMES M. MEDEIROS NO. 09-10479, at 1 (2009).

victim was strip dancing in a local club, the Cadillac Lounge, and offering private commercial sex acts as the "Sexxxy Petite Blonde Bombshell" at the Warwick hotel.[178]

Markoff was arrested shortly after his attack on the woman in Rhode Island.[179] The Rhode Island Attorney General and Warwick Police Department filed arrest warrants for Markoff.[180] Markoff committed suicide while awaiting trial.[181]

This case highlighted the hazardous environment created by decriminalized prostitution. While pimps and prostitutes were coming to Rhode Island to take advantage of the lack of laws against indoor prostitution, decriminalized prostitution was also attracting predators like Markoff.

Less than three weeks after the Craigslist Killer's robbery attempt, a lawyer who ran a "dating service" and engaged in prostitution was assaulted at knifepoint in a robbery attempt in Providence.[182] The man assaulted the victim after she went to meet him in his apartment.[183] She escaped by spraying chemicals in his eyes.[184] The man had a lengthy record of assault, drug, and weapons charges that dated back to 1993.[185]

As lawlessness and violence around prostitution increased, police learned that pimps were running prostitution businesses out of hotel rooms and were carrying weapons to protect themselves.[186] In a Warwick hotel room, a pimp, who was a convicted felon, was found with a twelve-gauge shotgun.[187] He said he needed it because of his "lifestyle" and to protect his women.[188]

---

178. *See* Ziner, *supra* note 173, at A1; Maureen Orth, *Killer@Craigslist*, VANITY FAIR (Aug. 31, 2009, 12:00 AM), http://www.vanityfair.com/culture/2009 /10/craigslist-murder200910.

179. *See* Orth, *supra* note 178 (noting that the Warwick robbery attempt occurred six days after April 10—i.e., April 16—and that the arrest occurred on April 20).

180. Tom Mooney, *R.I. Brings Charges Against Craigslist Suspect*, PROVIDENCE J., May 5, 2009, at A1.

181. Stephen Singer, *Craigslist Killer Suspect Philip Markoff Found Dead*, CHRISTIAN SCI. MONITOR (Aug. 16, 2010), http://www.csmonitor.com/From-the -news-wires/2010/0816/Craigslist-killer-suspect-Philip-Markoff-found-dead.

182. Amanda Milkovits, *Providence Man Threatened Escort with Knife, Police Say*, PROVIDENCE J., May 5, 2006, at A10.

183. Weiss, *supra* note 172.

184. *See* Milkovits, *supra* note 182, at A10.

185. *See id.* (noting that the perpetrator's criminal record dated back more than twenty years at the time of the offense).

186. *See* Press Release, Peter F. Neronha, U.S. Attorney's Office, Dist. of R.I., Convicted Felon Who Armed Himself Because of His "Lifestyle" Sentenced to 70 Months in Prison on Firearm Charge (Nov. 30, 2010), https://www.justice.gov/archive/usao/ri/news/2010/nov2010/lombardi _sentence.html.

187. *Id.*

188. *Id.*

The burgeoning sex industry in Rhode Island and unregulated nature of indoor prostitution attracted predators who targeted women in the sex industry. The cases of attempted robberies and assaults against women engaged in prostitution increasingly alarmed law enforcement officials and the general public in Rhode Island.[189]  With prostitution as an unregulated activity, police and officials had no authority to take proactive steps to stop the increase in prostitution and the violence surrounding it. They could only respond to such violence after the acts had occurred.

### E.    Teenage Girls Legally Employed in Strip Clubs

While people in Rhode Island were learning about the crimes that were hidden by decriminalized prostitution and how the flourishing sex trade was attracting violent criminals, another type of commercial sexual entertainment was found to be operating without regulation: underage teens dancing in strip clubs.

In June 2009, Providence Police responded to a domestic violence call and found a sixteen-year-old runaway girl with injuries on her face and head.[190]  Her forty-year-old boyfriend, who was likely her pimp, had assaulted her.[191]  He was later identified as a fugitive from justice in Massachusetts.[192]  The victim had fake identification and was working as a dancer at a popular strip club.[193]

A Providence emergency medical technician who responded to the call wrote this about the victim:

> A young girl got punched in the face a few nights ago.  She stood outside of her [three-story residence], bleeding from her bottom lip.  She offered me money because she didn't have insurance.  She told me she was a "dancer" at Cheaters, a notorious adult entertainment club down the road from my station.  She opened her purse, a stack of twenties and a bunch of condoms lay inside.  The girl was high, confused and needed help.  I helped her.  We put her in our truck, dressed her

---

189.  *See Accused 'Craigslist Killer' Faces New Charges in Rhode Island*, FOXNEWS (May 5, 2009), http://www.foxnews.com/story/2009/05/05/accused -craigslist-killer-faces-new-charges-in-rhode-island.html (reporting statements by Rhode Island Attorney General Patrick Lynch that "it may take some time to bring [Markoff] to court in Rhode Island" but that charges would be brought "because a community cries out for justice").

190.  *See* PROVIDENCE POLICE DEP'T, PROVIDENCE INCIDENT REPORT DETAIL CASE NO. 2009-00058160, at 2 (2009); Amanda Milkovits, *Missing Boston Teen Found in Providence*, PROVIDENCE J., June 10, 2009, at B2.

191.  *See* Milkovits, *supra* note 190, at B2 (noting that the girl told police that the forty-year-old man was her boyfriend and "had punched her in the face").

192.  *Id.*

193.  *See id.*; Michael Morse, *Circle the Wagons*, RESCUING PROVIDENCE (June 10, 2009), https://mmorsepfd.wordpress.com/2009/06/10/circle-the-wagons/.

0108

wound and had her put her money and condoms away.  Her ID said she was twenty and lived in Connecticut.  Her face said she was sixteen and lived on the streets.  Her face was right; her ID a lie.[194]

The victim was a teen missing from Boston for six months who was being held against her will by an escaped convict.[195]  When the police and medical technicians found her, she was suicidal.[196]  Since the girl had a large quantity of condoms in her purse,[197] the convict was likely forcing her to engage in prostitution in the private booths in the strip club in addition to her dancing.

When police attempted to hold someone accountable for the girl's exploitation, they discovered that there was no state law or city ordinance prohibiting teens from working or stripping in clubs.[198]  The only laws that applied were federal child labor laws that restricted the number of hours a child could work and prohibited certain kinds of dangerous work.[199]  Under Rhode Island employment laws, it was not illegal to employ sixteen- and seventeen-year-old individuals in strip clubs or other sex businesses because sixteen was the minimum employment age in Rhode Island.[200]  Because sixteen is also the age of legal consent for sex in Rhode Island, the girl could legally be involved in prostitution at the strip club.[201]  One police officer commented on the violence and exploitation by saying, "It leads to societal breakdown . . . .  These are just little girls."[202]

The lack of a law prohibiting this level of sexual exploitation drew national media attention.[203]  State Representative Joanne Gianinni appeared on national news to say that she was going to introduce another bill into the Rhode Island General Assembly that would ban minors from working in adult entertainment establishments.[204]  Although there was no law against hiring teens

---

194.  *Id.*

195.  *See* Press Release, F.B.I. Bos., Innocence Lost Task Force and Providence Police Recover Missing Juvenile (June 9, 2009), https://archives.fbi.gov/archives/boston/press-releases/2009/bs060909.htm.

196.  PROVIDENCE POLICE DEP'T, PROVIDENCE INCIDENT REPORT DETAIL CASE No. 2009-00060104, at 1 (2009).

197.   *See* Morse, *supra* note 193.

198.  Amanda Milkovits, *Minors in R.I. Can Be Strippers*, PROVIDENCE J., July 21, 2009, at A1.

199.  *Id.*

200.  *Id.*

201.  *Id.*

202.  *Id.*

203.  *See Legal Loophole Allows Rhode Island Minors to Strip*, CNN: AM. MORNING BLOG (July 24, 2009, 09:24 AM), http://am.blogs.cnn.com/2009/07/24/legal-loophole-allows-rhode-island-minors-to-strip/.

204.  *Id.*

to strip in clubs, the Providence Board of Licenses asked ten clubs to voluntarily sign a pledge not to hire teens younger than eighteen.[205]

During the debate about decriminalized prostitution in Rhode Island, the focus had been on the Asian brothels, but this case highlighted that sexual exploitation was also happening in the strip clubs. Media stories started appearing that described the open sexual exploitation in the clubs.[206] Providence's seven strip clubs were said to have a notorious reputation throughout New England.[207] One male customer said, "You get more contact here talking to a woman at the bar than you do in most clubs during a lap dance, and in the private rooms, anything goes for probably half the women working there, and the others will still make sure you leave happy."[208]

Without laws or regulations for adult entertainment businesses, an "anything goes" culture existed in the clubs and other sex businesses in Rhode Island.

## F.    Cat and Mouse Games: Attempts to Close Asian Brothels

Without laws prohibiting or regulating indoor prostitution, Rhode Island and federal law enforcement agencies' authority to investigate and prosecute suspected pimps and traffickers was stifled. Because there were no laws against prostitution, property owners were free to rent to prostitution businesses. According to a senior Providence Police officer,

> The problem . . . [in Rhode Island] is the prostitution laws are very narrowly defined . . . . They are really designed for street-walkers. They do not address, or make [prostitution] a crime, any sex for money if it's done indoors. So we have a lot of this going on. It's done easily and it's tough to disrupt it because we really don't have the law on our side.[209]

Since there were no laws or regulations concerning indoor prostitution, city officials looked for other ways to close the Asian

---

205. Gregory Smith, *Clubs Asked to Sign Pledge on Hiring of Strippers*, PROVIDENCE J., July 25, 2009, at A4.

206. Donna M. Hughes, *Donna M. Hughes: Hold R.I. Strip Club Owners Accountable*, PROVIDENCE J. (Mar. 30, 2014), http://www.providencejournal.com /opinion/commentary/20140330-donna-m.-hughes-hold-r.i.-strip-club-owners-accountable.ece.

207. Susan Donaldson James, *Rhode Island Clubs Ban Teen Strippers*, ABC NEWS (Aug. 5, 2009), http://abcnews.go.com/Business/story?id=8257359 &page=1.

208. Susan Donaldson James, *Teen Strippers, Old Enough to Be Indoor Hookers but Too Young to Drive*, ABC NEWS (July 23, 2009), http://abcnews.go.com/Business/story?id=8149969.

209. Johnson, *supra* note 46, at 19.

brothels.[210]  Providence officials tried to shut down the spa-brothels for professional licensing violations.[211]    The spa-brothels were advertising "massage[s]."[212]    Therapeutic massage businesses require a license, so the brothels were violating the massage ordinance by giving massages without a license.[213]

To get around this city ordinance violation, the brothel managers changed the wording of their advertisements to offer "body rubs," "table showers," and other creative terms for activities that were not regulated or prohibited by law.[214]  If the police arrested anyone for licensing violations, the brothel's lawyer argued that they did not give a massage and, therefore, did not need a license.[215]  After several attempts, city officials and law enforcement no longer tried to use massage ordinances to close Asian brothels.[216]

Providence officials also tried to charge the Asian brothels with maintaining a nuisance, but that was not successful either.[217]    A senior police officer said, "So it's a cat and mouse game."[218]  He commented about the brothels' ability to change the names of their services and advertising to avoid any regulations:

> [T]here's a huge amount of money that's generated from [prostitution in Asian brothels] . . . . [t]he Spa owners have good lawyers.    Highly skilled, highly paid, high profile attorneys who are very creative in trying to get around the law . . . . [t]he attorneys play cute and we have to go back and forth.  So we're really not getting anywhere on that front.[219]

After not being able to use the massage regulations to close the brothels, the Providence authorities tried to close the brothels using fire, building, and health code violations.[220]

---

210.  Associated Press, *R.I. Tries to Outlaw Indoor Prostitution – Again*, NBC NEWS (June 18, 2009, 1:42 PM), http://www.nbcnews.com/id/31428425/ns /us_news-crime_and_courts/t/ri-tries-outlaw-indoor-prostitution-again/#.WII _lmQrLfY.

211.  *See, e.g.*, Neil Remiesiewicz, *Police Close Massage Parlor, Arrest Masseuse*, WPRI NEWS (July 17, 2015, 10:39 PM), http://wpri.com/2015/07/17 /police-close-massage-parlor-arrest-masseuse/.

212.  *See, e.g.*, Bill Tomison, *3 Spa Workers Face Prostitution-Related Charges*, WPRI NEWS (July 10, 2015, 1:27 PM), http://wpri.com/2015/07/10/3 -spa-workers-face-prostitution-related-charges/.

213.  *See* 23 R.I. GEN. LAWS § 23-20.8-3 (2008).

214.  Milkovits, *supra* note 44.

215.  *See* Johnson, *supra* note 46, at 20–21.

216.  Lynn Arditi, *How R.I. Opened the Door to Prostitution*, PROVIDENCE J. (Nov. 14, 2014), http://www.providencejournal.com/news/content/20141114-5-31 -2009-how-r.i.-opened-the-door-to-prostitution---broken-legal-barriers-made -public-nuisance-a-private-act.ece.

217.  *Id.*

218.  Johnson, *supra* note 46, at 21.

219.  *Id.* at 20–21.

220.  *Id.* at 21.

Officials were successful in forcing one spa-brothel to close, but law enforcement and city officials realized that they were running out of enforcement tools.[221]   Next, they decided to pressure the building owners to evict the brothels.[222]  By 2009, there was a lot of public discussion about the problems created by decriminalized prostitution, and attention shifted to some well-known business people who were known to be renting buildings to Asian spa-brothels.[223]   The city of Providence sent letters to the owners of buildings where brothels were located, asking them to evict the brothel.[224]  At least one property owner pressured a brothel to leave, while others resisted the pressure from the city and replied that they would not change their practices until the law changed.[225]

Property owners hesitated to evict brothels because they could charge brothels premium rent rates.[226]  Pressuring property owners to evict brothels also had a limited effect because the brothels moved to another location and opened again, sometimes under another name.[227]   For example, following negative publicity, a former Providence mayor evicted a brothel that subsequently relocated to the same address as another brothel in Providence.[228]  The brothel advertised that it was "under new management," but continued to advertise that it offered "full service," a euphemism for sexual intercourse with "beautiful, charming, sex[y] Asian girls."[229] Often, the old and new brothels seemed to be connected.[230]  For example, the same photos, descriptions, and formatting would be used in advertisements, the same registered agents were used to incorporate the new location, and the same managers' vehicles were seen at the new location.[231]

---

221.  Amanda Milkovitz, *Brothels Survive on Weak R.I. Law*, PROVIDENCE J. (Aug. 21, 2006) (on file with author).

222.  Gregory Smith, *City Pressures Building Owners to Evict Spas*, PROVIDENCE J., Dec. 2, 2005, at D1.

223.  *See* Arditi, *supra* 87.

224.  *See* Johnson, *supra* note 46, at 29.

225.  *See* Smith, *supra* note 222, at D1.

226.  Donna M. Hughes, *Donna M. Hughes: Another Prostitution Loophole in R.I.*, PROVIDENCE J. (May 9, 2015), http://www.providencejournal.com/article /20150509/OPINION/150509309; *see also* Milkovitz, *supra* note 221; Arditi, *supra* note 87.

227.  *See* Sarah Schweitzer, *Many Seek Ban as Prostitution Thrives in R.I.*, BOS. GLOBE (Aug. 13, 2009), http://archive.boston.com/news/local/rhode_island /articles/2009/08/13/in_rhode_island_battle_over_legal_prostitution_rages_on /?page=full.

228.  *See* Melanie Shapiro, *Evicted Brothel Relocates, Bali Day Spa Moves to ABC Spa: Still Located in Providence*, DIGITALCOMMONS@URI (Aug. 12, 2009), https://works.bepress.com/donna_hughes/62/.

229.  *Id.*

230.  *See, e.g.*, Shapiro, *supra* note 48, at 120–46.

231.  *See, e.g.*, *id.*

The cat and mouse game between the Providence city authorities and the Asian brothels reinforced the need for new laws that ended decriminalized prostitution.

## G.   *Decriminalized Prostitution and the Consequences for Investigating Sex Trafficking*

Awareness of sex-industry-related human trafficking was growing, but the lack of laws prohibiting prostitution hindered law enforcement investigations.   Cases of sex trafficking are often identified while police are investigating prostitution, and sex trafficking investigations are often initiated by police setting up a sting or acting as a sex buyer to contact a potential victim.[232]  Police were unable to investigate suspected sex trafficking because indoor prostitution was a private act.   Therefore, police could not meet the necessary legal requirements of probable cause to investigate what was not a crime.

Numerous law enforcement officers and officials wrote letters supporting prostitution related legislation.[233]  They described their frustration in not being able to act to stop pimping and trafficking because of the lack of legal authority.[234]   One Pawtucket police officer, who was also a representative in the Rhode Island House of Representatives, wrote,

> Pimps are transporting their victims to Rhode Island where they know they can operate with near impunity.  They have no fear of a police sting nabbing them in the act since there are no laws against indoor prostitution.  The police have their hands tied and need the loophole closed in order to combat the pimps and traffickers.  All the human trafficking legislation in the world won't help as long as the loophole that allows indoor prostitution exists.[235]

Decriminalized prostitution excluded Rhode Island from participating in a national partnership with the FBI, the

---

232.  *See* Donna M. Hughes, *Analysis of the Arrest of a Cambridge Pimp and the Identification of a Victim*, DigitalCommons@URI   1 (July 3, 2009) https://works.bepress.com/donna_hughes/57/.

233.  *See* Donna M. Hughes, *Senators Prostitution Bill is a Sham*, Providence J., Sept. 4, 2009, at Commentary 6 (describing widespread support for a House bill that would have been a traditional law against prostitution).

234.  *See, e.g.*, Letter from Col. Stephen M. McCartney, Chief of Police, City of Warwick, to Chairman Lally & Honorable Members of the House Judiciary Committee (May 6, 2009), https://web.archive.org /web/20101016122332/http://citizensagainsttrafficking.org/uploads/McCartney -Chief_of_Police-Warwick.pdf.

235.  Press Release, Rep. Roberto DaSilva, Statement on the Harm of Decriminalized Prostitution in Rhode Island (June 18, 2009*),* http://www.rilin.state.ri.us/pressrelease/_layouts/RIL.PressRelease.ListStructur e/Forms/DisplayForm.aspx?List=c8baae31-3c10-431c-8dcd-9dbbe21ce3e9&ID =5391.

Department of Justice Child Exploitation and Obscenity Section, and the National Center for Missing and Exploited Children to investigate the domestic sex trafficking of children in the United States.[236]   The program, called the Innocence Lost National Initiative, required coordination with state and local law enforcement agencies.[237]   Because Rhode Island had no law on indoor prostitution, local and state police had no authority to investigate prostitution.[238]   A letter to Rhode Island Governor Donald Carcieri from the National Center for Missing and Exploited Children stated,

> Under current Rhode Island law, commercial sex between adults inside a building is considered a private activity and is thus protected.  This deprives Rhode Island law enforcement of the ability to detect whether children are being victimized in this commercial sex trade, to rescue these child victims, and to provide them with the services they so desperately need.  Your state's efforts in the fight against child prostitution would be greatly enhanced if law enforcement were empowered to fully investigate the commercial sex trade.[239]

Since prostitution was not an illegal activity in Rhode Island, federal agents could not arrest pimps or traffickers for transporting victims into Rhode Island using the Mann Act, which is an important federal law used to prosecute the transportation of someone across state lines for the purpose of "illegal sexual activity."[240]  The inability to use this simple but powerful federal law stymied federal investigations and prosecutions of sex trafficking in Rhode Island.  The violence, exploitation, and lawlessness in the state led the mayor of Providence to call Rhode Island a "true wild west."[241]

As the push for an end to decriminalized prostitution intensified during the summer of 2009, Luis CdeBaca, Ambassador at Large to Combat Human Trafficking and Director of the Office to Monitor and Combat Trafficking in Persons in the U.S. State Department, called for legal reform:

> There is a need for both a legal and a cultural message that does not tolerate prostitution.  I was surprised to learn that in Rhode Island . . . prostitution is legal so long as it happens

---

236.  Letter from Ernie Allen, former CEO & President of the Nat'l Ctr. for Missing & Exploited Children, to Gov. Donald Carcieri (July 23, 2009) (on file with the authors).
237.  *Id.*
238.  *Id.*
239.  *Id.*
240.  18 U.S.C. §§ 2421–2424 (2012).
241.  David N. Cicilline, *Time to End Legalized Prostitution in R.I.*, Providence J., May 19, 2009, at Commentary 6.

indoors, and girls as young as 16 years of age can legally dance in strip clubs . . . . It is a legitimate concern that such a hands-off approach towards the so-called "sex industry" can result in a zone of impunity in which police can't go, and where traffickers can exploit their prey. State legislators are trying to close these prostitution loopholes in Rhode Island so that the state does not become a magnet for commercial sexual exploitation.[242]

The knowledge that police were impeded from investigating serious crimes like domestic minor sex trafficking and transportation of victims into Rhode Island helped build momentum for the passage of a law to end decriminalized prostitution.

## CONCLUSION

In October 2009, the Rhode Island General Assembly passed several laws aimed at ending decriminalized prostitution, sexual exploitation, and human trafficking.[243] These included a law criminalizing prostitution, a comprehensive human trafficking law, and a law prohibiting minors from working in the adult entertainment industry.[244]

These three new laws marked the end of a legal and commercial era in which the sexual exploitation of women and girls through prostitution was a legitimate form of economic development and a high-profit enterprise for business owners. These laws also marked the end of a cultural era in which buying sex was a legal form of entertainment for men.

An added benefit of the public discussion about prostitution and sex trafficking was that awareness about the subordinate status of women in prostitution grew within police departments.[245] Officers' attitudes toward women in prostitution shifted, and they started to see the women and girls as likely victims instead of criminals.[246] By 2005, when Providence Police raided the Midori Spa, they

---

242. Hughes, *supra* note 6, at 1.

243. 11 R.I. GEN. LAWS § 11-34-5 (2002); 11 R.I. GEN. LAWS §§ 11-67-1 to -8 (Supp. 2016); 28 R.I. GEN. LAWS § 28-3-9.1 (Supp. 2016).

244. 11 R.I. GEN. LAWS §§ 11-34-5, 11-67-1 to -8; 28 R.I. GEN. LAWS § 28-3-9.1; *see also* H.R. 5044 Substitute B., 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (House bill criminalizing prostitution); S. 0596 Substitute B., 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (Senate bill criminalizing prostitution); H.R. 5661 Substitute B., 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (House bill on trafficking of persons); S. 0605 Substitute B., 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (Senate bill on trafficking of persons); H.R. 6441, 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (House bill on minors working in the adult industry); S. 1059, 2009 Gen. Assemb., Jan. Sess. (R.I. 2009) (Senate bill on minors working in the adult industry).

245. *See, e.g.*, W. Zachary Malinowski, *Officials Decry Trafficking of Women for Sex*, PROVIDENCE J., Nov. 29, 2006, at A1.

246. *See, e.g.*, Amanda Milkovits, *Hunting Houses of Ill Repute; Law Enforcement Sex Trafficking*, PROVIDENCE J., May 27, 2014, at A1.

announced a new strategy to crack down on brothels.[247]  They said they would arrest only the managers of the spa and not the women, who were likely victims of human trafficking.[248]  The police went into the brothel with translators and counselors for the women.[249]

Today, sex worker rights groups and international organizations, such as UN Women (the United Nations organization dedicated to equality and empowerment of women) and Amnesty International (the largest human rights group in the world), are advocating for the decriminalization of prostitution.[250]  This Article describes what happened over a period of twenty-nine years of decriminalized prostitution in Rhode Island.  The authors think this research documents the lawlessness, violence, and exploitation that accompanies decriminalized prostitution.   When prostitution is decriminalized, it is women's and girls' bodies that become legal sexual entertainment for men and the legal basis of profit and economic development for pimps, traffickers, business people, and public officials.

247.  *See* Gara, *supra* note 118.

248.  *Id.*

249.  Smith, *supra* note 222, at D1.

250.  *See, e.g.*, AMNESTY INT'L, 32ND INTERNATIONAL COUNCIL MEETING CIRCULAR NO. 18 2015 ICM CIRCULAR: DRAFT POLICY ON SEX WORK 4–5 (2015), http://files.ctctcdn.com/54482ed6201/46da8bac-36d7-4a59-b9e0-fd79b1aec 409.pdf.

0116

1

# EXHIBIT 6

2

3
Research Report, Who Buys Sex? Understanding and Disrupting Illicit Market Demand, Demand
Abolition (Nov., 2018)

4

5

6
**(0117-0169)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
# EXHIBIT 6

28

November 2018

# Who Buys Sex?

## Understanding and Disrupting Illicit Market Demand



Research Report

0118

# Table of Contents

**Page**

3  |  **Executive Summary**

4  |  **Major Findings**

6  |  **Study Background**

9  |  **Findings on Buyers and Demand**

18  |  **Findings on Sex Buying Reduction and Prevention**

32  |  **Policy Recommendations**

36  |  **References**

38  |  **Appendix A** | **Previous Approaches to Studying Sex Buyers**

40  |  **Appendix B** | **Raw Data Findings Cited in Report**

*This report contains sexual terminology and graphic content about sex buying that may not be appropriate for some audiences.*

  © 2018 Demand Abolition

0119

# Executive Summary

Much of the research on prostitution and sex trafficking in the US focuses on the **"supply" side** of the market: prostituted and trafficked persons, the great majority of whom are women and girls. While it is critically important to understand supply-side realities and effective approaches to victim services, the other half of the market—the **"demand" side**, defined almost entirely by the actions of men—has been woefully understudied by comparison.

This report fills those gaps in our understanding of demand in the illegal US sex trade, including why some men buy sex and what can be done to reduce this exploitative behavior in the short and long terms. Demand Abolition commissioned a survey completed by 8,201 adult males across the US between December 2016 and January 2017 to address these gaps and more. The study design and questionnaire content were developed by a team of researchers and approved by the University of Portland's Institutional Review Board.

In our analyses we approach sex buying as a harmful behavior that results from an accumulation of various influences, including: beliefs about sex buying, gendered cultural norms about sexuality, life-course transitions, perceived risk of arrest, and individual attributes such as impulse control. We use a push-pull framework to document the diverse, sometimes competing factors that give rise to sex buying as a cultural phenomenon, and allows us to identify strategies and tactics to confront it.

This report fills those gaps in our understanding of **demand in the illegal US sex trade**, including **why some men buy sex** and what can be done to **reduce this exploitative behavior** in the short and long terms.

# Major Findings

## WHO ARE THEY?

- **Most men have never paid for sex. In fact, our survey finds that only 6.2% of respondents have bought sex within the past 12 months (20.6% do so at least once in their lifetimes).** About half of men who have ever purchased sex did so between two and ten times, and less than one-quarter bought only once.

- **"High-frequency" buyers purchase so often that their actions account for a disproportionately large share of the illegal sex trade.** About 25% of active buyers report purchasing weekly or monthly, and their transactions account for nearly 75% of the market. These buyers are more likely to have started at a young age and with the help or encouragement of others in their social networks.

- **Demographic traits are poor predictors of sex buying.** Race and sexual orientation have almost no profiling power. Buyers are found across the income distribution with one important exception: currently active high-frequency buyers are much more likely than other men to make $100,000 or more annually.

- **Plenty of would-be sex-buyers are not currently active, including about one in five men who have never bought before but who "could envision buying sex in the future if the circumstances were right."**

## WHAT DOES THE MARKET LOOK LIKE?

- **On average, US sex buyers spend more than $100 per transaction.** Based on the recorded spend data and computed annual transactions for different groups of buyers, this survey estimates the annual size of the US commercial sex market at $5.7 billion.

- **Buyers visit a range of venues and use a similarly diverse number of information channels to purchase sex.** Prominent methods include visiting "massage" brothels—known to law enforcement as Illicit Massage Businesses (IMBs), arranging "dates" online, visiting "adult establishments," and going to well-known "tracks" for street prostitution. No single location dominates, though high-frequency buyers list IMBs as a frequented venue.

- **Buyers most commonly assume that the age of the last person they paid for sex was early- to mid-twenties.** The data support the finding that prostituted persons in this country are almost entirely women in that range, and disproportionately Black.

## WHY DO THEY BUY SEX?

- **Certain ideologies distinguish sex buyers from other men; they share many attitudes and beliefs about sex and relationships.** Active ones are more tolerant of cheating on a significant other and differ markedly from non-buyers on measures of impulse control.

- **Active buyers are more likely to say that prostitution is a "mostly victimless" crime and are less likely to say that prostitution is a crime "where someone is harmed."** They are also more likely to say that prostituted persons "enjoy the act of prostitution" and "choose it as a profession."

· **Buyers and non-buyers hold strikingly different views on masculinity and sex buying.** Non-buyers are much more likely than active ones to say that purchasing someone for sex involves treating females as objects, and that those actions exploit others. Active buyers are very likely to say they are "just guys being guys" or "taking care of their needs."

· **Many men who have bought sex in the past wish to stop.** About one-third of active buyers "strongly agree" that they do not want to do it again, a sentiment shared by most former buyers.

· **Active buyers value their personal safety, sexual health, and freedom from arrest above most other priorities; they are generally unconcerned about breaking the law but preoccupied by the need to avoid getting caught.** Active and former buyers are much more likely than non-buyers to say police "should not arrest anyone" involved in prostitution. The strongest bloc of male support for legalizing the US sex trade comes from buyers themselves.

· **Only about 6% of men who purchase sex illegally report ever having been arrested for it.** When buyers do perceive that risk, it can lead them to alter their activities. High-frequency buyers are more sensitive than low-frequency buyers to police presence and are more likely to react by shifting to a different location and diminishing their behavior. About one-quarter of buyers "strongly agree" that "the risk of arrest is so high I might stop."

· **Perceiving a risk of arrest has a diminishing effect on sex buying.** Two factors increase this perception: (1) a buyer's own arrest history, and (2) the extent to which he shifts his purchasing activities in response to police presence.

· **The main driver of sex buying, "normalized beliefs" about the commercial sex trade, combines interrelated ideas: prostituted women enjoy the act, it is mostly a victimless crime, buyers are merely taking care of their needs, and they are just "guys being guys."**

## WHAT CAN POLICYMAKERS DO ABOUT IT?

1  Move law enforcement's finite resources away from arresting and adjudicating prostituted persons and towards arresting and adjudicating buyers.

2  Make available short-term federal funding programs to support state and local agencies ready to instigate reforms.

3  Use mandatory minimum fines from convicted buyers to offset the costs of survivor exit services and law enforcement operations to stop demand.

4  Create increasingly severe penalty structures for repeat buyers, ensuring that sanctions are fair and consistent with survivor testimony of the nature of victim impact.

5  Counter messages that normalize sex buying through educational and public health interventions.

6  Establish employer policies prohibiting sex buying under any circumstances, including activities on company time or with company resources that are related to sex buying.

7  Implement targeted prevention campaigns and focus deterrence communications on behavioral "nudges."

See more on page 32 (Part IV, Policy Recommendations).

# PART I
# Study Background

Much of the research on prostitution and sex trafficking focuses on the "supply" side of the market: prostituted persons,[1] mostly women and girls, many of whom were trafficked. While supply-side realities and effective approaches to victim services require analysis, the other half of the market—the demand side—has been woefully understudied by comparison. This report seeks to fill those gaps in our understanding of demand in the US sex trade, including why some men buy sex and what can be done to reduce sex-buying behavior in the short and long terms.

We deliberately refer to men who buy sex because all available evidence points to this behavior being almost entirely conducted by males (Monto, 2004). We do not dispute evidence that, in rare instances, women have been known to buy sex (Weitzer, 2005). Yet we recognize that the demand side of the commercial sex trade is defined almost entirely by the actions of men.

Few researchers have used data to attempt explanations of why men buy sex (Atchison, 2010; Brewer et al., 2008; Holt et al., 2007; Monto & McRee, 2005). Many more have offered interpretations of sex buying (see Appendix A for a brief literature review). These generally emanate from the lived experiences of prostituted persons and tend to align with one feminist theoretical tradition or another (Monto, 2004; Weitzer, 2005). While important as scholarship, these analyses are not designed to identify the masculine socio-cultural forces that increase, diminish, or maintain demand.

## OUR APPROACH

We recognize that multiple individual and social forces cause sex buying, and close study can uncover a range of explanations. Nevertheless, we recognize it as (masculine) gendered deviant behavior that manifests as an economic market. Practically speaking, we view demand as being shaped by a combination of basic economic forces (e.g., cost and preferences), as well as cultural forces (e.g., gender and social norms).

We use a "momentum framework" to understand fluctuations in sex-buying practices among men whose demand drives the US sex trade. It approaches sex buying as a behavior driven by cumulative, positive nudges that accelerate a person's trajectory towards the activity. The concept of momentum defines sex buying as a life-course trajectory, avoiding emphasizing singular circumstantial, demographic, or correlative factors.

This approach regards sex buying as a harm-causing behavior that results from the acceleration or deceleration of micro- and macro-level factors including: beliefs about sex buying, gendered cultural norms about sexuality, life-course transitions, perceived risk of arrest, and psycho-social factors such as impulse control. This momentum framework helps document the push and pull factors underlying sex buying as a cultural phenomenon, and easily translates into strategies and tactics to confront and reduce it.

---

1   Deciding on terminology to describe persons in the commercial sex trade is a difficult process. No language is value-free, even for research in this field. We recognize people hold many competing, passionate views on the correct words to describe individuals historically labeled as "prostitutes." We choose to use the term "prostituted person" throughout this report for a simple reason: it is the term preferred by the survivors of the commercial sex trade with whom Demand Abolition has partnered and from whom we have learned since the program's inception. Respecting their dignity is our highest priority.

## STUDY METHODOLOGY

Research studies that focus on certain types of sex buying, use limited sample sizes, or employ problematic definitions of sex buying leave gaps in our understanding of this activity. Demand Abolition commissioned a survey about sex-buying behavior among 8,201 adult men across the US between December 2016 and January 2017, with the goal of addressing these gaps and more. The study design and questionnaire content were developed by a team of researchers,[2] and approved by the University of Portland's Institutional Review Board. The team chose to field the survey online through a third-party provider, Qualtrics, an independent research services firm, which provided both survey hosting and data collection.

> While it is critically important to understand supply-side market forces and effective approaches to victim services, this leaves the other half of the market—the demand side— woefully understudied by comparison.

Choosing to deploy the survey online reflected a desire to balance multiple tradeoffs. Compared to a phone-based or in-person method, respondents are much more likely to disclose sensitive information, particularly about sexual behavior, confidentially and online (see Tourangeau & Yan, 2007 for a review of relevant research). Web-based surveys are also more cost-efficient for collecting large amounts of data, particularly as fewer people participate in phone surveys. However, a major drawback of online studies is the process of selecting potential participants. Whereas phone or in-person surveys can be directed toward different types of probability-based samples (e.g., a simple random sample) of potential respondents, there is no way to do this through online invitations. Instead, the online survey industry uses various types of quota-based sampling procedures to create representative samples for any given study. Typically, convenience samples are crafted based on the geographic and demographic traits of respondents.

The third-party survey sampling firm that collected data for this study recruited US men aged 18 and over from across the country from multiple "panels," or groups of known prospective survey-takers. Several metro areas were "oversampled" by the research team for purposes unrelated to this report, using a weighting scheme to adjust these communities back to their proper proportion for all findings reported here. The firm recruited potential participants based on demographic quotas for race/ethnicity and age. As a final step in ensuring the representativeness of the sample, we weighted the dataset according to current demographic distributions of adult men in the US as reported by the Census Bureau.

Despite our best attempts, there is no way to avoid completely the possibility that our sample is skewed in one direction or another. Indeed, this is true in varying degrees for all survey-based studies. One major concern: might a participant be more likely, or perhaps less likely, to participate in a survey about sex buying based on his sexual behavioral history? If so, this would cause either an overestimation or underestimation of sex-buying behavior. One way we addressed this was by explaining to potential participants that the survey would cover a variety of sexual and non-sexual topics, and that all data would be completely confidential and, in fact, presented

---

2    The survey methodology and questionnaire content design team included Simon Hedlin, M.A., of Harvard Law School; Martin Monto, Ph.D., of the University of Portland; and Alex Trouteaud, Ph.D., of Demand Abolition. Alex led the Demand Abolition data analysis and reporting team.

anonymously to the analysis team. Respondents were only shown sex-buying questions after they had already answered a series of innocuous and then mildly sex-related questions. We did not observe a significant drop-off of participants after asking about sex-buying behavior, suggesting that the addition of these questions was unlikely to have dramatically altered the participant base.

We compared responses to our survey with another published report, namely the General Social Survey (GSS), which uses a large, nationwide probability sample—and even asks a couple of questions about sex-buying behavior. Looking only at variables we did not use to weight the data, we found that our sample closely mirrored the marital status and sexual orientation distributions in the GSS, as well as frequency of having sex. However, our sample differed significantly in that it contained: (1) a higher percentage of men who have no children, (2) a smaller percentage of men with "less than high school" educational attainment, (3) a smaller percentage of men who said extramarital sex is "always wrong," and (4) a smaller percentage of men who say they are "very happy." These differences could point to a limitation of available participants in online surveys broadly, or self-selection criteria for our survey particularly. These differences also could have occurred by chance.

These differences have simple implications for our estimation of sex-buying behavior: the data from this study constitute one source of many, and probably represent the high end of plausible estimates of sex-buying prevalence. In the GSS sample, 1.2% of men report that they have bought sex within the last year, and 10.1% say they have done it in their lifetimes. Our self-reported data are much higher, at 6.2% and 20.6%, respectively. We know that GSS numbers represent a significant undercount of sex-buying prevalence (Brewer et al., 2000), likely due to administration methods that lead to men feeling less comfortable sharing sexually deviant behavior. Nevertheless, our estimates are still at the highest end of other reports of lifetime sex-buying incidence in the US, which tend to range between 10%-20% (Michael et al., 1994; Monto, 2004; Shively et al., 2012; Sullivan and Simon, 1998). As such, we recommend against treating these estimates as definitive population parameters, and we encourage other researchers to publish similar data using different methodologies for comparison. The value of the data in this study is less about individual point estimates (e.g., sex-buying prevalence or market size), and more about how different men encounter messages and experiences that affect their involvement in the demand side of the US sex trade.

# PART II
# Findings on Buyers and Demand

## HOW MANY MEN ARE BUYING?

Sex trafficking and prostitution can take place in any section of our country, from small towns to busy truck stops to elite urban neighborhoods. At any time of day, someone can go online and view hundreds of local ads for sex, visit a nearby "massage" brothel, or drive through corridors known for street prostitution. Wherever there is evidence of "supply" in the commercial sex trade, there must also be a pool of demand to necessitate it. Our survey collected data that help us explore the demand side of the market and discern how men who buy sex—currently or in the past—differ from the male population at large.

Most men have never paid for sex. In fact, our survey finds that only 6.2% of respondents have bought it within the past 12 months, and just 20.6%[3] enter the illegal sex-buying market at least once in their lifetimes (Appendix A). Across multiple studies, the percentage of US men actively engaged in sex buying within a 12-month period ranges in the low-to-mid single digits, and the estimates of men who have ever bought in their lifetimes is between 10%-20%.[4] Most men who have ever purchased sex did so 2-5 times, with about 25% having purchased 10 times or more (Appendix B).

**FIGURE 1**



Not all buyers who are actively involved in the US sex trade participate equally. We refer to men who reported currently buying sex weekly or monthly as "**high-frequency buyers**" throughout the remainder of the report. Men who buy at least once per year, or quarterly on average, are labeled "**low-frequency buyers**." Separately, high-frequency and low-frequency buyers may be "active" or "former" based on their current involvement.[5]

---

3    To measure lifetime sex-buying behavior we asked, "Thinking about the time since your 18th birthday, have you ever paid someone in order to have sex with them, including oral sex, hand jobs, vaginal or anal sex, or some other form of person-to-person sexual act?" Later we asked men who responded affirmatively to this question how many times they have done so within the last 12 months.

4    See the methods section of this report for a detailed discussion about the estimates in this study, their limitations, and how and why they might be similar to or different from those in other studies.

5    We define **active buyers** as those who have paid for sex two or more times this year; or, just once this year but with a history of sex buying and an intent to buy again. Active buyers "strongly agree" they would buy again in the future if the circumstances are right. **Former buyers** either have not bought sex in the past year and "disagree" when asked if they would buy sex in the future, or merely have not paid for sex within the last six years.

High-frequency buyers are more likely to have started at a young age, and with the help or encouragement of others in their social networks. These people are far more likely than others to have had their first paid sex experience initiated by "a friend, colleague, group of friends, or family member," typically by the time they turned 21.

**FIGURE 2**



## Circumstances of Buyer's First Paid Sex Experience

Nearly one in five high-frequency buyers had his first paid-sex experience while he was legally a juvenile (Appendix B, Figure C). Our findings show sex buying not only as an individual behavior, but also as a cultural phenomenon that can be passed down generationally and reinforced by social networks that accept sex buying as normal.

**FIGURE 3**



0127

## POTENTIAL BUYERS

We recognize that, as in any market, illegal sex buying is dynamic—constantly evolving and changing in response to external forces. Our survey asked both buyers and non-buyers whether they could "envision buying sex in the future if the circumstances were right." Numerous would-be sex-buyers are not currently active, including about one in five men who have never paid for sex (as Figure 4 details, 20.2% of these men "somewhat agree" or "strongly agree" they could envision buying sex in the future). In later sections, we will delve deeper into what these circumstances are, and how they reinforce the experiences and beliefs associated with sex-buying behavior.

**FIGURE 4**



"I could envision buying sex, in the future, if the circumstances were right."

## INSIDE THE US SEX MARKET, ACCORDING TO BUYERS

Many studies and journalistic accounts attempt to describe aspects of the illicit sex trade in the US, such as the most common venues and the most desired attributes of prostituted persons. Our survey is one of the first to offer a snapshot through data provided directly by the buyers themselves. Our research digs deeply into the views of the 20% of men who have purchased sex to discover how they experience this underground market, including how much they pay to sustain it.

## VENUES

Buyers visit a range of venues and use a similarly diverse number of information channels to purchase sex. Prominent methods include visiting illicit "massage" brothels—known to law enforcement as Illicit Massage Businesses (IMBs), arranging "dates" online, visiting strip clubs or adult establishments, and going to well-known "tracks" for street prostitution. No one location dominates, though high-frequency buyers list IMBs as a favorite venue, while street-level sex buying and buying during military service are much more common experiences for former buyers.

FIGURE 5

## Circumstances of Buyer's Most Recent Paid Sex Transaction



# The **Internet** and **Sex Buying**

It is widely assumed that most sex-trafficking and prostitution activities have moved online. While Figure 5 might suggest that few buyers use online ads to arrange paid sex transactions, Figure 6 brings the role of the internet into sharper focus. Most buyers have recently browsed online ads for paid sex, and nearly the same percentage have taken the next step of contacting a person through an ad.

**FIGURE 6**

## Paid Sex "Shopping Behavior" in Past 12 Months



These data suggest the internet plays a prominent role in perpetuating the sex trade, at the very least providing buyers with a robust information source for conducting "research" prior to transacting. The numbers also demonstrate that it's rare for buyers to turn to online ads every time—or even most times—they want to buy. Nevertheless, online advertising is an integral part of marketing the illegal sex trade. Online ads and review boards play an indirect role in promoting transactions, and on occasion directly connect a buyer with his next transaction.

The data reveal that venue can affect the price of purchased sex. Consistent with previous studies, street-level transactions are, on average, significantly lower than all other venues (Figure 7). Surprisingly high average prices are paid at IMBs, even after "extreme" price values reported by buyers were excluded from analysis. This finding requires further study. An interesting way to think about the average price of paid sex transactions is to contrast these amounts to the fines judges typically levy against convicted sex buyers. In many jurisdictions, fines rarely surpass $100, or less than the average price for paid sex.

FIGURE 7

## Average (Mean) Cost of Buyer's Most Recent Paid Sex Transaction



$74  I was on the street

A friend, colleague, or family member set it up  $110

Someone other than the sex provider approached me first  $112

The person was someone I already knew; it turned into paid sex  $124

$125  I was browsing a prostitution ratings/ reviews website

The provider was someone I had already paid for sex previously  $126

A person I met through an Internet dating site approached me  $128

I was at a strip club or other adult establishment  $136

$227  I was at a massage parlor

Many buyers, especially high-frequency ones who purchase weekly or monthly, say their most recent transaction was with the same person they paid the time before, indicating that many transactions are with "known" prostituted persons (Figure 7). Similarly, a significant percentage of transactions were with someone the buyer "...already knew, and it turned into paid sex." This finding is consistent with the literature suggesting some sex buyers consider paid sex behavior part of "normal," relational sex (Atchison, 2010; Monto, 2004). What to non-buyers is a clear demarcation of prostitution activity—giving money to another person in exchange for sex—might to a buyer appear to be part of developing a "romantic" relationship with that person. We must consider this when estimating prostitution incidence, since some buyers don't think of all paid sex activity as prostitution. It also speaks to how sex buying is gendered normative behavior for some men.

# Prostituted Persons, According to Buyers

Buyers' best guesses at the age range of the last person they paid for sex suggest most transactions are with prostituted persons in their early-to-mid-twenties (Appendix B, Figure D). Most said the person was between the ages of 21 and 25, and former buyers were more likely to estimate the person was even younger. Buyers were most likely to report that their most recent paid sex transaction was with a person they describe as White (44.9%), rather than Black (19.1%). Yet non-Hispanic Black persons comprise 13% of the US population, and therefore are significantly overrepresented at a rate of roughly 1.5x in the race data (Appendix B, Figure E).

High-frequency buyers are more likely to have recently paid for sex with a Black prostituted person. While most paid sex transactions involve female prostituted persons, about one in five high-frequency buyers most recently purchased sex from a male (Appendix F). Our buyer data supports the finding that US prostituted persons are almost entirely women in their young-to-mid-twenties, and disproportionately Black.

## MARKET SIZE

Economic markets are defined by transactions, not by persons. To better understand what the illegal sex market looks like, and who is disproportionately driving demand in it, we need to examine who is responsible for how many transactions. While this impersonal way of thinking risks downplaying the activity's very real harms, it represents an honest accounting of how much harm is caused and by whom. From the standpoint of a prostituted person, cumulative trauma is perhaps better measured by survived exploitative transactions, rather than unique individual exploiters.

Our research shows that, while the size of the illegal sex industry in the US is significant, it is fueled by a relatively small number of men. Sex buyers in the US spend more than $100 per transaction on average, and men who purchase sex least often pay the highest prices on average (Figure 8). Based on average spend data and computed annual transactions for different groups of buyers, this survey estimates the US sex market at $5.7 billion each year.[6]

---

6    This figure is consistent with mathematically-robust estimates produced through other methodologies, including a 2014 study by the Urban Institute which measured the size of the sex trade in eight US metro areas. Recently, Polaris estimated the market size of commercial sex in US illicit massage businesses to be $2.5 billion based on recent academic research, suggesting this survey's estimate of $5.7 billion for the overall market might be low.

FIGURE 8




## Dollars Spent Annually on Paid Sex

Additionally, the more frequently a buyer pays for sex, the less he spends per transaction. When we factor in the percentage of men in each frequency group, and the number of transactions each group makes, it is clear that men who buy most often account for the lion's share of the overall market. **While about 25% of active sex buyers report purchasing weekly or monthly, those transactions account for nearly 75% of the market** (Figure 9). About one in four buyers purchase *at least* every other month. Nearly half of active buyers purchase between two and five times per year.

FIGURE 9



0133

## A FREQUENCY-BASED BUYER TYPOLOGY

How often a buyer transacts can radically affect how much responsibility he bears for the shape of the commercial sex trade. Recognizing this, we use a simple typology, summarized in Figure 10, to compare the experiences of these different groups of buyers. As we will show later, this typology unlocks key findings about why men increase (accelerate) or decrease (decelerate) their sex-buying behavior.

We first divide men into three groups based on whether they have **never bought,** are **former buyers** no longer active, or are **active buyers** whose actions currently define the demand side of the US sex trade. Active buyers are further separated into **high-frequency buyers** and **low-frequency buyers**, based on how much market activity is attributable to their actions.

The obvious next question is, "Do these groups of men differ in ways that might explain *why* they do or do not pay for sex?" For a variety of reasons, previous research has tended to focus on demographic differences among sex buyers. In this study we can look far beyond demographics to help answer this essential research question.

FIGURE 10

### Sex-Buyer Typology

| TYPOLOGY | Non-Buyers | Former Buyers | Active Low-Frequency Buyers | Active High-Frequency Buyers |
|---|---|---|---|---|
| **BUYING BEHAVIOR** | Has never bought sex, and 'strongly disagrees' he ever could. | It has been at least 6 years since he last bought sex; or, has a more recent history of low-frequency buying and 'strongly disagrees' he ever could again. | Has bought sex 2-5 times this year; or, just once but with a history of buying and an intent to buy again. | Has bought 6+ times this year. |
| **LIKELIHOOD OF BUYING IN THE FUTURE** | None; category excludes the 20.2% of men who have never bought sex but might in the future. | 28.9% say they might buy sex in the future. | 95.9% say they might buy sex in the future. | 97.4% say they might buy sex in the future. |
| **PERCENT OF MARKET TRANSACTIONS** | 0% | 0% | 28.2% | 72.8% |

While about 25% of active sex buyers report purchasing weekly or monthly, those transactions account for nearly 75% of the market.

# PART III
# Findings on Sex-Buying Reduction and Prevention

## DEMOGRAPHIC INFLUENCES ON SEX BUYING

Policymakers, advocates, and practitioners pursuing demand-reduction approaches to ending prostitution (and by extension sex trafficking) often look for common factors that might indicate the likelihood of a person being or becoming a sex buyer. Our research shows that demographic traits tend to be poor predictors. Age, more than other demographic variables, is somewhat associated with sex buying, as **former buyers** are more likely to be older, and **high-frequency buyers** are more likely to be younger (Figure 11). However, **low-frequency buyers** are evenly distributed across age ranges, as are men who have never paid for sex.

**FIGURE 11**





Race, sexual orientation, and marital status show modest statistical relationships with sex buying (Appendix B, Figures H-J). Race has almost no relationship with sex buying; however, Black men are disproportionately represented among **active high-frequency buyers**, though Black men still comprise less than half of this buyer type. Sexual orientation of buyers generally mirrors that of the male population at large, except that **active high-frequency buyers** are slightly more likely to self-identify as bisexual. This finding is consistent with other data in our study indicating that this group of buyers is more likely to have recently paid for sex with a male prostituted person (Appendix B, Figure I).

**Active buyers** are less likely to be married than **former buyers** and **non-buyers**, as seen in Appendix B, Figure J. Nevertheless, over one-third of **active buyers** are married. Over half of active buyers have children under age 18 in the home (Appendix B, Figure K).

**Active high-frequency buyers** are much more likely to report they are in a romantic relationship than are **active low-frequency buyers** (Figure 12), yet they are less likely to report being married. This curious pattern reinforces literature suggesting buyers consider paid sex behavior part of "normal" relational sex, thus demonstrating how the activity becomes gendered normative behavior for some men.



FIGURE 12

## Current Relationship Status of Respondents

In general, sex buying is only weakly related to income, education level, or political ideology. Buyers are found across the income distribution with one important exception: **active high-frequency buyers** are much more likely than other men to make $100,000 or more annually (Figure 13).

FIGURE 13



## Annual Household Income of Respondents

The data show no meaningful relationship between education levels and sex buying (Appendix B, Figure L). Men with all amounts of educational attainment are equally likely to pay for sex. There is no one political leaning associated with sex buyers, either, though **active buyers** and **former buyers** are more likely to describe their political views as "liberal" or "very liberal." Additionally, however, a disproportionate number of **active high-frequency buyers** describe their views as "very conservative" (Appendix B, Figure M).

While research reveals plenty of minor demographic differences among groups of sex buyers, these do very little to predict who is a sex buyer and why. We cannot write a set demographic profile for a sex buyer. He could be any age or race, earn at any income level, or be in any type of relationship.

FIGURE 14



## IDEOLOGICAL INFLUENCES ON SEX BUYING

Whereas demographic data fall short in developing profiles of sex buyer types, ideological data can be quite effective. Sex buyers share many attitudes and beliefs about sex and relationships. For example, **active buyers**, and to a lesser extent **former buyers**, are far more tolerant of cheating on a spouse or significant other, as demonstrated in Figure 15. This probably explains why **active buyers** are more likely than all other groups to have cheated or had an affair in the last year (Figure 16). Across both measures, **active high-frequency buyers** register stronger negative views than **active low-frequency buyers**.

FIGURE 15



Respondents' Beliefs About Cheating

FIGURE 16



Respondents Who Had an Affair or Cheated
Within the Past 12 Months

Advocates often connect consumption of pornography with sex-buying behavior. According to our research, **active** and **former buyers** are much more likely than **non-buyers** to have viewed porn in the past year, though it should be noted that over half of non-buyers did so as well (Figure 17). This relationship is addressed in greater detail later, when we discuss "acceleration" forces.

FIGURE 17



Respondents Who Viewed Porn
Within the Past 12 Months

Men who buy sex are about as sexually active as **non-buyers**, with one important exception: **active high-frequency buyers** are much more likely than all other groups, including **active low-frequency buyers**, to report having sex multiple times per week (Appendix B, Figure N). They are also more likely than all other groups to report contracting a sexually transmitted infection in the last year, suggesting they adhere less to safe sex practices (Appendix B, Figure O).

**Active buyers** might engage in more sexually promiscuous behavior not simply because of a heightened libido, but due to a relative inability to wait for satisfaction. We find that **active buyers** differ markedly from **former buyers** and **non-buyers** on measures of impulse control and delayed gratification. We included a series of such questions, originally developed and validated as part of the Delaying Gratification Inventory (Hoerger, Quirk & Weed, 2011). Figure 18 shows that across each of the five tested statements, **active high-frequency buyers** and **active low-frequency buyers** indicate lower levels of impulse control, and **former buyers** more closely resemble **non-buyers**.

FIGURE 18

## Measure of Impulse Control and Delayed Gratification



Sex buyers share many similar attitudes and beliefs
about sex and relationships.

0139

RESEARCH REPORT | 2018

While impulse control and delayed gratification are important to understanding sex-buyer behavior, some of the most insightful findings arose from questions probing buyers' beliefs about prostitution.

**FIGURE 19**



### Beliefs and Behaviors Associated with Sex Buying

**BEHAVIORS**
- Likely to have had an affair
- Watched porn in the past 12 months
- Likely to have contracted an STI
- Lack of impulse control

**BELIEFS**
- "Guys being guys" and "taking care of needs"
- Prostitution is a victimless crime
- Tolerance towards infidelity
- Provider enjoys sex and chose it as profession

**Active buyers** are far more likely than **non-buyers** to say that prostitution is a "mostly victimless" crime, and are less likely to say that prostitution is a crime "where someone is harmed" (Figure 20).

**FIGURE 20**



### "Do you believe prostitution is a victimless crime, or mostly a crime where someone is harmed?"

Legend:
- Never Bought
- Active Low-Frequency Buyers
- Active High-Frequency Buyers
- Former Buyers
- Men Overall

| Category | Never Bought | Active Low-Frequency Buyers | Active High-Frequency Buyers | Former Buyers | Men Overall |
|---|---|---|---|---|---|
| Mostly a Victimless Crime | 18.9 | 45.8 | 37.7 | 38.5 | 29.4 |
| Mostly a Crime Where Someone is Harmed | 31.9 | 11.6 | 21.9 | 10.7 | 23.1 |
| Both Equally | 34.7 | 31.2 | 28.5 | 36.0 | 34.8 |
| I Don't Know | 14.5 | 11.5 | 11.9 | 14.8 | 13.5 |

Going further, **active buyers** are more likely than both **non-buyers** and **former buyers** to believe that prostituted persons "enjoy the act of prostitution" (Figure 21). **Active buyers** are less likely to believe that people in prostitution are "forced or lured into the trade," and more likely to say that prostituted persons "choose it as a profession."

FIGURE 21



"Which of the following statements about 'prostitution' do you agree with?"

**Buyers** and **non-buyers** hold strikingly different views on masculinity and sex buying (Figure 22). **Non-buyers** are much more likely than **active buyers** and **former buyers** to say that purchasing someone for sex involves treating women as objects, and that their actions exploit others. **Active buyers** are especially likely to say they are "just guys being guys" or "taking care of their needs."

FIGURE 22



"Which of the following statements about 'buyers/johns' do you agree with?"

0141

RESEARCH REPORT | 2018

Compared to meager demographic differences among categories of sex buyers, we observed clear distinctions across a variety of attitudes and behaviors associated with sexual and relational ideologies, painting a clearer portrait of the different types of sex buyers. In the next section we will consider the logical next step of this analysis: factors that reduce and prevent sex-buying behavior.

## RISK AND ACCOUNTABILITY INFLUENCES ON SEX BUYING

As we just observed, men who perpetuate prostitution hold deep beliefs that also justify their behavior. Given this, it is tempting to be cynical about whether demand for paid sex can be reduced. However, the old adage that "prostitution is the oldest profession" ignores how sex buying rates vary dramatically across cultures and over time, and evidence presented in the introduction of this report demonstrates that sex buying is generally on the decline in the US. Findings from this section of the report provide insight into how and why men reduce (decelerate) sex-buying behavior, and sometimes stop altogether.

First we should acknowledge that many men who have bought sex in the past do not intend to repeat the behavior. About one-third of **active low-frequency buyers** "strongly agree" that they want to stop (Figure 23), a sentiment shared by twice as many former buyers.

FIGURE 23



"I would like to stop buying sex."

The reasons why any person stops sex buying permanently can be complex and multi-layered. **Former buyers** give us some insight into this process through the reasons they cite for walking away from previous sex-buying opportunities (Figure 24). The most prevalent logic former buyers offer is, "I realized that paying for sex is inconsistent with my moral beliefs." This finding once again reinforces the central importance played by belief systems in determining behavior. Far fewer former buyers said they were concerned they might get arrested, a finding which we will interpret with further data below.

FIGURE 24

## Why Former Buyers Walked Away from Sex-Buying Opportunities



Our survey assessed the top barriers to engaging in further sex-buying behavior and found that, for the most part, buyers care most about their own well-being. **Active buyers** value their personal safety, sexual health, and freedom from arrest (Appendix B, Figure P). Respondents were much more concerned about the risk of arrest than they were about finding a place to purchase sex where it is legal to do so. Active buyers today are clearly untroubled by breaking the law but preoccupied by a desire to avoid getting caught by the authorities.

Buyers say other factors need to be in place for them to purchase sex; one is that the prostituted person they buy should "not be forced or trafficked." This finding can be interpreted several ways. It could indicate a fear of severe criminal penalties associated with getting caught, a desire not to harm a "forced or trafficked" person, or a combination of both impulses.

**Active buyers** and **former buyers** are much more likely than **non-buyers** to say police "should not arrest anyone" involved in prostitution (Figure 25), demonstrating that the greatest source of support among men for legalizing the US sex trade comes from buyers themselves. About one in five **active high-frequency buyers** believe police should arrest "mostly persons in prostitution" compared to "mostly johns" or "both, equally." **Non-buyers**, on the other hand, overwhelmingly believe police should arrest buyers and prostituted persons "equally."

Active buyers are less likely to believe that people in prostitution are "forced or lured into the trade," and say that prostituted persons "choose it as a profession."

0143

FIGURE 25



"Who should your local police focus on arresting to combat prostitution?"

When we look at buyers' actual experiences with law enforcement, it becomes much easier to understand why few of them perceive a real risk of arrest. Only about 6% of men who purchase sex illegally have ever been arrested for it (Figure 26). **Active high-frequency buyers** are six times as likely to have been arrested for sex buying; two-thirds of them report having been arrested multiple times for the same offense. The survey does not provide insight into whether a subsequent arrest led to heightened penalties or was even recognized as a repeat offense by the law enforcement agency.

FIGURE 26



Sex Buying Arrest History

Respondents indicated that when they do perceive a risk of arrest, it can lead them to alter their activities (Figure 27). **Active high-frequency buyers** are more sensitive than **active low-frequency buyers** to police presence, and are more likely to shift their buying behavior in response. About one-quarter of these buyers "strongly agree" that "the risk of arrest is so high I might stop" (Figure 28).

FIGURE 27

## "Have you ever stopped buying sex in one area because of police presence?"



FIGURE 28

## "The risk of getting arrested for buying sex is so high that I am considering not buying sex again."



These findings demonstrate that mitigating sex buying at the individual and system levels is possible, but complex. Many disparate forces act to increase and decrease sex-buyer behavior, leading us to try and document the interplay among them. In the next section, we summarize the results of an advanced statistical procedure designed to achieve exactly this goal.

0145

## A SYSTEM OF ACCELERANT AND DECELERANT INFLUENCES ON SEX BUYING

Practitioners and policymakers who seek to stop sex buying must understand why men increase (accelerate) or decrease (decelerate) this harmful behavior. Our survey contains questions that we've shown track closely to different types of sex-buying patterns. Using an advanced statistical procedure called Structural Equation Modeling (SEM),[7] we can test many of these associations simultaneously to explore overarching frameworks that best describe our data.

The full, detailed presentation of this SEM analysis is contained in Appendix Figure Q, including model fit statistics. Below we've summarized two major areas of critically important findings.

The first major conclusion is that the main driver, or accelerant, of sex buying is "normalized beliefs" about the commercial sex trade. This ideology is represented by interrelated beliefs: prostituted people enjoy the act, prostitution is mostly a victimless crime, buyers are merely taking care of their needs, and buyers are just "guys being guys." In Figure 29 we see that normalized beliefs are associated with an increase in sexual promiscuity—which in this analysis includes greater odds of cheating on a spouse/partner and believing the activity can be okay, as well as an increased likelihood of having contracted an sexually transmitted infection recently. Normalized beliefs reinforce self-preservation motives in sex buying—the extent to which a buyer prioritizes his own physical safety, sexual health, and freedom from arrest.

FIGURE 29



### The Acceleration Process Leading to Sex Buying

Figure 29 demonstrates factors that influence normalized beliefs, including lack of impulse control, being networked with other sex buyers, and consuming pornography. While not depicted in this figure, we also find that age is associated with normalized belief systems, suggesting that views about the sex trade become calcified in a buyer's ideology over time.

---

7   SEM is a family of procedures, and many quantitative researchers will be familiar with an early version of SEM known as path analysis. Indeed, the results of most SEM analyses can be displayed in path diagrams, as we have done here. SEM's limitations are similar to those of any other regression or correlation-based analysis. The underlying data are cross-sectional, and the study design is nonexperimental; thus, causality cannot be proven by any analysis in this report, including through SEM. While exploratory in nature, the SEM results do provide a useful framework for developing further research studies to study some of these complex relationships in closer detail.

One of the major advantages of SEM as an analysis method is not just the ability to order these different forces in an overarching framework, but then to compare the magnitude of these forces, or effects, against each other. Through this process, which is summarized in Figure 30, we find that normalized beliefs have the strongest impact on accelerating sex-buying behavior. These "cumulative impact scores" are, for those familiar with SEM, the total effects (direct plus indirect effects) on the model's endogenous outcome variable, intent to buy sex. These scores do not have any *absolute* meaning, but they do have *relative* meaning; a score of .20 is twice as strong as a score of .10, for instance.

FIGURE 30

## Accelerants and Decelerants of Sex-Buying Intent



| Cumulative Impact Score | ACCELERANT | DECELERANT | Cumulative Impact Score |
|---|---|---|---|
| .45 | Normalization Beliefs | Is Married | -.14 |
| .27 | Sexual Promiscuity | Perceives Risk of Arrest | -.08 |
| .25 | Self-Preservation Motives | Age | -.06 |
| .10 | Pornography Consumption | Arrest History | -.01 |
| .04 | Networked with Other Buyers | | |

Just as we can map out sex-buying accelerant relationships, we can do the same for decelerant relationships, leading to the second major finding. Figure 31 highlights the criminal justice system's role in reducing sex buying. Perceiving a risk of arrest has a *diminishing effect* (dotted line) on sex buying. Two factors increase the perception of risk: a buyer's own arrest history, and the extent to which a buyer shifts his paid sex activity to other communities in response to police presence. This pattern suggests that cracking down on sex buying in one community, while it will certainly push some activity to neighboring areas, will also reinforce in those buyers' minds that they face a plausible risk of arrest.

FIGURE 31

## The Deceleration Process of Reducing Sex Buying



Other decelerant factors not shown in this figure include age and marital status. As buyers get older, they are less likely to engage in paid sex activity. This is a strong, direct relationship, but carries a major caveat. Because buyer age *increases* the calcification of normalized beliefs, this accelerant almost completely offsets the slowing down of sex buying that we would otherwise expect to see as a buyer "ages out" of the market.

Buyers who are married (not just those involved in a romantic relationship) tend to buy sex at reduced rates compared to their unmarried counterparts. Recall that despite this decelerant effect, over one-third of **active buyers** are married.

Across these decelerant effects, one thing should be obvious for practitioners and policymakers alike: the strongest realistic opportunity to reduce sex-buying behavior in the short-term, and thus shrink the demand-side of the commercial sex market, is to focus on strategies that increase the *perception of arrest risk* among buyers. This involves much more than just individual arrests.

## CONCLUSION

The analyses in this report raise as many questions as they answer, but nonetheless represent a major leap forward in our understanding of how sex buying flourishes, and how it might diminish. Buyers form a diverse group of men, with some far more entrenched in the market than others. They are less united by demographics than by the beliefs they hold. Changing sex-buying behavior in the long term is largely, though not exclusively, about altering these destructive belief systems. The criminal justice system also plays an important role in influencing buyer behavior through the perception of risk, and by helping to counter the injurious false narrative held by many buyers that buying sex is normal, harmless, and acceptable. We summarize the implications of these findings for policymakers in the next and final section of the report.

Perceiving a risk of arrest has a diminishing effect on sex buying.

PART IV
# Policy Recommendations

This study illuminates several areas for policy change designed to reduce demand for commercial sex, including sex trafficking, and by extension reduce victimization rates. Not only can federal, state, and local public policy improve, but organizations and institutions of any size can also implement changes.

---

## A SMARTER CRIMINAL JUSTICE APPROACH

The data show that buyers are sensitive to the risk of arrest, cite it as a barrier to sex buying, and stop buying sex in communities where they perceive a higher likelihood of arrest. Obviously not every buyer can be—or even needs to be—arrested for the criminal justice response to have a significant impact on reducing demand.

State and local law enforcement agencies, which are primarily responsible for enforcing laws against sex buying, must be strategic. Arresting prostituted persons does nothing to deter buyers. In fact, the very presence of prostituted persons is a direct response to demand, not the other way around. The data demonstrate that we can deter illicit commercial sex markets by arresting sex buyers as part of a broader strategy to increase perceptions of risk.

---

### 1 | RECOMMENDATION

Shift law enforcement's finite resources from arresting and adjudicating prostituted persons and towards arresting and adjudicating buyers.

When law enforcement agencies engage in demand-reduction operations, they should:

- Publicize the operations widely so that the entire community is aware that demand is a priority for the agency, and that there is an ongoing plausible risk of arrest for men who attempt to buy sex. This study documents the central importance of the *perception* of risk of arrest in deterring buyers and would-be buyers. The publicity needed to heighten risk perception is not for shaming individual arrestees—a strategy known to be ineffective, as well as detrimental to families and communities (McAlinden, 2005). Publicity can take the form of earned media coverage and social media outreach after successful operations, and even *before and while* operations take place. This publicity deterrence model is widely used in combating DUI criminality, where it is an evidence-based practice known to reduce intoxicated driving rates.

- Conduct demand operations that mirror the diversity of venues, including buyer stings conducted online; in fake illicit massage brothels, apartment brothels, and high-end "escort" agencies; and on known street corridors (as long as the street operations do not require police to first arrest prostituted persons). Conducting a range of demand operations ensures that criminal accountability applies equally to the diverse spectrum of buyers within a community.

- Use investigative data to identify and build cases against high-frequency buyers, as well as buyers who advertise their exploits to the larger community to bolster the activity. With limited resources,

law enforcement agencies must always focus on the highest-impact offenders. Our study makes clear that a relatively small percentage of buyers account for most market activity.

- Ensure law enforcement has the information and data-sharing protocols in place to identify which arrested buyers are recidivists. Many self-identified buyers in this study report being arrested for sex buying on multiple occasions, yet law enforcement professionals indicate that arrestees commonly say it's "their first time."

## 2 | RECOMMENDATION

### Make available federal short-term funding programs to support state and local law enforcement agencies ready to make demand-reduction reforms.

A shift in law enforcement practice requires training and other professional resources to support new protocols. Financial support for this does not need to be long term; the costs of demand operations should be offset in part by reduced investment in arrests previously targeted at prostituted persons. Training on cost-efficient demand operation approaches, especially those pioneered by leading law enforcement agencies, will also help drive down operations costs for agencies that are new to the practice. Training and technical assistance for law enforcement demand operations is currently available through the National Johns Suppression Initiative (NJSI). For more information on NJSI: www.cookcountysheriff.org/tag/national-johns-suppression-initiative/

## 3 | RECOMMENDATION

### Implement mandatory minimum fines of adjudicated buyers to help offset costs of survivor exit services, effective long-term buyer education programs, and law enforcement demand operations.

While mandatory minimum fines of convicted buyers can fund operations, it is just as important—if not more important—that these fines support victim and "exit" services for prostituted persons, including trafficking victims. Not only does this strategy help ensure sustainable funding for such services, but our data demonstrate how it is needed to reinforce the corrective message that sex-buying harms prostituted persons. This message is best delivered through effective long-term sex buyer education programs, which should be mandated as a condition of adjudication rather than as a diversion alternative

## 4 | RECOMMENDATION

### Create increasingly severe penalty structures for repeat buyers, while ensuring that sanctions are consistent with the nature of the offense and not unfairly punitive.

Lawmakers should ensure that state and local laws against sex buying consider the reality of recidivists by assessing increasingly severe penalties. Such laws should also contemplate the uniquely negative impact of "promoting buyers," people who introduce others into the sex trade (especially juveniles) or post public content about their exploits to encourage other men to buy sex. Our findings show how "promoting buyers" are central to the generational cascade of sex-buying behavior. State and local sex buying laws, as well as pimping and trafficking laws, generally were not authored with the reality of "promoting buyers" in mind, leaving prosecutors with ill-fitting options for charging such defendants.

## ENGAGING ALLIES IN CULTURAL INTERVENTIONS

While the criminal justice system is most readily suited to "decelerate" demand, it is hardly the only sector that can serve an important role. The "normalization culture" underlying sex-buying behavior presents a wide range of opportunities for organizations and institutions to address head-on the driving ideologies behind demand. Education, health, and business sectors can be key allies in strategic cultural interventions to reduce demand, since the data in this study make clear that buyers try to hide their behavior from others.

### 5 | RECOMMENDATION

### Counter messages that normalize sex buying through interventions in education and public health sectors.

Buyers cocoon themselves in networks and subcultures that reinforce the "normalization" of sex buying; other networks and cultural influencers must directly and actively counter this narrative. It is critical to challenge the demonstrably false notions that sex buying is both a victimless crime and normal male sexual behavior. The data here show how this belief system is the root justification for most men who buy sex.

- Bystander intervention strategies should be developed and deployed—especially for young adult audiences—to teach safe and practical ways to challenge these false narratives within peer networks. Training strategies are already being used to great success in sexual assault prevention programs on college campuses and elsewhere. Discussions on the topics of consent, sexual harm, and relationship power differentials should be extended into the issue area of commercial sex.

- Survivor voices are critically important to educate the public, including would-be buyers, on the magnitude and nature of harms caused by sex buying. Survivors' authentic voices are essential to countering the victimless crime mythology these data show is internalized by many men.

- School-based sexual education is essential in reducing demand over the long term, especially since we have learned through this study that many men start buying sex at a young age. Programs for early adolescents can help young people understand the harms and non-normative nature of sex buying and other forms of gender-based violence as outlined below.

### 6 | RECOMMENDATION

### Create employer policies prohibiting sex buying.

Buyers are represented across all demographic groups of men, and high-frequency buyers are more likely to have higher incomes. Therefore, every business or organization should state explicitly within its code of conduct that buying sex is prohibited, including activities on company time or with company resources that are related to sex buying. Such policies should provide clear and specific consequences for employees caught buying sex, including relaying the incident to local authorities under mandated reporter protocol—acknowledging that the prostituted person is potentially an adult or juvenile trafficking victim.

## 7 | RECOMMENDATION

Implement targeted prevention campaigns and focus deterrence communications on behavioral "nudges."

These interventions are designed to encourage small changes in *positive* behaviors through careful suggestion and strategic presentation of choice sets which are optimized based on how humans process information and make decisions. When implemented at scale, these small changes can accrue major social impact. Behavioral nudge opportunities to reduce demand could include:

· **Targeted deterrence and prevention campaigns that focus on how much "safer" it is for men to engage in consensual relational sex compared to buying sex.** The data in this report show that buyers are primarily motivated by their own concerns for well-being and strategically downplay the possibility that prostituted people are harmed. Therefore, the behavioral nudge calculus must be expressed in terms of payoff to the buyer despite the inclination to focus on the harm caused to others. Nudge campaigns might also focus on how relational sex is normal, easier, and more satisfying than paying for sex.

· **Scalable communications programs, especially those deployed digitally, that focus on nudging men away from exploitative sexual experiences that are highly correlated with sex buying.** Our study finds that such experiences include frequenting strip clubs, consuming pornography, and cheating on a romantic partner. For instance, web search ads could provide plausible, healthy sexual alternatives to boys and men searching for these experiences. Additionally, media partners could encourage portrayals that reflect these experiences more accurately, documenting not just the harm caused to exploited persons, but also the dissatisfaction and regret that many men—as shown in this study—experience after they purchase sex.

· **Contributions from the health sector, which can help reduce demand on multiple fronts.** Violence against women is a public health issue, and sex buying is a form of gender-based violence that registers significant amounts of traumatic harm to an overwhelming majority of prostituted individuals. Preventing this harm altogether is the fundamental aim of demand reduction. As it has done for sexual assault, intoxicated driving, and many other issues, the public health sector can identify and promote evidence-based practices in reducing demand. The data in this study suggest ample opportunity for testing targeted community interventions.

· **Involvement of physicians and mental health counselors.** Related to the need for public health involvement is a practical consideration: sex buying is a risky activity. This study identifies serious risks for experiencing physical violence, contracting sexually transmitted infections, and other health concerns—not counting the health effects caused by buyers to relational partners and prostituted persons. Physicians and mental health counselors should understand sex buying as a behavior that, among other things, threatens the health and well-being of the buyer.

# References

Agnew, R. (1992). Foundation for a General Strain Theory of Crime and Delinquency. Criminology, 30(1), 47-88.

Atchison, C. (2010). Report of the Preliminary Findings for Johns' Voice: A Study of Adult Canadian Sex Buyers.

Brewer, D. D., Muth, S. Q., & Potterat, J. J. (2008). Demographic, Biometric, and Geographic Comparison of Clients of Prostitutes and Men in the US General Population. Electronic Journal of Human Sexuality, 11(9).

Brewer, D. D., Potterat, J. J., Garrett, S. B., Muth, S. Q., Roberts, J. M., Kasprzyk, D., ... & Darrow, W. W. (2000). Prostitution and the sex discrepancy in reported number of sexual partners. Proceedings of the National Academy of Sciences, 97(22), 12385-12388.

Broidy, L., & Agnew, R. (1997). Gender and Crime: A General Strain Theory Perspective. Journal of Research in Crime and Delinquency, 34(3), 275-306.

Bucher, J., Manasse, M., & Milton, J. (2015). Soliciting strain: Examining both sides of street prostitution through General Strain Theory. Journal of Crime and Justice, 38(4), 1-19.

Claude, K., & Key, M. L. (2010). Targeting the Sexbuyer. The Swedish Example: Stopping Prostitution and Trafficking Where it All Begins. Swedish Institute.

Farley, M. (2007). Renting an organ for ten minutes: What tricks tell us about prostitution, pornography and trafficking. In D. Guinn (Ed.), Pornography: Driving the demand for International sex trafficking. Los Angeles, CA: Captive Daughters Media, 144-152.

Hoerger, M., Quirk, S. W., & Weed, N. C. (2011). Development and validation of the Delaying Gratification Inventory. Psychological Assessment, 23(3), 725.

Holt, T. J., & Blevins, K. R. (2007). Examining Sex Work from the Client's Perspective: Assessing Johns Using on-line Data. Deviant Behavior, 28(4), 333-354.

Månsson, S. A. (2004). Men's practices in prostitution and their implications for social work. Social work in Cuba and Sweden: Achievements and Prospects.

Månsson, S. A., & Linders, A. (1984). Sexualitet utan ansikte: könsköparna. [Sexuality without a face: The sex buyers]. Carlsson & Jönsson.

McAlinden, A. M. (2005). The Use of 'Shame' with Sexual Offenders. British Journal of Criminology, 45(3), 373-394.

Michael, R. T., Gagnon, J. H., Laumann, E. O., & Kolata, G. (1994). Sex in America: A Definitive Survey.

Monto, M. A. (2004). Female Prostitution, Customers, and Violence. Violence Against Women, 10(2), 160-188.

Monto, M. A., & McRee, N. (2005). A comparison of the male customers of female street prostitutes with national samples of men. International Journal of Offender Therapy and Comparative Criminology, 49(5), 505-529.

Monto, M., & Milrod, C. (2013). Ordinary or peculiar men? Comparing the customers of sex workers with a nationally representative sample of men. International Journal of Offender Therapy and Comparative Criminology, 58, 802–820.

Pitts, M. K., Smith, M. A., Grierson, J., O'Brien, M., & Misson, S. (2004). Who pays for sex and why? An analysis of social and motivational factors associated with male clients of sex workers. Archives of Sexual Behavior, 33, 353-358.

Raymond, J. (2004). Prostitution on Demand: Legalizing the Buyers as Sexual consumers. Violence Against Women, 10, 1156-1186.

Reyes, E. A. (2013, November 2). Fewer men are paying for sex, survey suggests. Los Angeles Times. Retrieved from http://articles.latimes.com/2013/nov/02/nation/la-na-paying-for-sex-20131102

Sandell, G., Pettersson, E., Larsson, J., & Kuosmanen, J. (1996). Könsköparna: Varför går män till prostituerade? Djupanalys av män som köper sex [The sex buyers: Why do men go to prostitutes? In-depth analysis of men who buy sex]. Stockholm, Sweden: Natur och Kultur.

Shih. J. (1994). A plague in prostitution: HIV and AIDS in Thailand. R I Med, 1994 May; 77(5):145-9.

Shively, M., Kliorys, K., Wheeler, K., & Hunt, D. (2012). A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts. The National Institute of Justice.

Sprecher, S. (1998). Social exchange theories and sexuality. Journal of Sex Research, 35(1), 32-43.

Sullivan, E., & Simon, W. (1998). The Client: A Social, Psychological, and Behavioral Look at the Unseen Patron of Prostitution. Prostitution: On whores, hustlers, and johns, 134-55.

Tourangeau, R., & Yan, T. (2007). Sensitive questions in surveys. Psychological Bulletin, 133(5), 859-883.

Vanwesenbeeck, I., De Graaf, R., Van Zessen, G., Straver, C. J., & Visser, J. H. (1993). Protection styles of prostitutes' clients: Intentions, behavior, and considerations in relation to AIDS. Journal of Sex Education and Therapy, 19(2), 79-92.

Ward, H., Mercer, C. H., Wellings, K., Fenton, K., Erens, B., Copas, A., & Johnson, A. M. (2005). Who pays for sex? An analysis of the increasing prevalence of female commercial sex contacts among men in Britain. Sexually Transmitted Infections, 81(6), 467-471.

Weitzer, R. (2005). New directions in research on prostitution. Crime, Law and Social Change, 43(4-5), 211-235.

Weitzer, R. (2009). Sociology of Sex Work. Annual Review of Sociology, 35, 213-234.

Xantidis, L., & McCabe, M. P. (2000). Personality Characteristics of Male Clients of Female Commercial Sex Workers in Australia. Archives of Sexual Behavior, 29(2), 165-176.

## Appendix A  |  Previous Approaches to Studying Sex Buyers

Since the 1990s, numerous studies have attempted to correct the imbalanced focus on "supply" over "demand" in prostitution research, and have improved our understanding of sex buyers. Knowledge about these buyers comes primarily from three methodologies: (1) comparing samples of buyers with the general population, (2) comparing buyers who attend educational programs ("john schools"), subsequent to their arrest, with men in the general population, and (3) using surveys to compare buyers who admit engaging in the behavior to those who do not (Brewer, Muth, & Potterat, 2008). While each of these approaches has methodological limitations, they have produced stable findings about buyers and the market. One major conclusion, which runs contrary to sensationalized media reports, is that the prevalence of sex buying is dropping. Analysis of General Social Survey data between 1991-1996 and 2006-2012 indicates the number of men in the US who have ever bought sex has decreased from 17% to 13.2% (Reyes, 2013).

One major theoretical framework for understanding this data derives from social exchange theory, which has been used to explain sexual behavior broadly, especially partner selection. Generally, this theory draws on economic principles by emphasizing the exchange of material or symbolic resources between people, labeling costs (exchanges that result in loss or punishment), rewards (pleasurable exchanges), and reciprocity. There are multiple kinds of exchange theory, but they share three core assumptions: (1) all social interactions are a kind of social exchange, (2) people seek to maximize their rewards and minimize costs, and (3) when individuals receive rewards, they feel compelled to reciprocate (Sprecher, 1998).

Applied to the commercial sex market, exchange theory posits that when relational, non-commercial sex is viewed as more costly than commercial sex, a buyer will deem prostitution more "cost-efficient" and rewarding. As an explanatory model, social exchange theory obviously falls flat. If sex buying were merely an attempt by men to achieve sexual "cost efficiencies," then a reasonable person would expect all or most men to have paid for sex at least once in their lifetimes, and the prevalence of sex buyers cross-culturally would be nearly identical. According to multiple studies (Ward et al., 2005; Claude, 2010; Axel Månsson, 2004; Shih, 1994; Shively, Wheeler & Hunt, 2012), neither of these findings comes close to holding true.

Another debated framework for understanding buyer behavior is whether these men should fall under a category of "peculiar man" (Farley, 2007; Raymond 2004; Sandell, Pettersson, Larsson, & Kuosmanen, 1996; Vanwesenbeeck, Graaf, Zessen, Straver, & Visser, 1993; Mansson & Linders, 1984) or "every man" (Monto & Milrod, 2013; Pitts, Smith, Grierson, O'Brien, & Misson, 2004). The "every man" narrative is an artifact of Kinsey's early studies of sexuality (Xantidis & McCabe, 2000). Kinsey's research claimed that 69% of American men bought sex at least once in their lifetimes, which led to a hypothesis that sex buying is biologically determined. Kinsey relied on deeply flawed samples of men, undermining most of his findings on sex buying. Yet, the notion that sex buying reflects normative male sexuality has remained pervasive. More recent research on its prevalence raised serious challenges to this claim (Monto 2004).

Monto and McRee (2005) found buyers and non-buyers do not differ significantly in demographic variables, such as age, education, marital status, length of time in relationship, presence of a regular partner, number of children, or occupation. They did find sex buyers were less likely to take on a feminine sex-role orientation and lower social-sexual effectiveness, indicating there may be a level of relational difficulty underlying some sex-buying behavior. Analyzing men attending weekend "john schools," Xantidis and McCabe (2000) found buyers were less likely than non-buyers to be married, be happily married, or be happy in general. They also found buyers were more likely to think about sex and engage in other aspects of the commercial sex industry, plus less likely to think the commercial sex industry is morally wrong.

Weitzer (2009) proposed a "polymorphous paradigm" that would bridge disparate approaches to understanding the commercial sex market as characterized by varied forms of power relationships and experiences. While the polymorphous paradigm captures the diverse experiences of prostituted persons without engaging in reductionism, it highlights an important point: the sex market is always a buyer's market. That term reflects an organization of power dynamics that shapes prostitution transactions in favor of the purchaser.

The circumstances and situations that bring buyers into the sex market are not mediated by the same troublesome influences such as poverty, housing instability, employment opportunities, and traumatic histories that tend to shape prostituted persons' circumstances. In other words, buyers and sellers do not generally come from equivalent material conditions. Weitzer's (2009) polymorphous paradigm helped change the trajectory of prostitution scholarship toward a more balanced, encompassing approach, but it does not offer an explanation of buyer behavior.

Sex buying can also be understood through "deviance" frameworks, in two ways: socially deviant, because it is an illegal activity,[8] and gender deviant, as a demonstrably uncommon masculine behavior. Agnew's (1992) general strain theory identifies three major types of strain that can help explain how sex buying occurs as a masculine, gender-deviant behavior: 1) strain experienced by individuals due to real or anticipated failures in achieving non-deviant goals, causing the person to perceive his only real choices are deviant ones;  2) strain caused by removing positive forces or elements, and 3) strain caused by the introduction of negative forces or elements. These strains create pressure to choose among deviant forms of coping. Broidy and Agnew (1997) even analyzed strain theory in terms of gender and crime, suggesting this framework can be a helpful way to understand why many crimes manifest differently in men and women.

Indeed, Bucher, Manasse, and Milton (2015) found that sex buying can serve as a behavioral coping mechanism to fulfill basic goals like companionship, excitement, and a sexual outlet for men who feel blocked from achieving sexual satisfaction. The authors note this pattern fits with a highly gendered type of strain, whereby certain notions of masculinity are driven by sexual prowess and gendered power dynamics in which men are expected to exert control over their environment. Failing to achieve these expectations can produce a strain that threatens some men's identities; they turn to sex buying to correct it.

---

8    Sex buying is illegal in the US, in all but a few counties in Nevada.

## Appendix B  | Raw Data Findings Cited in Report

FIGURE A



### Respondents Who Have Ever Paid for Sex

YES, This Year
6.2%

YES, But Not
This Year
14.4%

NO
79.4%

FIGURE B



### Number of Times Buyers Paid for Sex in Their Lifetimes

10+
26.4%

1
22.4%

6-10
14.6%

2-5
36.6%

FIGURE C

## Buyer's Age of First Paid Sex Experience



FIGURE D

## Estimated Age of Prostituted Person Most Recently Bought for Sex, According to Buyer



0158

FIGURE E



## Perceived Race/Ethnicity of Prostituted Person Most Recently Bought for Sex, According to Buyer

FIGURE F



## Gender of Prostituted Person Most Recently Bought for Sex, According to Buyer

0159

RESEARCH REPORT | 2018

FIGURE G



Number of Times Active Buyers Paid for Sex
in the Last 12 Months

25-52+
4.7%

6-24
21.5%

1
30.8%

2-5
43.0%

FIGURE H



Race of Respondents

- Never Bought
- Active Low-Frequency Buyers
- Active High-Frequency Buyers
- Former Buyers
- Men Overall

Caucasian: 69.3, 61.4, 46.4, 65.1, 66.9
Black: 10.5, 16.8, 35.3, 12.2, 11.4
Hispanic: 7.6, 16.0, 15.3, 9.5, 9.4
Asian: 4.3, 3.7, 1.3, 2.8, 4.7
Other: 8.2, 2.0, 1.7, 10.4, 7.5

FIGURE I



FIGURE J



FIGURE K



Number of Children in the Respondent's Household

FIGURE L



Education Attained by Respondents

FIGURE M



Political Ideology of Respondents

FIGURE N



Respondents' Frequency of Having Sex in Past 12 Months

0163

**RESEARCH REPORT** | **2018**

**FIGURE O**

## Respondents Diagnosed with Sexually Transmitted Infections (STIs) in Past 12 Months



FIGURE P

## What Respondents Say Would Be Very Important Factors in Deciding to Buy Sex



0165

RESEARCH REPORT | 2018

FIGURE Q

## Path Diagram and Summary Statistics of Intent to Buy Sex Structural Equation Model



Notes: (R2) for endogenous variables, bold lines are indirect relationships, †p<.10, * p<.05, ** p<.001, latent variables in ovals, bootstrapped standard errors, mediation paths in boldface
N=1,776; RMSEA=.032, CFI=.904, TLI=.882; SRMR=.035

0167

**The good news…**

# No buyers,
# no business.

**DEMAND ABOLITION**  is committed to eradicating the illegal commercial sex industry in the US by combating demand for purchased sex and increasing accountability for buyers. We embrace a multisector approach, working closely with an active network of survivor leaders, criminal justice professionals, practitioners, researchers, policymakers, corporate leaders, philanthropists, media, and others.



**For more information contact policy@demandabolition.org**

demandabolition.org

# EXHIBIT 7

U.S. DEPARTMENT OF STATE, TRAFFICKING IN PERSONS REPORT at pg. 27 (2007)

**(0170-0171)**

# EXHIBIT 7

# THE TIERS

**TIER 1**

Countries whose governments fully comply with the Trafficking Victims Protection Act's (TVPA) minimum standards

**TIER 2**

Countries whose governments do not fully comply with the TVPA's minimum standards but are making significant efforts to bring themselves into compliance with those standards

**TIER 2 WATCH LIST**

Countries whose governments do not fully comply with the TVPA's minimum standards but are making significant efforts to bring themselves into compliance with those standards AND:

a) The absolute number of victims of severe forms of trafficking is very significant or is significantly increasing; or

b) There is a failure to provide evidence of increasing efforts to combat severe forms of trafficking in persons from the previous year; or

c) The determination that a country is making significant efforts to bring themselves into compliance with minimum standards was based on commitments by the country to take additional future steps over the next year.

**TIER 3**

Countries whose governments do not fully comply with the minimum standards and are not making significant efforts to do so

Child soldiers are a global phenomenon. The problem is most critical in Africa and Asia, but armed groups in the Americas and the Middle East also unlawfully use children in conflict areas. All nations must work together with international organizations and NGOs to take urgent action to disarm, demobilize, and reintegrate child soldiers.

## Sex Trafficking and Prostitution

Sex trafficking is considered the largest specific subcategory of transnational modern-day slavery. Sex trafficking would not exist without the demand for commercial sex flourishing around the world. The U.S. Government adopted a strong position against prostitution in a December 2002 policy decision, which states that prostitution is inherently harmful and dehumanizing and fuels trafficking in persons.

Prostitution and related activities—including pimping and patronizing or maintaining brothels—encourage the growth of modern-day slavery by providing a façade behind which traffickers for sexual exploitation operate. Where prostitution is tolerated, there is a greater demand for human trafficking victims and nearly always an increase in the number of women and children trafficked into commercial sex slavery. Few women seek out or choose to be in prostitution, and most are desperate to leave it. A 2003 scientific study in the *Journal of Trauma Practice* found that 89 percent of women in prostitution want to escape prostitution but had no other options for survival.

27

0171